# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**GREATER NEW YORK MUTUAL INSURANCE COMPANY,**

                                        **Plaintiff,**                **Case 1:26-cv-00470**

**v.**

**SUBIN ASSOCIATES, LLP,**
**SUBIN & ASSOCIATES LLC,**
**SUBIN, LLP,**
**ERIC SUBIN, PLLC,**
**CERCHIONE HUROWITZ LAW GROUP LLP,**
**HERBERT S. SUBIN,**
**ERIC D. SUBIN,**
**ROBERT EISEN,**
**ARNOLD BAUM,**
**PETER MAY,**
**LAW OFFICES OF GARY S. PARK, P.C.,**
**GARY S. PARK,**
**VILLAMAR & MEWAFY, PLLC,**
**VILLAMAR LAW GROUP PLLC,**
**THE MEWAFY LAW FIRM, PLLC,**
**JAMES S. VILLAMAR,**
**MOHAMED MEWAFY,**
("*Legal Service Defendants*")

**JORGE LUPI a/k/a JORGE A. GONZALEZ-LUPI,**
**J & D INVESTIGATION SERVICES CORP.,**
**AMEDICO LEGAL LLC,**
**AMEDICOLEGAL FUNDING LLC,**
**AMEDICO LEGAL NETWORK LLC,**
**AMEDICO HOLDCO, LLC,**
**M.K.S. CONSULTANTS INC.,**
**LUIS F. DELEON,**
**JOHN DOE NOS. 1-25,**
**XYZ CORPORATION NOS. 1-25,**
("*Runner/Support Defendants*")

**CARTIGA CONSUMER FUNDING, LLC f/k/a PLAINTIFF FUNDING HOLDING, LLC d/b/a LAWCASH,**
**PEGASUS FUND, LLC d/b/a PEGASUS FUND 2022, LLC,**
**NEXIFY CAPITAL LLC,**
**EXPRESS FUNDING OF AMERICA, LLC,**
**CHEROKEE FUNDING II, LLC,**
**XYZ CORPORATION NOS. 26-50,**
("*Funding Defendants*")

**KOLB RADIOLOGY P.C.,**
**THOMAS M. KOLB, M.D.,**
**METRO POINT MEDICAL P.C.,**
**S M B MEDICAL SERVICES P.C.,**
**STEPHANIE BAYNER, M.D.,**
**METROPOLITAN MEDICAL & SURGICAL P.C. d/b/a PAIN**
**MEDICINE OF NEW YORK**,
**MARK GLADSTEIN, M.D.,**
**CONTEMPORARY DIAGNOSTIC IMAGING LIMITED**
**LIABILITY COMPANY,**
**ALKIES LAPAS, D.O.,**
**ADVANCED ORTHOPEDICS AND NEUROSURGERY LLC,**
**SCOTT STEVEN KATZMAN, M.D.,**
**WEST ORANGE SURGICAL CENTER, LLC d/b/a**
**MOUNTAIN SURGERY CENTER,**
**ALEXANDRE B. DE MOURA, M.D., P.C. d/b/a NEW YORK**
**SPINE INSTITUTE,**
**ANGEL EDUARDO MACAGNO, M.D.,**
**ALEXANDRE B. DE MOURA, M.D.,**
**RAND MEDICAL, P.C. d/b/a RAND DIAGNOSTIC**
**IMAGING, P.C.,**
**STEVEN LOSIK, M.D.,**
**MADHU BOPPANA, M.D.,**
**NY ORTHOPEDICS, P.C. d/b/a SPINECARE NYC**
**ORTHOPEDICS d/b/a GERLING INSTITUTE FOR**
**MUSCULOSKELETAL AND NEUROLOGICAL CARE,**
**MICHAEL GERLING, M.D.,**
**SAWEY HARHASH, M.D.,**
**WASHINGTON MEDICAL, P.C.,**
**ALL BORO MEDICAL REHABILITATION PLLC,**
**FELIX KARAFIN, M.D.,**
**KEVIN WEINER, M.D.,**
**SANFORD R. WERT M.D., PC,**
**SANFORD R. WERT, M.D.,**
**NY&NJ ORTHO SPINE, LLC,**
**ROSS SHERBAN, M.D.,**
**ARON ROVNER MD, PLLC,**
**ARON ROVNER, M.D.,**
**MCCULLOCH ORTHOPAEDIC SURGICAL**
**SERVICES, P.L.L.C. d/b/a NEW YORK SPORTS AND**
**JOINTS ORTHOPAEDIC SPECIALISTS,**
**KENNETH MCCULLOCH, M.D.,**
**HASANUZZAMAN MEDICAL CARE P.C., and**
**MOHAMMAD HASANUZZAMAN, M.D.,**
("*Medical Provider Defendants*")

**Defendants.**

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................. 1
II.  JURISDICTION AND VENUE ............................................................................. 2
III. PARTIES ............................................................................................................... 3
   A.  PLAINTIFF ....................................................................................................... 3
   B.  DEFENDANTS ................................................................................................... 3
      i.   Legal Service Defendants .......................................................................... 3
      ii.  Runner/Support Defendants ....................................................................... 8
      iii. Funding Defendants ................................................................................... 11
      iv.  Medical Provider Defendants .................................................................. 12
IV.  FACTUAL BACKGROUND ............................................................................... 21
   A.  THE FRAUD SCHEME ...................................................................................... 21
      a.  Labor Law Lawsuits and Related Workers' Compensation Claims ............ 22
      b.  The Sidewalk Law ..................................................................................... 24
      c.  Personal Injury Lawsuits .......................................................................... 25
      d.  The History of the Fraud Scheme .............................................................. 28
      e.  Defendants' Roles in the Fraud Scheme and the Fraudulent Treatment Protocol ........... 32
   B.  THE ENTERPRISE ............................................................................................ 44
      a.  Subin Defendants ...................................................................................... 57
      b.  The Gatekeeper Clinics ............................................................................. 58
      c.  Kolb Defendants – Fraudulent MRIs ......................................................... 60
      d.  Rand Defendants – Fraudulent MRIs ......................................................... 64
      e.  The Surgeon Defendants ........................................................................... 65
   C.  FRAUDULENT ACCIDENT, TREATMENT AND CLAIM/LAWSUIT IN FURTHERANCE OF FRAUD SCHEME ............................................................................................... 72
      a.  Claimant A (Labor Law Claim) ................................................................ 73
      b.  Claimant B (Trip-and-Fall Claim) ............................................................ 90
      c.  Claimant C (Trip-and-Fall Claim) ...........................................................112
      d.  Claimant D (Labor Law Claim) .............................................................. 124
      e.  Claimant E (Labor Law Claim) ............................................................... 139
      f.  Claimant F (Trip-and-Fall Claim) ............................................................ 156
      g.  Claimant G (Trip-and-Fall Claim) ........................................................... 168
      h.  Claimant H (Trip-and-Fall Claim) ........................................................... 180
      i.  Claimant I (Trip-and-Fall Claim) ............................................................. 191
   D.  PLAINTIFF'S JUSTIFIABLE RELIANCE ............................................................. 201
   E.  DAMAGES ..................................................................................................... 204
V.   CAUSES OF ACTION ...................................................................................... 207
VI.  JURY TRIAL DEMAND ................................................................................... 297

**COMPLAINT**

Plaintiff, GREATER NEW YORK MUTUAL INSURANCE COMPANY ("GNY"), by and through its attorneys, THE WILLIS LAW GROUP, PLLC, alleges as follows:

## I.    PRELIMINARY STATEMENT

1.      GNY was founded in 1914 by immigrant property owners who were systematically excluded from the insurance market. These individuals, many of whom had recently arrived to the United States, came together to create a mutual insurer grounded in fairness and protection for those most vulnerable. Their vision was simple yet profound: to ensure hardworking families, regardless of origin, could safeguard their livelihoods against unforeseen loss.

2.      For more than a century, GNY has honored that founding ethos. It has stood as a bulwark against exploitation, committed to defending its policyholders and upholding the integrity of the insurance system. The immigrant founders of GNY understood vulnerability firsthand. They knew what it meant to navigate unfamiliar laws, languages, and customs while striving to build a better life. Their response was to create an institution that would protect, not prey upon, the vulnerable.

3.      The scheme alleged in this Complaint is the antithesis of those founding principles. Defendants have associated together as an enterprise and orchestrated a fraudulent scheme that targets immigrants and individuals of limited means. In particular, this enterprise (1) recruits members of this vulnerable population to fake injuries and exaggerate accidents, (2) fabricates medical diagnoses and injuries, and (3) uses falsified medical documentation to inflate claims. Defendants then direct claimants to undergo unnecessary and invasive medical procedures, often funded by predatory litigation funding loans controlled by investors, all to create the illusion of

1

catastrophic injuries and drive-up settlement values. These actions are not isolated. Rather, they are part of a coordinated pattern and effort designed to defraud insurers, such as Plaintiff, through sham lawsuits and inflated medical bills.  Through coercion, misinformation, and predatory financial practices, Defendants have transformed the promise of legal redress into a trap, one that leaves Claimants saddled with exorbitant debt, unnecessary surgeries, and shattered trust.

4.      Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., to dismantle this enterprise and recover damages caused by its pattern of racketeering activity, including mail fraud, wire fraud and violations of the Travel Act and Hobbs Act. Plaintiff requests, *inter alia*, treble damages, attorneys' fees, and injunctive relief to prevent further abuse of the judicial system.

5.      The fraudulent scheme described herein weaponizes the courts and medical system to extort settlements from insurers, including Plaintiff, through fear of economic harm, and unnecessarily drives up insurance premiums and the cost of insurance for the public at large. Plaintiff brings this action to expose and dismantle that scheme. In stark contrast to the immigrant-driven mission that gave rise to GNY, Defendants' conduct reflects a calculated effort to enrich themselves at the expense of justice, equity, and human dignity. The law does not and must not countenance such abuse.

## II.      JURISDICTION AND VENUE

6.      This is a civil action arising out of RICO. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, because numerous acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many Defendants reside in this District.

### III.    PARTIES

**A.    PLAINTIFF**

8.     Plaintiff GREATER NEW YORK MUTUAL INSURANCE COMPANY ("Plaintiff" or "GNY") is a domestic corporation, organized and existing under and by virtue of the laws of the State of New York. At all relevant times herein, GNY was licensed to conduct business as an insurance company by the New York State Insurance Department and maintains its principal place of business in the State of New York. GNY maintains an umbrella of underlying entities that are under shared ownership and control, including Greater New York Mutual Insurance Company, Insurance Company of Greater New York, Strathmore Insurance Company, GNY Custom Insurance Company, Greater Mid-Atlantic Indemnity Company, and Greater Midwestern Indemnity Company, which in commerce generally collectively operate under the shared trade name of Greater New York Group.   Since 1914, GNY has been serving its policyholders and is currently the largest insurer of habitational properties in New York City.

**B.    DEFENDANTS**

    i.    <u>Legal Service Defendants</u>

9.     Defendant SUBIN ASSOCIATES, LLP ("Subin Firm") is a limited liability partnership, organized and existing under the laws of the State of New York. At all relevant times herein, Subin Firm maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

10.     Defendant SUBIN & ASSOCIATES LLC is a limited liability company organized and existing under the laws of the State of New York. At all relevant times herein, Subin & Associates LLC maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

11.     Defendant SUBIN, LLP is a limited liability partnership organized and existing under the laws of the State of New York.  At all relevant times herein since around July 10, 2024, Subin, LLP maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

12.     Defendant ERIC SUBIN, PLLC is a professional limited liability company organized and existing under the laws of the State of New York.  At all relevant times herein since around July 10, 2024, Eric Subin, PLLC maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

13.     Defendant CERCHIONE HUROWITZ LAW GROUP LLP ("Cerchione LLP") is a limited liability partnership organized and existing under the laws of the State of New York. At all relevant times herein since around May 28, 2025, Cerchione LLP maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

14.     On information and belief,[1] Defendant HERBERT S. SUBIN ("H. Subin") resides in and is a citizen of the State of New York. H. Subin is Defendant Eric Subin's uncle. At all relevant times until at least the end of 2025, H. Subin is/was a managing partner of Subin Firm. At all relevant times, H. Subin was licensed or otherwise authorized to practice law in the State of

---

[1] Allegations on information and belief are based on facts peculiarly within the possession and control of Defendants.

New York, and, on information and belief, substantially assisted in overseeing, managing, and controlling litigation with Subin Firm, including regarding the Claimants mentioned herein.

15.    On information and belief, Defendant ERIC D. SUBIN ("E. Subin") resides in and is a citizen of the State of New York. E. Subin is H. Subin's nephew. At all relevant times until around the end of 2025, E. Subin was a supervisor, senior partner and member of Subin Firm.  At all relevant times since around July 2024, E. Subin was a member of Subin, LLP and Eric Subin, PLLC. At all relevant times, E. Subin was a member of Subin & Associates LLC, was licensed or otherwise authorized to practice law in the State of New York, and on information and belief, substantially assisted in overseeing, managing, and controlling litigation with Subin Firm, including regarding the Claimants mentioned herein.   On information and belief, E. Subin controlled Subin Firm and its prosecution of Claimants' claims and lawsuits, assigning duties and responsibilities to employees, WC Firms (as defined herein) and Medical Provider Defendants, supervised lawsuits filed on behalf of Claimants by Subin Firm and dictated what steps to take in pursuing those claims, and was the primary liaison between and amongst members of the Enterprise (as defined herein) and in particular Lupi (as defined herein), through WhatsApp messaging, and certain Medical Provider Defendants via email, text and phone calls.

16.    On information and belief, Defendant ROBERT J. EISEN ("Eisen") resides in and is a citizen of the State of New York. At all relevant times until around March 2025, Eisen was a managing attorney for Subin Firm, and, on information and belief, substantially assisted in overseeing, managing, and controlling litigation with Subin Firm, including regarding the Claimants mentioned herein. At all relevant times, Eisen was licensed or otherwise authorized to practice law in the State of New York.

17.     On information and belief, Defendant ARNOLD BAUM ("Baum") resides in and is a citizen of the New York. At all relevant times, Baum was Chief Operating Officer for Subin Firm and and/or Chief Operating Officer and general counsel for Cerchione LLP. At all relevant times, Baum was licensed or otherwise authorized to practice law in the State of New York, and, on information and belief, substantially assisted in overseeing, managing, and controlling litigation with Subin Firm, including regarding the Claimants mentioned herein.

18.     On information and belief, Defendant PETER MAY ("May") resides in and is a citizen of the State of New York. At all relevant times until around January 2025, May was a Directing Attorney for Subin Firm and, on information and belief, was responsible for oversight of all pre-litigation matters, from initial intake through institution of litigation. At all relevant times, Peter May was licensed or otherwise authorized to practice law in the State of New York, and, on information and belief, substantially assisted in overseeing, managing, and controlling litigation with Subin Firm, including regarding the Claimants mentioned herein.

19.     Subin Firm, Subin & Associates LLC, Subin, LLP, Eric Subin, PLLC, Cerchione LLP, H. Subin, E. Subin, Eisen, Baum, May and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Subin Defendants."

20.     Defendant LAW OFFICES OF GARY S. PARK, P.C. ("Park Firm") is a professional corporation organized and existing under the laws of the State of New York. At all relevant times herein, the Park Firm maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

21.     On information and belief, Defendant GARY S. PARK ("Park") resides in and is a citizen of the State of New York. He is the named partner and owner of the Park Firm. At all

relevant times, Park was licensed or otherwise authorized to practice law in the State of New York, and, on information and belief, substantially assisted in overseeing, managing, and controlling litigation with the Park Firm, including regarding Claimant C (as defined herein).

22.    Park Firm, Park and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Park Defendants."

23.    Defendant VILLAMAR & MEWAFY, PLLC ("Villamar Firm") is a professional service limited liability company, organized and existing under the laws of the State of New York. At all relevant times herein, the Villamar Firm maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

24.    Defendant VILLAMAR LAW GROUP PLLC ("Villamar Law") is a professional service limited liability company, organized and existing under the laws of the State of New York. At all relevant times herein, Villamar Law maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

25.    Defendant THE MEWAFY LAW FIRM, PLLC ("Mewafy Law") is a professional service limited liability company, organized and existing under the laws of the State of New York. At all relevant times herein, Mewafy Law maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

26.    On information and belief, Defendant JAMES S. VILLAMAR ("Villamar") resides in and is a citizen of the State of New York. At all relevant times hereto, he was also a named partner and, on information and belief, a managing partner of the Villamar Firm and/or Villamar Law. At all relevant times, Villamar was licensed or otherwise authorized to practice law in the State of New York.

27.     On information and belief, Defendant MOHAMED MEWAFY ("Mewafy") resides in and is a citizen of the State of New York. At all relevant times hereto, he was also a named partner, and, on information and belief, a managing partner of the Villamar Firm and/or Mewafy Law. At all relevant times, Mewafy was licensed or otherwise authorized to practice law in the State of New York.

28.     Villamar Firm, Villamar Law, Mewafy Law, Villamar, Mewafy and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Villamar Defendants."

29.     Subin Defendants, Park Defendants, and Villamar Defendants are collectively referred to as the "**Legal Service Defendants**."

ii.     <u>Runner/Support Defendants</u>

30.     On information and belief, Defendant JORGE A. LUPI a/k/a JORGE GONZALEZ-LUPI ("Lupi") is a citizen of the State of New York.

31.     Defendant J & D INVESTIGATION SERVICES CORP. ("JD Services") is a corporation, organized and existing under the laws of the State of New York. On information and belief, at all relevant times, Lupi operated, controlled, and was the majority owner of JD Services.

32.     Defendant AMEDICO LEGAL LLC ("Amedico") is a limited liability company, organized and existing under the laws of the State of New York. On information and belief, at all relevant times, Lupi operated, controlled, and was majority owner of Amedico.

33.     Defendant AMEDICOLEGAL FUNDING LLC ("Amedico Funding") is a limited liability company, organized and existing under the laws of the State of New York. On information and belief, at all relevant times, Lupi operated, controlled, and was the majority owner of Amedico Funding.

34.     Defendant AMEDICO LEGAL NETWORK LLC ("Amedico Network") is a limited liability company, organized and existing under the laws of the State of Delaware. On information and belief, at all relevant times, Lupi operated, controlled, and was the majority owner of Amedico Network.

35.     Defendant AMEDICO HOLDCO, LLC ("Amedico Holdco") is a limited liability company, organized and existing under the laws of the State of Delaware. On information and belief, at all relevant times, Lupi operated, controlled, and was the majority owner of Amedico Holdco.

36.     Defendant M.K.S. CONSULTANTS INC. d/b/a LATINOS LEGAL CONNECTIONS ("MKS") is a corporation, organized and existing under the laws of the State of New York. On information and belief, at all relevant times, Lupi operated and controlled MKS.

37.     On information and belief, Defendant LUIS F. DELEON ("DeLeon") is and was a citizen of the State of New Jersey.  DeLeon provided notary services to and has also attested to being an "investigator" for Subin Firm.  DeLeon's sister, Geraldine DeLeon, has been named in a RICO suit for services she provided Subin Firm as its operations lead.[2]

38.     At all relevant times herein, Defendants JOHN DOE NOS. 1-25 are persons of unknown citizenship who, along with Defendants Lupi and DeLeon, participated in the fraudulent scheme described herein by recruiting potential Claimants (as defined herein) into staging and/or perpetuating fake accidents at various sites throughout the State of New York and/or signing up Claimants after accidents with minor injuries or no injury, enticed Claimants to pursue claims and undergo surgeries, coached Claimants on how to document their "accidents", including by calling (or having someone else call) an ambulance or first responders to the "accident" location, and/or

---

[2] *See Union Mut. Fire Ins. Co. v. Subin Assocs., LLP*, 25-cv-02652 (E.D.N.Y. May 12, 2025).

how to efficiently malinger a minor incident into surgeries, including by instructing Claimants on what to tell first responders and providers at the emergency room ("ER"), and/or otherwise coordinated the logistics of Claimants' rote protocol medical care and necessary lawsuit involvement, with the knowing cooperation and substantial assistance of Medical Provider Defendants, Legal Service Defendants, and Funding Defendants.

39.     At all relevant times herein, Defendants XYZ CORPORATION NOS. 1-25 are business entities of unknown organization that, along with Defendants JD Services, Amedico, Amedio Funding, Amedico Network, Amedico Holdco and MKS, participated in the Fraud Scheme by recruiting and managing individual Runner/Support Defendants, facilitating Claimants' progress through the Fraud Scheme with Funding Defendants and Medical Provider Defendants (as defined herein), and/or by directly or indirectly diverting funds from lawsuit recoveries back to Legal Service Defendants, through "reimbursement" for "expenses" to compensate various Defendants for their respective roles in the Fraud Scheme.

40.     Lupi, JD Services, Amedico, Amedico Funding, Amedico Network, Amedico Holdco, MKS, DeLeon, John Doe Nos. 1-25, and XYZ Corporation Nos. 1-25 are collectively referred to as the "**Runner/Support Defendants**."

41.     Runner/Support Defendants engaged in numerous acts in furtherance of and as a necessary step for the execution of the Fraud Scheme, including referring and/or transporting Claimants to Legal Service Defendants so that Claimants could retain Legal Service Defendants to a) directing Claimants' medical treatment from Medical Provider Defendants; b) directing Claimants to obtain high-interest funding loans from Funding Defendants; and/or c) directing, authorizing, coordinating and controlling the prosecution of Claimants' personal injury lawsuits and related workers' compensation claims.

10

iii.    <u>Funding Defendants</u>

42.    Defendant CARTIGA CONSUMER FUNDING, LLC f/k/a PLAINTIFF FUNDING HOLDING, LLC d/b/a LAWCASH ("Cartiga") is a limited liability company, organized and existing under the laws of the State of Delaware.

43.    Pegasus FUND, LLC d/b/a PEGASUS FUND 2022, LLC ("Pegasus") is a limited liability company, organized and existing under the laws of the State of Delaware.

44.    On information and belief, Nexify CAPITAL LLC ("Nexify") is a limited liability company, organized and existing under the laws of the State of Delaware.

45.    Defendant EXPRESS FUNDING OF AMERICA, LLC ("EFA") is a limited liability company duly organized and existing under the laws of the State of New York.

46.    Defendant CHEROKEE FUNDING II, L.L.C. d/b/a GAIN ("Cherokee") is a limited liability company duly organized and existing under the laws of the State of Georgia.

47.    At all relevant times, on information and belief, Defendants XYZ CORPORATION NOS. 26-50 are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to Legal Service Defendants, Runner/Support Defendants, the Claimants (defined below) and/or Medical Provider Defendants.

48.    Cartiga, Pegasus, Nexify, EFA, Cherokee, XYZ Corporation Nos. 26-50 and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "**<u>Funding Defendants</u>**."

49.    As part of the Fraud Scheme (as defined herein), Funding Defendants, in concert and with the substantial assistance of Legal Service Defendants, gave money, typically in the form of high-interest litigation funding loans (i.e., "advances") to be secured by the settlement payments anticipated from Claimants' Labor Law and/or trip-and-fall lawsuits. The purpose of the loans was

11

to secure Claimants' cooperation with the scheme. Funding Defendants often paid Medical Provider Defendants upfront for unnecessary and expensive surgeries, which were billed at excessive rates to secure Medical Provider Defendants' cooperation with the scheme. The funds provided to Medical Provider Defendants for these surgeries and other medical procedures, including the funds' usurious interest rate, were recouped from Claimants' settlement proceeds. By securing the cooperation of Claimants and Medical Provider Defendants, Funding Defendants significantly increased the value of Claimants' lawsuits and Legal Service Defendants' contingency fees. This, in turn, astronomically increased the amount(s) that Funding Defendants recovered vis-à-vis Claimants' settlement proceeds.

      iv.    <u>Medical Provider Defendants</u>

     50.    Defendant KOLB RADIOLOGY P.C. ("Kolb Radiology") is a professional corporation, organized and existing under the laws of the State of New York. At all relevant times herein, Kolb Radiology maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

     51.    Defendant THOMAS M. KOLB, M.D. ("Kolb") resides in and is a citizen of the State of New York.  At all relevant times herein, Kolb was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Kolb Radiology.

     52.    Kolb Radiology, Kolb and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Kolb Defendants."

     53.    Defendant METRO POINT MEDICAL P.C. ("Metro Point") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times

herein, Metro Point maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

54.    Defendant S M B MEDICAL SERVICES P.C. ("SMB Medical") is a professional corporation, organized and existing under the laws of the State of New York. At all relevant times herein, SMB Medical maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

55.    Defendant STEPHANIE BAYNER, M.D. ("Bayner") resides in and is a citizen of the State of New York.  At all relevant times herein, Bayner was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Metro Point and SMB Medical.

56.    Metro Point, SMB Medical, Bayner and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Metro Point Defendants."

57.    Defendant METROPOLITAN MEDICAL & SURGICAL P.C. d/b/a PAIN MEDICINE OF NEW YORK ("Metropolitan Medical") is a professional services corporation organized and existing under the laws of the State of New York.  At all relevant herein, Metropolitan Medical maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

58.    On information and belief, Defendant MARK GLADSTEIN, M.D. ("Gladstein") resides in and is a citizen of the State of Florida.  At all relevant times herein, Gladstein was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Metropolitan Medical.

13

59.     Metropolitan Medical, Gladstein and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Metropolitan Medical Defendants."

60.     Defendant CONTEMPORARY DIAGNOSTIC IMAGING LIMITED LIABILITY COMPANY ("Contemporary Diagnostic") is a professional limited liability company, organized and existing under the laws of the State of New Jersey.  At all relevant times herein, Contemporary Diagnostic maintained its principal place of business in the State of New Jersey and was authorized to and did conduct business in the State of New Jersey.

61.     Defendant ALKIES LAPAS, DO ("Lapas") resides in and is a citizen of the State of New Jersey.  At all relevant times herein, Lapas was a physician licensed to practice medicine in the State of New Jersey, and was an owner, operator, officer, director and/or employee of Contemporary Diagnostic.

62.     Contemporary Diagnostic, Lapas and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Contemporary Diagnostic Defendants."

63.     Defendant ADVANCED ORTHOPEDICS AND NEUROSURGERY LLC ("Advanced Ortho") is a professional limited liability company, organized and existing under the laws of the State of New Jersey.  At all relevant times herein, Advanced Ortho maintained its principal place of business in the State of New Jersey and was authorized to and did conduct business in the State of New Jersey.

64.     On information and belief, Defendant SCOTT STEVEN KATZMAN, M.D. ("Katzman") resides in and is a citizen of the State of Florida.  At all relevant times herein,

14

Katzman was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Advanced Ortho.

65.     Advanced Ortho, Katzman and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Advanced Ortho Defendants."

66.     Defendant WEST ORANGE SURGICAL CENTER, LLC d/b/a MOUNTAIN SURGERY CENTER ("Mountain Surgery") is a limited liability company, organized and existing under the laws of the State of New Jersey.  At all relevant times herein, Mountain Surgery maintained its principal place of business in the State of New Jersey and was authorized to and did conduct business in the State of New Jersey.

67.     Defendant ALEXANDRE B. DE MOURA, M.D., P.C. d/b/a NEW YORK SPINE INSTITUTE ("NYSI") is a professional corporation, organized and existing under the laws of the State of New York. At all relevant times herein, NYSI maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

68.     On information and belief, Defendant ANGEL EDUARDO MACAGNO, M.D. ("Macagno") resides in and is a citizen of the State of New York.  At all relevant times herein, Macagno was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of NYSI.

69.     Defendant ALEXANDRE B. DE MOURA, M.D. ("De Moura") resides in and is a citizen of the State of New York.  At all relevant times herein, De Moura was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of NYSI.

70.     NYSI, Macagno, De Moura and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "NYSI Defendants."

71.     Defendant RAND MEDICAL P.C. d/b/a RAND DIAGNOSTIC IMAGING ("Rand") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, Rand maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

72.     Defendant STEVEN LOSIK, M.D. ("Losik") resides in and is a citizen of the State of New York.  At all relevant times herein, Losik was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Rand.

73.     Defendant MADHU BOPPANA, M.D. ("Boppana") resides in and is a citizen of the State of New York.  At all relevant times herein, Boppana was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Rand.

74.     Rand, Losik, Boppana and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Rand Defendants."

75.     Defendant NY ORTHOPEDICS, P.C. d/b/a SPINECARE NYC ORTHOPEDICS d/b/a GERLING INSTITUTE FOR MUSCULOSKELETAL AND NEUROLOGICAL CARE ("Gerling Institute") is a professional service corporation, organized and existing under the laws of the State of New York. At all relevant times herein, Gerling Institute maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

16

76. Defendant MICHAEL GERLING, M.D. ("Gerling") resides in and is a citizen of the State of New York. At all relevant times herein, Gerling was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of the Gerling Institute.

77. Gerling, Gerling Institute and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Gerling Institute Defendants."

78. Defendant WASHINGTON MEDICAL, P.C. ("Washington Medical") is a professional corporation, organized and existing under the laws of the State of New York. At all relevant times herein, Washington Medical maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

79. Defendant SAWEY HARHASH, M.D. ("Harhash") resides in and is a citizen of the State of New York. At all relevant times herein, Harhash was a physician licensed to practice medicine in the State of New York and New Jersey, and was an owner, operator, officer, director and/or employee of the Washington Medical P.C.

80. Harhash, Washington Medical and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Washington Medical Defendants."

81. Defendant ALL BORO MEDICAL REHABILITATION PLLC ("All Boro") is a professional limited liability company organized and existing under the laws of the State of New York. At all relevant times herein, All Boro maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

17

82.     Defendant FELIX KARAFIN, M.D. ("Karafin") resides in and is a citizen of the State of New York.  At all relevant times herein, Karafin was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of All Boro.

83.     Defendant KEVIN WEINER, M.D. ("Weiner") resides in and is a citizen of the State of New Jersey.  At all relevant times herein, Weiner was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of All Boro.

84.     All Boro, Karafin, Weiner and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "All Boro Defendants."

85.     Defendant SANFORD R. WERT M.D., PC ("Wert PC") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, Wert PC maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

86.     Defendant SANFORD R. WERT, M.D. ("Wert") resides in and is a citizen of the State of New Jersey.  At all relevant times herein, Wert was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Wert PC.

87.     Wert PC, Wert and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Wert PC Defendants."

18

88.     Defendant NY&NJ ORTHO SPINE, LLC ("NYNJ Ortho") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, NYNJ Ortho maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

89.     Defendant ROSS SHERBAN, M.D. ("Sherban") resides in and is a citizen of the State of Florida.  At all relevant times herein, Sherban was a physician licensed to practice medicine in the State of New York and New Jersey, and was an owner, operator, officer, director and/or employee of NYNJ Ortho.

90.     NYNJ Ortho, Sherban and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "NYNJ Ortho Defendants."

91.     Defendant ARON ROVNER MD, PLLC ("Rovner PLLC") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, Rovner PLLC maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

92.     Defendant ARON ROVNER, M.D. ("Rovner") resides in and is a citizen of the State of Florida.  At all relevant times herein, Rovner was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Rovner PLLC.

93.     Rovner PLLC, Rovner and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Rovner PLLC Defendants."

94.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, McCulloch Ortho maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

95.     Defendant KENNETH MCCULLOCH, M.D. ("McCulloch") resides in and is a citizen of the State of New York.  At all relevant times herein, McCulloch was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of McCulloch Ortho.

96.     McCulloch Ortho, McCulloch and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "McCulloch Ortho Defendants."

97.     Defendant HASANUZZAMAN MEDICAL CARE P.C. ("Hasanuzzaman PC") is a professional corporation, organized and existing under the laws of the State of New York.  At all relevant times herein, Hasanuzzaman PC maintained its principal place of business in the State of New York and was authorized to and did conduct business in the State of New York.

98.     Defendant MOHAMMAD HASANUZZAMAN, M.D. ("Hasanuzzaman") resides in and is a citizen of the State of New York.  At all relevant times herein, McCulloch was a physician licensed to practice medicine in the State of New York, and was an owner, operator, officer, director and/or employee of Hasanuzzaman PC.

99.     Hasanuzzaman PC, Hasanuzzaman and, where applicable, their agents, servants, employees, and all others acting on their behalf or under their direction and control, are collectively referred to as the "Hasanuzzaman PC Defendants."

20

100.    Kolb Defendants, Metro Point Defendants, Metropolitan Medical Defendants, Contemporary Diagnostic, Advanced Ortho Defendants, Mountain Surgery Defendant, NYSI Defendants, Rand Defendants, Gerling Institute Defendants, Washington Medical Defendants, All Boro Defendants, Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants, McCulloch Ortho Defendants, and Hasanuzzaman PC Defendants are collectively referred to as "**Medical Provider Defendants**."

101.    Legal Service Defendants, Runner/Support Defendants, Funding Defendants, and Medical Provider Defendants are collectively referred to as "**Defendants**."

### IV.    FACTUAL BACKGROUND

#### A.    THE FRAUD SCHEME

102.    Since at least 2018 to the present, and with a significant increase since 2020, Defendants, along with others known and unknown, engaged in a fraudulent scheme to defraud insurers, including Plaintiff, for their own financial gain by: (i) recruiting Claimants[3] to stage and/or perpetuate fake accidents; (ii) misrepresenting pre-existing or degenerative conditions as new acute and causally related injuries, inflating minor or localized injuries into extensive claims, or inventing injuries altogether; (iii) producing and submitting false documents to support meritless personal injury lawsuits, including primarily those involving New York Labor Law and/or trip-and-fall claims; (iv) providing (or purporting to provide) healthcare services to Claimants that were excessive and medically unnecessary; (v) transferring funds—either directly or indirectly—to Defendants and Claimants to support and perpetuate the fraudulent scheme; and/or (vi) using false medical diagnoses and unnecessary treatments to fraudulently inflate the supposed value of personal injury lawsuits (the "Fraud Scheme").

---

[3] As used herein, Claimants refer to claimants who were represented by Subin Firm and who brought claims and/or lawsuits against Plaintiff's insureds.

103.    Although each case may involve complex details, the scheme is simple: recruit claimants, perform unnecessary surgeries, and prolong litigation to secure fraudulent settlements and/or judgments from or against Plaintiff and others. The Claimants were induced to cooperate by promises of monetary windfalls by Subin Defendants from Claimants' lawsuits, which were financed by funding from Funders often timed with, if not directly contingent on, filing suit, and monetized by undergoing needless surgeries at the urging of Legal Service Defendants, Medical Provider Defendants, and Runner/Support Defendants.

104.    The objective of the Fraud Scheme is and was to obtain payments from insurers, including Plaintiff, for fraudulently inflated settlements and/or judgments arising from Claimants' personal injury lawsuits. As detailed herein, the Fraud Scheme directly harmed Plaintiff and others.

a.    Labor Law Lawsuits and Related Workers' Compensation Claims

105.    A worker injured on a construction site in the State of New York can simultaneously pursue a Workers' Compensation Claim and a personal injury lawsuit against an alleged tortfeasor.

106.    A worker injured on a construction site in New York is entitled to prompt indemnity and medical compensation under the New York Workers' Compensation Law. Where the matter in which the worker is injured constitutes a violation of the New York Labor Law, the worker may also be entitled to compensation from the property owner or general contractor through a Labor Law lawsuit.

107.    New York's Labor Law imposes statutory liability on property owners, general contractors, and their agents, including strict liability for violations of N.Y. Labor Law § 240(1) (elevation-related injuries), and liability for violations of N.Y. Labor Law §§ 241(6) (construction, excavation and demolition work) and 200 (general worksite negligence).  Thus, property owners and general contractors are typically named as defendants in Labor Law lawsuits.

108.    Plaintiff primarily insurers property owners and, as such, often bears the brunt of the inevitable Labor Law lawsuit, which is effectively and at least partially financed by the fraudulent workers' compensation claim through payment of Claimants' lost wages and medical treatment.

109.    Pursuant to New York Workers' Compensation Law § 29, the employer or carrier responsible for providing workers' compensation benefits is deemed to have a lien against the proceeds from any settlement or judgment obtained by a related Labor Law lawsuit.

110.    A workers' compensation claim is initiated by filing documents, typically consisting of a C-3 Employee Claim Form (submitted by mail) or EC-3 Employee Claim Form (submitted electronically) (hereinafter, the "C-3 Forms"), with the New York State Workers' Compensation Board ("NY WCB").[4]

111.    The C-3 Forms are typically signed by the claimant and their attorney and typically requires that the claimant "affirms that the information is true and accurate to the best of [their] knowledge and belief."  When represented by counsel, claimants' attorneys must also "certify to the best of [their] knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the allegations and other factual matters asserted [therein] have evidentiary support, or are likely to have evidentiary support after as reasonable opportunity for further investigations or discovery."

112.    The C-3 Forms also contain the following language: "Any person who knowingly and with INTENT TO DEFRAUD  presents, causes to be presented, or prepares with knowledge or belief that it will be presented to, or by an insurer, or self-insurer, any information containing

---

[4] *See* https://www.wcb.ny.gov/content/main/forms/c3.pdf and https://www.wcb.ny.gov/onlineforms/c3/C3Form.html (last visited Jan. 22, 2026).

any FALSE MATERIAL STATEMENT or conceals any material fact, SHALL BE GUILTY OF A CRIME and subject to substantial FINES AND IMPRISONMENT."

113.    The claimant's attorney typically fills out the C-3 Form and other forms to establish injuries to specific body parts and authorize medical treatment and indemnity payments for the Claimant.  These determinations are further made through additional forms and documentation submitted to the NY WCB by and through the Claimant's attorney, as well as directly by treating doctors and facilities.

114.    For Claimants treated by Medical Provider Defendants and represented by Subin Defendants (as well as affiliated and complicit workers' compensation specific law firms, including but not limited to Defendant Villamar Firm (collectively, the "WC Firms")), Medical Provider Defendants and Subin Defendants and/or WC Firms would have necessarily submitted documents to the NY WCB identifying the alleged workplace accident and injuries, as well as submitted forms, records, and billing regarding the medical services provided to such Claimants.

115.    These forms and documentation, when they facially appear to comply with the medical treatment guidelines, are accepted and approved even when the information contained therein is false. Essentially, these Defendants dupe the NY WCB into establishing faked or preexisting, non-causally related injuries and authorizing related medical treatment through rote protocol and checking formulaic boxes, which are then used as affirmative proof in Claimants' related Labor Law lawsuits and to fraudulently inflate any settlement or judgment obtained therefrom.

   b.    The Sidewalk Law

116.    In 2003, New York City passed a law shifting responsibility for maintaining sidewalks from the City of New York to property owners whose property abuts the sidewalks (the

"Sidewalk Law"). Under the Sidewalk Law, owners of commercial buildings and residential buildings with more than three units are required to maintain abutting sidewalks in a reasonably safe condition. As a result, the owners may be sued and held liable for accidents, such as trip-and-falls, caused by defective conditions on such sidewalks. N.Y.C. Admin. Code § 7-210, *et seq*.

117.    New York City also requires owners of commercial buildings and owners of residential buildings with more than three units "to have a policy of personal injury and property damage liability insurance for … liability for any injury to property or personal injury, including death, proximately caused by the failure of such owner to maintain the sidewalk abutting such property in a reasonably safe condition." *Id.* § 7-211.

c.    Personal Injury Lawsuits

118.    Personal injury lawsuits, including those involving Labor Law and trip-and-fall claims, are typically initiated through the filing of a Summons and Complaint in one of the Supreme Courts of the State of New York.  The Complaints are typically verified by the Claimant or their attorney and served upon all parties to the lawsuit.

119.    Once an insurance carrier receives notice of a personal injury claim, it must open a claim and assigns both an adjuster and attorney to administer and defend the claim.

120.    The parties responsible for payment of any monetary recovery because of those lawsuits are the exposed insurance carriers, and/or anyone else, excess carriers, reinsurers, etc., who can or will be required to fund any settlements or judgments.  In many instances, owners of large residential and commercial buildings (i.e., the types of buildings that GNY insures), and their insurance carriers (who can be identified by searching public court records and/or communications amongst plaintiffs' counsel), are the targets for monetary recovery and schemes to defraud such as

the Fraud Scheme alleged herein, as the applicable insurance policies tend to have higher policy limits, as well as excess coverage.

121.    Subsequent to the filing and service of the Summons and Complaint, additional documentation known as original and supplemental Bills of Particulars are prepared, verified by the Claimant or his or her attorney, and served upon all parties to the lawsuit.

122.    Pursuant to Section 3020(a) of the New York Civil Practice Law and Rules ("CPLR"), by verifying a Complaint or Bill of Particulars, the verifying attorney or party, "subscribe[s] and affirm[s] to be true, under penalties of perjury, that the pleading is true to the knowledge of the deponent, except as to matters alleged on information and belief, and that as to those matters, such deponent believes it to be true." Prior to December 21, 2024, such verifications were made under oath.

123.    For all lawsuits filed in New York State Supreme Courts in which negligence is alleged, including personal injury, Labor Law and trip-and-fall lawsuits, a Bill of Particulars must be verified. CPLR § 3044.

124.    Additionally, the Administrative Rules of the Unified Court System & Uniform Rules of the Trial Courts, applicable to Supreme Courts of the State of New York, requires that every "pleading, written motion, and other paper, served on another party or filed or submitted to the court" be signed by an attorney (or a party if not represented by counsel). By signing such paper, the attorney or pro se party certifies that:

> to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the presentation of the paper or the contentions therein are not frivolous as defined in section 130-1.1(c) of this Subpart, and (2) where the paper is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom, and (ii) the matter

26

was not obtained in violation of [the New York State Unified Court System's Rules of Professional Conduct].

22 NYCRR § 130-1.1a(b)

125.    For Claimants represented by Subin Defendants in personal injury lawsuits, Subin Defendants have submitted documents attesting to the alleged accidents, injuries and treatment that were verified and/or certified by one of more of Subin Defendants pursuant to the CPLR and the New York Codes, Rules and Regulations ("NYCRR").

126.    The documentation submitted in the personal injury lawsuits is used as a basis to seek litigation loans, justify medical treatment, obtain reimbursement for medical expenses, make lien payments, make settlement demands, and to quantify damages in connection with settlements and/or judgments.  In the context of Labor Law lawsuits, documentation includes the workers' compensation liens and treatment obtained through workers' compensation claims.

127.    Based on its contractual obligations, Plaintiff has a duty to defend its insureds against claims brought against them, regardless of whether said claims are fraudulent or not.  The longer those claims and lawsuits drag on, the greater the expense(s) incurred by insurers, including Plaintiff.

128.    When the documentation submitted is fraudulent or contains fraudulent information, as is the case in the Fraud Scheme described herein, the settlement demands become exorbitant when they should either be nominal or non-existent.

129.    Moreover, fraudulent information increases claims administration and litigation expenses that would not have been incurred otherwise. Litigation is prolonged, with needless expenses incurred, as a result of the Fraud Scheme.

d.    The History of the Fraud Scheme

130.    Despite Plaintiff's diligent efforts, many of the fraudulent activities undertaken by the participants of the Fraud Scheme were actively concealed and incapable of being discovered with sufficient time to avoid incurring excessive litigation costs.  Plaintiff then ends up on the hook for the cost of any settlement or judgment obtained through fraudulent means, as well as excessive litigation costs, with little ability to adequately defend itself.

131.    Defendants are sophisticated actors with years (if not decades) of knowledge of personal injury claims and the workings of liability insurance policies.  H. Subin, E. Subin, Eisen, Baum and May have been licensed attorneys since 1989, 2012, 1999, 1981 and 1996, respectively, and have coordinated and pursued fraudulent claims with now well-known runner/litigation funder, Lupi and the other Defendants since at least 2018. H. Subin, E. Subin, May, Eisen and Baum are well aware that the pursuit of personal injury claims results in costs well beyond just settlement and award payments, including, *e.g.*, costs for the administration of claims and the defense of lawsuits. By prolonging litigation, an insurer's administration and defense costs necessarily increase.

132.    Many Defendants, including Subin Defendants, have a documented history of engaging in schemes to defraud and, thus, are well acquainted with how to devise and carry out such schemes, including the Fraud Scheme alleged herein.

133.    For example, Subin Defendants have been sued multiple times under RICO for their involvement in schemes to defraud insurers by fraudulently inflating the value of personal injury lawsuits.  To date, Subin Firm has withdrawn from more than 200 personal injury lawsuits in New York, including more than 120 cases during a four-month period between January and May 2024 (shortly after two insurers sent letters to Subin Firm putting them on notice of the extent of

fraudulent claims that they were handling). This does not include additional cases that Subin Firm has suddenly and inexplicably dropped since then, several of which are at issue herein.[5]

134.    Moreover, many Medical Provider Defendants have been sued for their involvement in schemes to defraud, including involving personal injury lawsuits that Subin Firm withdrew from.[6]

135.    In connection with Subin Firm's withdrawal from hundreds of personal injury lawsuits in New York, attorneys for Subin Firm testified in court that there was "a concern with the referral source that got [them] the case, and upon the advice of ethics counsel, [they were] seeking to be relieved from all cases referred to [them] by this referral source", which the Subin Firm attorney identified as at least 200 to 300 cases.

136.    In response to a Court Order, Subin Firm provided the name "Ari Alay" as the referral source for one of their lawsuits, listing his address as "9 Wimbleton Lane, Great Neck, New York" ("9 Wimbleton"), which was the registered address for Lupi's vehicle.

137.    On information and belief, Ari Alay who is also known as Ariel Alayev, has been involved in several insurance fraud schemes and has connections with Lupi, but has never resided at 9 Wimbleton.[7]

138.    As pressure mounted from Defendants in the personal injury lawsuits for Subin Firm to disclose more details regarding its problematic referral source, Subin Firm began filing consents to change attorney, with some dated before their corresponding motions to withdraw as counsel, to avoid disclosing any additional further details regarding their referral source.

---

[5] See Fajardo, supra, Doc Nos. 63 at ¶¶ 12-17; 66; see also EXO Industries Corp. v. Subin Assocs., LLP, Index No. 155432/2024, Doc. No. 2.
[6] See, e.g., Fajardo, supra,  Doc No. 63.
[7] See Solorzano v. 30 Cooper Square P'ship, Index No. 701227/2021, Doc. No. 52 at 3:12–5:4 (Queens Cnty. Sup. Ct., Jan. 6, 2025); see also Urbano Marcelino Contreras Diaz v. Notias Constr., Inc., 817432/2022E, Doc No. 82 (Bronx Cnty. Sup. Ct., Nov. 21, 2022).

139.    Subin Firm's withdrawals, massive and unprecedented as they may be, are performative. The Fraud Scheme continues.

140.    On July 10, 2024, less than four months after two insurers filed their first RICO action in the Eastern District of New York alleging a similar scheme to defraud carried out by other New York-based law firms[8] and shortly after Subin Firm received letters from two insurers notifying it of a recent uptick in fraudulent lawsuits in the construction industry and, specifically, that "records indicate that the highest number of suspected fraudulent cases seem to originate from your law firm," H. Subin and E. Subin established two new entities, Subin, LLP and Eric Subin, PLLC.

141.    Moreover, shortly after the Complaint in *Hajjar, supra,* was filed Subin Firm removed E. Subin from the "leadership" section on its website, May and Eisen left Subin Firm, and the Villamar Firm (the workers' compensation law firm that coordinated and participated in the Fraud Scheme with Subin Firm) shut down its website (vmlawgroup.com).  On information and belief, Defendant Villamar now works at Villamar Law and Defendant Mewafy now works at Mewafy Law.

142.    In May 2025, shortly after Subin Firm was sued for the third time under RICO for a substantially similar scheme to defraud,[9] Subin Firm's now-former managing member, Charles Hurowitz, formed a new entity, Cerchione LLP.  On December 10, 2025, Cerchione LLP filed a certificate of amendment, updating its principal office to 150 Broadway, 23rd Floor, New York, New York – the same building and floor as the principal executive office for Subin Firm and Subin

---

[8] *Roosevelt Road Re, Ltd.. v. Hajjar*, 24-cv-1549 (E.D.N.Y., Mar. 1, 2024).
[9] *See Union Mut. Fire Ins. Co. v. Subin, supra*; *see also Ionian Re, LLC v. Cedillo*, 24-cv-7969 (E.D.N.Y., Nov. 15, 2024); *Roosevelt Road Re, Ltd. v. Subin*, 24-cv-5033 (E.D.N.Y., July 19, 2024).

& Associates LLC, which was formed by E. Subin in 2018. The other named partner of Cerchione LLP is Gregory T. Cerchione, former principal and managing member of Subin Firm.

143. In early January 2026, Cerchione LLP's website (cerchionehurowitz.law) went live and Subin Firm shut down its website (subinlaw.com) and its URL automatically redirected users to the website for Subin, LLP (subin.com), which consisted of only a "coming soon" page.

144. Substantial portions of Cerchione LLP's website are practically (if not entirely) identical to Subin Firm's now-defunct website, including the biographies and photographs for all of its attorneys (all of whom are former employees/members of Subin Firm) and the descriptions of its practice areas. In addition to hiring practically all of Subin Firm's attorneys, on information and belief, Cerchione LLP also hired several former non-attorney employees of Subin Firm, including paralegals, executive assistants and authorized filing agents.

145. Cerchione LLP is now listed as the authorized agent and/or law firm representing plaintiffs in nearly all (if not all) of the personal injury lawsuits formerly handled by Subin, including for Claimants at issue herein.

146. Though no formal dissolution filing had been made as of January 22, 2026, on information and belief, Subin Firm is in the process of dissolution and winding down and is no longer representing any clients.

147. E. Subin ultimately left Subin Firm and now works for Subin, LLP. E. Subin has entered appearances on numerous existing cases and opened new cases in the name of Subin, LLP. Despite having active cases since February 2025, as of early January 2026, Subin, LLP still does not have an active website.

148. Though, as of early January 2026, H. Subin still listed his law firm on New York State Courts Electronic Filing ("NYSCEF") and New York State's Unified Court System as Subin

31

Firm, and he was not listed as an attorney for Cerchione LLP on its website, his appearances on many (if not all) personal injury lawsuits on NYSCEF were updated to indicate "filed by" Cerchione LLP.

149.    Subin, LLP and Eric Subin, PLLC share the same mailing address and are co-debtors on a financing statement filed by Esquire Bank on December 2, 2024, listing as collateral, all of their present and future assets. This credit line was able to be opened (purportedly upon the value of firm inventory) despite that Subin, LLP was not listed as counsel on any cases until February 2025.  Since February 2025, Subin, LLP has appeared in dozens of New York State court lawsuits, including several Claimants.

150.    Cerchione LLP is also a debtor on a financing statement filed by Esquire Bank on December 26, 2025, listing as collateral, all of its present and future assets. This credit line was able to be opened (purportedly upon the value of firm inventory) despite the fact that as of January 5, 2026, Cerchione, LLP was not listed as counsel on any cases.

151.    On information and belief, Subin LLP and Cerchione LLP are mere continuations of Subin Firm, and were created with intent to hinder, delay and defraud Subin Firm's future creditors.

152.    Similarly, Lupi formed at least three additional entities, Amedico Network and Amedico Holdco (formed April 19,2024), as well as Amedico Funding (formed June 21, 2023), and has advertised expansion into five states.

      e.    <u>Defendants' Roles in the Fraud Scheme and the Fraudulent Treatment Protocol</u>

153.    Each of Defendants knowingly played a critical role in the Fraud Scheme, exercising control over their respective functions to advance its objectives. Each Defendant's particular role in and contribution to the Enterprise was necessary and dependent on other

Defendants' performance of their respective roles and contributions. The scheme relied on coordinated, intentional conduct, with all Defendants understanding the shared goal of securing payment on false claims. Each of Defendants, whether through explicit agreement or implicit understanding, consented to and supported the execution of this conduct.

154.    The Fraud Scheme shares many structural elements similar to those found in *United States v. Rainford*, as summarized by the Second Circuit in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

110 F.4th 455, 468 (2d Cir. 2024).

155.    Demonstrative of Subin Defendants' participation in the staging of accidents, on at least three occasions, powers of attorney and/or litigation funding loans were signed by one or more Subin Defendants before Claimants' accidents had even occurred.[10]

156.    Defendants have harnessed the New York state courts to commit fraud and rob Plaintiff and others. This is precisely the concern that Congress expressed when it enacted RICO. "RICO's legislative history shows that Congress was nonetheless concerned about state courts being used to further a violation of RICO and accordingly contemplated that state-court proceedings could be enjoined to 'prevent and restrain violations' of RICO." *State Farm v. Triborough N.Y. Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024).

---

[10] *See infra*; *Union Mut. Fire Ins. Co. v. Subin, supra.*

157.    Runner/Support Defendants, Medical Provider Defendants, and Funding Defendants each provided substantial assistance to Subin Firm, thereby aiding and abetting its conduct. This includes supplying Claimants and submitting falsified documentation essential to executing the Fraud Scheme and securing inflated settlements and/or judgments. In return, Subin Firm aided and abetted these Defendants by referring Claimants and obtaining inflated settlements and/or judgments that were then used to purportedly satisfy Claimants' medical liens and Funding Defendants' litigation loans.

158.    Runner/Support Defendants coordinated, induced, and, in many instances, required Claimants to enter into litigation funding loans with Funding Defendants by offering cash advances at exorbitantly high interest rates (e.g., in excess of 40% per annum) to financially strapped Claimants.

159.    The litigation funding loans were used to pay for Claimants' excessive and unnecessary medical services provided by Medical Provider Defendants and to pay for illicit kickbacks for Defendants' referrals for those services.

160.    Many of the Claimants involved in the Fraud Scheme are undocumented immigrants with limited or no proficiency in English.  In many instances, Claimants were coerced or otherwise incentivized to enter into litigation funding loans with Funding Defendants pursuant to loan agreements that were written entirely in English. Further, Claimants were not informed of the loan terms, including exorbitantly high interest rates, origination and other fees, or that loan funds would be used to reimburse excessive and unnecessary medical services. Each of these significantly reduced Claimants' potential recovery in their personal injury lawsuits. And, in some instances, Claimants were not even aware that litigation funding loans had been taken out in their names.

161.    On information and belief, to conceal the Fraud Scheme, Lupi, Subin Defendants and others agreed that many Claimants Lupi generated would be "referred" by or to other complicit law firms, including but not limited to Defendant Park Firm. Further, the proceeds of the Fraud Scheme paid to Lupi were disguised as seemingly innocuous referral fees in violation of 18 U.S.C. §§ 1956 & 1957. The number of these occurrences are exclusively within the knowledge of Defendants and unable to be ascertained by Plaintiff without discovery.

162.    Defendant Park Firm provided Lupi and Lupi Alter Ego Entities (as defined herein) with a physical office at Park Firm offices, from which they operated and a Park Firm email address that they used.  Park Firm also permitted Lupi to falsely holding himself out as an attorney at Park Firm:

| Claim/ Case #: | ████████ | . | Accident Date: 12/05/2019 |
| Claim Address: | | | |
| Atty: JORGE LUPI ( GARY PARK LAW) | P# | | F# |
| PAT Date & Time: | | | |
| ATTORNEY EMAIL:Jlupi@garyparklaw.com | | | |

163.    Over the course of several years, Lupi repeatedly and unabatedly held himself out as an attorney in the context of managing Claimants' medical care in coordination with Park Defendants and Subin Defendants, as evidenced in court filings in Claimant C's trip-and-fall lawsuit and in RICO lawsuits against Subin Defendants, thus raising serious ethical and legal concerns considering that Lupi is not a licensed New York attorney.  For example, in a record produced by Mountain Surgery filled out by a Claimant (not an exemplar herein) represented by Subin Firm, the Claimant listed Lupi and Amedico Legal as her attorney:



164.    Listing Lupi, a non-lawyer, as the attorney of record in handwritten documentation on multiple surgical records is not merely an anomaly; rather, it suggests misconduct and intentional misrepresentation that undermines the integrity of the legal and medical professions, in likely violation of their respective professional conduct rules and state law.

165.    Lupi and Park Defendants' connection is well-documented and dates as far back as 2016, when Lupi retained Park to represent him in a motor vehicle accident ("MVA"). Park also represented Lupi's now ex-wife in two MVAs.[11] In September 2017, correspondence from Park Firm to a client indicated that Lupi would be picking them up.

166.    The individuals identified as Runner/Support Defendants including Lupi and those acting under his direction and control (e.g., Claimant C), collectively operated in furtherance of and actively participated in the Fraud Scheme by facilitating the recruitment and continued cooperation of Claimants. Acting under the control and direction of E. Subin and H. Subin, and in

---

[11] *See Gonaz*lez-*Lupi v. Gourdet*, Index No. 709105/2016 (Queens Cnty. Sup. Ct., Aug. 3, 2016) (Lupi MVA), *Gonazlez-Lupi v. Castrillo*, Index No. 800331/2019 (Nassau Cnty. Sup. Ct., Aug. 14, 2019) (matrimonial action), *Castrillo v. Burkhardt*, Index No. 706495/2017 (Queens Cnty. Sup. Ct., May 12, 2017) (Lupi's now ex-wife's first MVA), *Castrillo v. Tardieu*, Index No. 709258/2020 (Queens Cnty. Sup. Ct., July 6, 2020) (Lupi's now ex-wife's second MVA).

36

coordination with other members of the Enterprise, these individuals recruited claimants to participate in staging or sustaining fictitious accidents across New York.

167.    Regardless of whether any actual injuries occurred, Claimants were directed by Runner/Support Defendants—acting under the guidance and coordination of Defendants and other unnamed members of the Enterprise—to fabricate and claim specific bodily injuries allegedly sustained in staged construction and trip-and-fall accidents, and to seek corresponding medical treatment.

168.    Runner/Support Defendants then referred and/or transported these Claimants to Subin Firm, where its attorneys and/or other employees, at the direction of and in coordination with Defendants, met with these Claimants.

169.    Lupi was one of the "runners" who, along with individuals acting under his direction and ongoing control—including, but not limited to, Claimant C—recruited Claimants and directed them to Subin Firm and to one or more Medical Provider Defendants. These actions were undertaken on behalf of the Enterprise and, at the direction of and in coordination with, Subin Defendants.

170.    The Subin Firm and its corporate alter-egos, at the direction of and in coordination with other Defendants, represented Claimants and initiated lawsuits and resulting insurance claims filed against the various parties insured by Plaintiff for purported injuries that resulted from workplace and trip-and-fall accidents.

171.    For workers' compensation claims, Subin Firm, at the direction of and in coordination with other Defendants, referred Claimants to complicit WC Firms, who Defendants had an agreement and understanding as to the Fraud Scheme and from whom Subin Firm would receive financial remuneration based on the amount of the settlements obtained by the WC Firms.

172.    In order to inflate the settlement value and workers' compensation benefits, and thereby effectuate higher profit, Runner/Support Defendants and/or attorneys or other employees of Subin Firm, at the direction of and in coordination with other Defendants, directed claimants to seek "treatment" from one or more Medical Provider Defendants who provide a variety of services at facilities primarily in New York and New Jersey.

173.    Medical Provider Defendants also had an agreement and mutual understanding with other Defendants regarding their participation in the Fraud Scheme. This included the provision of fraudulent, unwarranted and/or unnecessary treatment that bore no legitimate connection to any alleged accident. Medical Provider Defendants supplied false and/or misleading medical documentation to Subin Firm, that was utilized to support inflated settlement demands. This conduct was carried out in furtherance of the Fraud Scheme and in exchange for a continued stream of patient referrals and additional financial compensation derived from predatory litigation funding arrangements.

174.    In this respect, the scheme bears striking similarity not only to *Rainford, supra*, and *Tri-Borough*, *supra*, in which certain medical providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." *Id* at 73.  Moreover, similar to *Tri-Borough*, implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…" *Id*. at 74.

175.    Here too, following initial evaluation of Claimants by gatekeeper clinic personnel, one or more Medical Provider Defendants routinely referred Claimants to, inter alia, physical

therapy, injections, and orthopedic and neurology consultations at other Medical Provider Defendants involved in the Fraud Scheme.

176.    Further, one or more Medical Provider Defendants routinely ordered a variety of diagnostic imaging services in every single case—in virtually every instance, these included MRIs of the cervical and lumbar spine, shoulders, and knees—from a handful of different radiologists involved in the Fraud Scheme.  These radiologists then routinely issued diagnostic imaging reports that contained false and/or misleading findings not supported by the underlying imaging studies, and/or omitted/misrepresented degenerative and/or pre-existing conditions as acute and/or causally related to the purported accidents.

177.    Medical Provider Defendants provided false diagnoses, and rendered medical "treatment" that was unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accidents, for which they received compensation through Funding Defendants and via liens on Claimants' files, and increased referral streams.

178.    Moreover, Medical Provider Defendants used the fraudulent diagnostic imaging reports, but not the underlying images which showed either show degenerative conditions or fail to show any evidence of an acute injury, to justify continued physical therapy, injections, and other modalities for Claimants, with the ultimate intent to provide a false justification for extensive back and neck surgeries, shoulder surgeries, knee arthroscopies, etc.

179.    Despite the New York State Surgical and Invasive Procedure Protocol providing "[t]he surgeon is responsible for assessing what films/images are appropriate for viewing before and during the surgery,"[12] Medical Provider Defendants routinely and intentionally failed to consult the diagnostic films, and instead relied only on the diagnostic reports, which were

---

[12] *New York State Surgical and Invasive Procedure Protocol*, N.Y. DEPT. OF HEALTH, September 2006, at 8, available at www.health.ny.gov/professionals/protocols_and_guidelines/surgical_and_invasive_procedure/docs/protocol.pdf.

calculated to misrepresent Claimants' conditions as acute and causally related to the alleged incidents. On information and belief, this practice of willful ignorance was calculated to give otherwise unnecessary procedures a patina of legitimacy because Medical Provider Defendants were able to disregard the non-existent, degenerative, and/or pre-existing nature of Claimants' alleged injuries, which would have been apparent had Medical Provider Defendants simply complied with New York's standard of care and reviewed the films themselves.

180.    This rote protocol treatment of the gatekeeper clinics (e.g., Metro Point, All Boro, Washington Medical and Hasanuzzaman PC) and the fraudulent imaging reports generated by the radiologists (e.g., Kolb Radiology and Rand) were used to justify pre-determined protocol surgeries performed by surgeons (e.g., Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants, Wert PC Defendants, Rovner PLLC Defendants and NYNJ Ortho Defendants) in order to inflate the value of Claimants' personal injury lawsuits.

181.    Each of Medical Provider Defendants understood and agreed that in turn for providing false or misleading medical documentation needed that justified protracted, invasive, and costly medical treatment, Legal Service Defendants, with the assistance of Runner/Support Defendants, would funnel claimants to Medical Provider Defendants.

182.    The designed inflation of the ultimate recovery in the personal injury actions was twofold. The excessive and unnecessary treatment and surgeries performed pursuant to the fraudulent treatment protocol were typically funded through high-interest litigation funding loans from Funding Defendants and/or liens/letters of protection issued by Legal Service Defendants, despite the availability of more affordable options like health insurance or Medicaid.

183.    A Medicaid lien is limited to the amount paid whereas a litigation funding loan can include origination fees and high interest rates that must be paid in addition to the principle amount loaned.

184.    By bypassing standard practices, Medical Provider Defendants charged significantly inflated rates—often several times higher than insurance or Medicaid would allow. These fraudulently inflated medical costs enabled Legal Service Defendants to demand correspondingly higher settlements or judgments. Second, injections and surgeries of Claimants inflate the facial value of otherwise innocuous claims.

185.    Armed with the false and misleading medical diagnoses and related unnecessary and excessive "treatment," Legal Service Defendants fraudulently inflated the value of the personal injury lawsuits in order to extract greater settlements and judgments from insurers, including Plaintiff, and prolong litigation, thereby dramatically increasing defense costs, for insurers, including Plaintiff.

186.    Subin Defendants, in coordination with Medical Provider Defendants, submitted fraudulent documents (e.g., Verified Complaints, Bills of Particulars) by mail or electronic service to all parties to the personal injury lawsuits and others. These documents contained false or misleading statements regarding Claimants' accidents, injuries, and medical treatment. The purpose of these documents was to falsely bolster and increase the value of Claimants' personal injury lawsuits, which inflated the settlement value of Claimants' lawsuits and claims and, thus, Defendants' financial gain from them.

187.    Each Medical Provider Defendant agreed to and in fact provided substantial assistance in the mail and wire fraud arising out of service of the Bills of Particulars in each matter,

providing the falsified content needed to prolong litigation and fraudulently inflate the value of the claims.

188.    Funding Defendants also agreed to and provided substantial assistance through the advancement of funds to Claimants to keep them on the Fraud Scheme track in both cooperation with the fraudulent lawsuits and receiving unwarranted medical treatment and procedures, and through partial payments to Medical Provider Defendants to induce their performance.

189.    The proceeds from the settlement or judgments in the personal injury lawsuits were divided among Defendants to cover artificially inflated "costs" for unnecessary and excessive "services", and pay back the high-interest loans issued by Funding Defendants, often leaving Claimants with a minute fraction of the proceeds and a lifetime of pain and impairment from the "treatment" received in furtherance of the Fraud Scheme at the direction of Legal Service Defendants.  In many ways, the distribution of proceeds to Defendants, and in particular to Runner/Support Defendants, mirrored a pyramid scheme—runners were paid for recruiting Claimants who were then incentivized (including, on information and belief, through promises of financial compensation) to recruit more Claimants.

190.    Many Claimants involved in the Fraud Scheme were assisted by Defendants in obtaining fraudulent work authorization credentials. As part of the Fraud Scheme, Claimants were instructed to fabricate or misrepresent the circumstances of their accidents and injuries, and to undergo a wide array of medical treatments that were unnecessary, excessive, unwarranted, not causally related to their purported accidents, and financially burdensome.

191.    As an inducement to Claimants to falsely attest to accidents and injuries and to undergo unnecessary medical procedures, including surgeries, Defendants offered Claimants cash advances and a percentage of any settlement proceeds. These incentives were provided shortly

after the Claimants retained Legal Service Defendants, and through litigation funding after the commencement of legal proceedings and completion of surgical interventions.

192.    By representing Claimants and pursuing settlements on their behalf, Subin Firm—acting through and in furtherance of the Enterprise and via underlying state court proceedings—earned a percentage of any resulting judgment or settlement as compensation. In addition to these legal fees, Subin Firm and its affiliates obtained further financial benefit through unnecessary litigation funding, which was funneled through various companies. These arrangements ultimately returned funds to Subin Firm and other participants in the Enterprise, to the specific and foreseeable detriment of the Claimants themselves.

193.    By referring Claimants to the WC Firms to pursue workers' compensation benefits on behalf of Claimants, Defendants, by and through Subin Firm and its affiliates, maintained control over treatment allegedly provided while WC Firms earned a certain percentage of the workers' compensation benefit as compensation.

194.    Workers' compensation benefits and settlement values are directly influenced by the extent and severity of the medical treatment claimed. By directing Claimants to undergo unnecessary, excessive and unwarranted healthcare services, Defendants intentionally, fraudulently and unlawfully inflated the value of workers' compensation benefits and, thereby, related lawsuit settlements and judgments. These inflated recoveries financially benefited Subin Firm and other participants in the Enterprise, thereby furthering and perpetuating the scheme.

195.    At all relevant times, and by virtue of the structure and operation of the Fraud Scheme, Defendants were fully aware of and in agreement with one another regarding the Fraud Scheme's illegal objective to defraud Plaintiff and others. Defendants' coordinated conduct reflects their knowing agreement to participate in the Fraud Scheme and their desire for it to

continue in perpetuity. As a result, this illegal conduct has become standard operating procedure of Defendants and the Enterprise.

196.    The intended victims of the Fraud Scheme were the insurance carriers and other payors, such as Plaintiff, who were required to pay Claimants' personal injury settlements and awards.

## B.    THE ENTERPRISE

197.    At all relevant times, Defendants carried out the Fraud Scheme through an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"), with Subin Firm—acting through itself or related corporate alter-ego entities—coordinating the overall operation and directing its individual components, were engaged in activities of which affected interstate commerce, and participated in the operation or management of the Enterprise.

198.    The common, illegal purposes of the Enterprise were to defraud Plaintiff and those similarly situated by making payments for fraudulently induced workers' compensation and Labor Law claims and to coerce personal injury lawsuit settlements and awards through protracted litigation, falsely escalating treatment, and threat of economic harm. In doing so, Defendants took full advantage of the legal duty to defend that insurers bear on behalf of their insureds, as well as good faith duties to protect insureds from excess judgments.

199.    The Enterprise was an ongoing organization with a decision-making and operational structure that, while informal, was coordinated and functioning, including: (i) leadership, management, and pursuit of claims necessary to the Fraud Scheme by Subin Defendants (as to litigation and overall management of the Fraud Scheme, as well as managing the WC firms and the overall Scheme operations through the workers' compensation system); (ii) operators who executed day-to-day acts, including Subin Firm employees, as well as Medical

Provider Defendants who purportedly treated Claimants, but whose true purpose was to provide falsely substantiated clinical, diagnostic, and surgical treatment; and (iii) facilitators who provided financial and logistical support, including Runner/Support Defendants and Funding Defendants. Each Defendant's particular role in and contribution to the Enterprise was necessary and dependent on other Defendants' performance of their respective roles and contributions. The Enterprise used established channels - email, phone, mail, bank wires, and corporate entities - to achieve its common purpose.

200.    The Enterprise is distinct from any single Defendant named herein. Each Defendant is a separate legal/real person who conducted or participated in the conduct of the Enterprise's affairs, not merely Defendants' own affairs. Without each Defendant's contribution and participation in the Enterprise, Defendants could not have profited from the Fraud Scheme.

201.    The Enterprise engaged in and its activities affected interstate commerce, including the use of interstate communications (e.g., mailings, and financial transactions across state lines) and transit to utilize out-of-state surgical centers, such as Mountain Surgery.

202.    Each Defendant so charged in Counts I and III, *infra*, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs by engaging in a pattern of racketeering activity, exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise ("Count I Defendants" and "Count III Defendants"). Each Defendant so charged in Count II, *infra*, agreed to participate in the Enterprise through a pattern of racketeering activity ("Count II Defendants").

203.    From at least 2018 through the present and continuing, Count I Defendants and Count III Defendants committed at least two predicate acts of racketeering within the past ten years, including but not limited to violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud),

§ 1952 (Travel Act violations), and § 1951 (Hobbs Act violations), specifically as pled *infra*. The predicate acts were related (same participants, victims, methods, and purpose) and amounted to, or posed a threat of, continued criminal activity.

204.    The pattern of racketeering activity described above and set forth in detail below reflects continuity in that:

    a.    the predicate acts occurred repeatedly over a substantial period of time – at least 7 years and continuing and were not a single, isolated scheme (closed-ended); and/or

    b.    the Enterprise's regular way of doing business relied on the same unlawful methods and remains ongoing or, at minimum, poses a specific threat of repetition at the time of this filing (open-ended).

205.    The Enterprise is not a mere "rimless hub and spokes" conspiracy. Each Defendant's particular role in and contribution to the Enterprise was necessary and dependent on other Defendants' performance of their respective roles and contributions.

206.    The Enterprise is generally depicted in Figure 1, below, with red arrows signifying each Defendant's participation in the Fraud Scheme and the green arrows signifying the receipt and distribution of Fraud Scheme proceeds.

207.    The members of the Enterprise are and have been joined in a common purpose – to conduct, operate, maintain, and profit from the Fraud Scheme *via* prosecuting fraudulent workers' compensation claims, and personal injury lawsuits that arose out of staged worksite and/or trip-and-fall injuries and were supported by fraudulent legal filings and medical documentation of either unnecessary, unjustified medical treatments and/or outright medical record fabrications, all of which was the for the purpose of defrauding Plaintiff and others similarly situated.

**Figure 1.**



208.    Defendants have operated as a continuing unit since at least 2018 with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose - to defraud insurers, including Plaintiff and others through fraudulent workers' compensation claims and Labor Law and trip-and-fall lawsuits.

209.    Since at least 2018, Subin Firm has been involved in hundreds of lawsuits, the majority of which involved purported worksite and/or trip-and-fall injuries, covered by various

insurers including Plaintiff and others, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

210.    As a necessary step and in furtherance of the Fraud Scheme, Lupi has spent more than a decade generating and securing the continued cooperation of claimants who are willing to have fraudulent workers' compensation claims, and personal injury lawsuits filed and prosecuted on their behalf.

211.    Lupi recruited claimants into staging and/or perpetuating accidents; facilitated and secured their retainer of Subin Firm and other known and unknown law firms affiliated with the Enterprise, including Park Defendants, often contemporaneous with saddling such claimants with litigation funding "advances" with otherwise-usurious interest rates in exchange for purported "broker" fees; coordinated, monitored, and managed the administration of unnecessary and excessive medical treatment for Claimants, and guaranteed payment for such services; provided, received, and facilitated illegal kickbacks and bribes; engaged in money laundering and unauthorized money transmissions; and reinvested proceeds from the Fraud Scheme to expand and sustain the ongoing operations of the Enterprise.

212.    According to court filings, Subin Firm's relationship with Lupi dates back to at least January 2012.[2] Lupi, a convicted felon,[2] was recently deported by the United State government to Venezuela and intends to further relocate to Spain.[3] The subject line of the email from the FBI included as an exhibit was as follows: "Jorge Lupi Indictment and Plea Agreement Runner and Litigation Funder."

213.    Lupi was not an unknown operator to the Enterprise or its members.  Rather, Lupi literally had a "seat at the table" with Subin Firm, attending initial client intake and/or other meetings with claimants and one or more Subin Defendants.

214.    In 2012, Subin Firm undertook representation of a non-claimant who, after retaining legitimate counsel, submitted an affidavit in which he swore that that he was brought to Subin Firm by a person he knew as "Jorge" (on information and belief, Lupi), who told the non-claimant that he "received several thousand dollars from Subin for bringing them the case, which he promised to share but never did", and that the non-claimant met with H. Subin and E. Subin, who informed him that in order to accept his case, he would have to sign a separate agreement that called for him to pay $100,000 out of any money received from his case. The non-claimant further swore that "Subin's office introduced [him] to a legal funding company, and that he "signed numerous agreements, first with one company and then with another" and that he "didn't know or really consider that [he] was borrowing the money at such a high interest rate because Subin always assured [him] that [his] case was worth at least $4 million dollars." "I never expected though that I would end up owing over $5 million dollars to the companies." *DeJesus v. J & A Wine Liquor Corp. et al.*, Index No. 301460/2013E, Doc. No. 15 (Bronx Cnty. Sup. Ct., March 4, 2013).

215.    Claimant B (as defined herein), who retained Subin Firm three days after her purported trip-and-fall accident, testified that she first met Lupi at her initial intake meeting with one or more Subin Defendants and Claimant C had facilitated or arranged the meeting, as demonstrated below:

49

```
insurance, it says "insurer: Subin &

Associates, Jorge Lupi." Who is Jorge Lupi?

     A.     He was in the meeting with

Subin.

     Q.     Were you at that meeting?

     A.     Yes, sir.

     Q.     Why was Jorge Lupi there?

     A.     I don't know.

     Q.     What did you tell them?

     A.     That I had an accident.

     Q.     Who called this meeting?

     A.     My friend Sixto had spoke with,

I don't know who, and they gave me an

appointment.

     Q.     Was this the first time that

you met with Subin?

     A.     Yes, sir.
```

216.    Claimant B testified that Claimant C told her before her initial meeting with Subin

Firm that she would be meeting Lupi there as well:

```
     Q.     Did Sixto Delgado ever talk to

you about Jorge Lupi?

     A.     He talked to me about the

meeting.  He said that we were going to

meet in the meeting.  I was going to meet

him there.
```

217. Claimant B further testified that she continued to communicate with Lupi after that meeting, and that Lupi told her that, if her case was accepted, that he would guarantee medical payments for her treatment.

218. Claimant A (as defined herein) was also referred to Subin Firm by "Jorge", who on information and belief, was Lupi, and thereafter, did not meet with anyone at Subin Firm other than "Jorge."

219. Lupi directed and operated the affairs of the Enterprise through subordinates, including, on information and belief, Claimant C, an uber/livery driver, who is connected to several other claimants represented by Subin Firm, including Claimants B and G (as defined herein).

220. For example, Claimant C was identified as a "witness" in Subin Firm's discovery response for another trip-and-fall Claimant, Jayson Aristizabal-Rodas ("Rodas"). After another firm substituted in as Rodas's counsel in April 2024, Claimant C was removed as a purported "witness."

221. Rodas also has or had multiple "friends" on Facebook with trip-and-fall and other personal injury lawsuits, including at least five "friends" who were represented by Subin Firm.

222. In many instances, Subin Firm has represented claimants who were closely associated and/or related in connection with similar trip-and-fall or other personal injury claims.[13]

223. Lupi also engaged in the aforementioned conduct through various corporate entities and shell companies, including JD Services, Amedico, Amedico Funding, Amedico Network, and Amedico Holdco, as well as entities that were nominally owned by others, but over which Lupi exercised de facto ownership and control, including MKS (collectively, hereinafter referred to as

---

[13] *See, e.g.*, *Taveras v. Tuck-It-Away Associates, L.P.*, Index No. 159848/2022, Doc Nos. 28, 41 (N.Y. Cnty. Sup. Ct.) (discussing two mother and daughter claimants represented by Subin Firm alleging similar injuries in connection with unwitnessed, unreported trip-and-falls occurring 20 days apart); *Exo Industries, supra*, Doc No. 2 at ¶¶ 73-115.

the "Lupi Alter Ego Entities").  On information and belief, MKS is nominally owned by Lupi's girlfriend, Marysela Salinas, who was a plaintiff in a trip-and-fall lawsuit filed in Queens County Supreme Court under Index No. 704784/2018 in which she was first represented by Park Firm before her case was transferred to the Subin Firm. MKS was incorporated on August 30, 2019, just sixteen days after Lupi filed for divorce.

224.    On information and belief, JD Services was initially formed with Lupi's now ex-wife, and was one of the top two "brokers" responsible for "developing" a book of litigation funding loans worth over $22 million through EFA, for which JD Services' purported "broker" fees were in excess of $2 million, which were paid to Lupi, with many of the claimants that entered into such loans arrangements being steered to Subin Firm.

225.    This book of advances ultimately became the subject of litigation between EFA and Cherokee (the purchaser of the receivables) based in part on EFA selling Cherokee "millions of dollars-worth of receivables where the collectability and validity is in doubt because the underlying claims are, on information and belief, tainted by fraud" and Subin Firm's motions to voluntarily withdraw from many of those cases that were brought to Subin Firm through Lupi, as alleged below:

> 84.    Subin Associates, LLP, a New York-based law firm that was representing many of the claimants in connection with Sold Receivables, has filed motions to involuntarily withdraw from many of the cases underlying the Sold Receivables, upon information and belief, over concerns that that certain claims that were brought to it by a runner for the firm, Jorge Lupi, may be fraudulent.
>
> 85.    Upon information and belief, EFA paid nearly two million dollars in broker fees to Mr. Lupi in connection with the Sold Receivables.

226.    In addition to facilitating "origination"-level litigation funding advances, Lupi directed Claimants to medical providers funded by these advances for unnecessary and excessive

healthcare services, thereby inflating claim costs. Through Lupi Alter Ego Entities, Lupi then induced Claimants, who often did not speak any English, to repeatedly "refinance" these advances *via* agreements that were entirely in English, reaping ever-larger "broker" fees. How this played out is both foreseeable and intentional.

227.    For example, Claimant B testified that she did not know how many litigation funding loans she had in connection with her trip-and-fall lawsuit and could not recall how much money she was lent in advances (including whether it was more than $50,000 or $500,000) or signing any litigation funding loan with Cartiga.  According to court filings, Claimant B had at least three litigation funding loans, including with Cartiga.

228.    In litigation commenced against Cartiga by one of its former employees, Kristopher Hassett ("Hassett") alleged, inter alia: Cartiga's "representations would encourage claimants to undergo medical procedures in return for increased personal funding in order to maximize the potential value of their claim"; "during [his] assessment, he discovered that Cartiga was "funding and further supporting [] fraudulent claims"; one partner firm (on information and belief, Subin Firm) "appeared to be all fraudulent"; "approximately $5,500,000.00 were funded against standard underwriting policy"; and "an individual named 'Jorge' [on information and belief, Lupi] was 'creating cases.'"

229.    In a recorded phone call, the transcript of which was appended to Kristopher Hassett's petition, concerns were raised about the involvement of Subin Firm (identified therein as "Sube") in widespread fraud. The conversation focused on the Fraud Scheme, the exploitation of vulnerable individuals, and the belief that such individuals were ill-equipped to deal with figures like Lupi (identified therein as "Jorge Lupe"), who "gets cases funded" and "gets lawyers." *Hassett v. Cartiga, LLC*, Index No. 151064/2024, Doc. No. 4 (N.Y. Cnty. Sup. Ct., Feb. 2, 2024).

230.    During this conversation, an attorney expressed concern about reputational harm and stated a desire to avoid association with "Sube." It was also noted that Lupi was jeopardizing the operation with too many fraudulent claims.

231.    In at least one instance, advances in connection with a litigation funding loan signed by Baum were directed to be made to paulina@amedicolegal.com, the email address for non-party Paulina Hurtado ("Hurtado"), who worked for one or more Lupi Alter Ego Entities.

232.    To the extent that any such litigation funding loan advances were ultimately transferred to Lupi and/or his Alter Ego Entities, they were unauthorized money transmitters in violation of 18 U.S.C. § 1960 (Prohibition of Unlicensed Money Transmitting Businesses).

233.    The use of a Park Firm address, the misrepresentation of Lupi as an attorney, and the act of guaranteeing payments based on false and/or misleading medical provider documentation, including for healthcare services that were unnecessary and excessive, were not isolated incidents, but rather part of a consistent pattern and practice within the operations of the Enterprise.

234.    In furtherance of and in conducting the affairs of the Enterprise, Lupi repeatedly engaged in violations of New York State Penal Law § 215.00 (Bribery of a Witness), which is a Class D Felony under New York law, a predicate act under 18 U.S.C. § 1961(1)(A), and unlawful activity as defined under 18 U.S.C. § 1952.

235.    Lupi, along with other Defendants and members of the Enterprise, in conducting the affairs of and for the benefit of said Enterprise, offered, conferred, or agreed to confer "things of value" to medical providers, including Medical Provider Defendants, and Claimants, in exchange for false and/or misleading statements and testimony that was then used by Legal Service Defendants to fraudulently inflate the settlement and/or judgment value of claimants' personal

injury lawsuits. These inducements included litigation funding advances, current and future referrals, guarantees of payment for medical treatment, and promises of inflated settlements for Claimants. Both groups—medical providers and Claimants—are essential witnesses in the underlying legal proceedings, and these inducements were made with the understanding that such witnesses' testimony would be improperly influenced.

236.    Indeed, the suspicious circumstances surrounding the surgical referrals discussed herein create the plausible inference of a bribery-and-kickback scheme. The consistent pattern of conduct, relationships among the parties, and financial arrangements collectively support the conclusion that improper inducements were systematically used to facilitate and sustain the Fraud Scheme and keep the machinery of the Enterprise operating.

237.    For example, Mountain Surgery is located in New Jersey and owned, in part, by Katzman. With the intent to promote, carry on, or otherwise facilitate such specified unlawful activity above, Lupi, who was located in New York, arranged and coordinated treatment with certain medical providers at Mountain Surgery, including one or more Medical Provider Defendants, for New York-based Claimants to travel to Mountain Surgical. Thereafter, Lupi in fact so promoted, carried on, or otherwise facilitated such specified unlawful activity. Each arranged interstate surgery was therefore a violation of 18 § U.S.C. 1952 (the "Travel Act").

238.    The Subin Firm, also New York-based, coordinated travel for New York-based Claimants to receive unnecessary medical treatments outside the State of New York with the intent to promote, carry on, or otherwise facilitate such specified unlawful activity as described herein. In doing so, Subin Firm necessarily made use of the wires, mail, or otherwise used facilities in interstate commerce, and thereafter in fact so promoted, carried on, or otherwise facilitate such

specified unlawful activity. Each arranged instance of medical travel, particularly the interstate surgeries, were therefore violations of 18 § U.S.C. 1952.

239.    H. Subin, E. Subin, and Lupi have each used the income derived, directly or indirectly, from their patterns of racketeering activity and have used or invested at least part of such proceeds, directly or indirectly, in the establishment or operation of enterprises which are engaged in, or the activities of which affect, interstate or foreign commerce, including, on information and belief, through the formation of the following entities: Subin, LLP, Eric Subin, PLLC, Cerchione LLP, Amedico Network, Amedico Holdco and Amedico Funding.

240.    Likewise, on information and belief, all or part of Villamar Defendants, Subin Defendants and Lupi's ill-gotten profits from the Enterprise were reinvested into Villamar Law and Mewafy Law; Subin, LLP, Eric Subin, PLLC and Cerchione LLP; and Amedico Network, Amedico Holdco and Amedico Funding, respectively.

241.    The purpose of the reinvestment of the Fraud Scheme proceeds, on information and belief, is five-fold: (a) to convey corporate assets before Defendants have a massive, trebled damages, judgment entered against them and/or are subject to pre- or post-judgment asset seizures or restraints (in possible violation of New York's Uniform Voidable Transactions Act); (b) to invest or reinvest Defendants' income from the racketeering activity derived from the Enterprise; (c) fresh corporate books; (d) to perpetuate the Enterprise; and/or (e) to conceal Defendants' involvement in the Fraud Scheme.

242.    Moreover, E. Subin's appearances under the newly formed Subin, LLP (and any appearances by Subin Firm's former attorneys under the newly formed Cerchione LLP) in personal injury lawsuits, including those involving out-of-state treatment, required filings transmitted over the wires, acts with an impact on interstate commerce.

243.    Amedico Network, Amedico Holdco, and Amedico Funding, which Lupi advertises as operating in at least five states, on their face implicate interstate commerce, and on information and belief, their purpose is to perpetuate and expand the Enterprise, and to directly finance fraudulent claims that will increase the number of such claims Plaintiff is damaged by. Thus, Plaintiff has suffered a redressable "investment injury."

a.    Subin Defendants

244.    As set forth above and in detail below, Subin Defendants functioned as the core management, supervisory, and logistical clearinghouse of the Enterprise.

245.    At all relevant times, Subin Defendants directed, authorized, coordinated, and controlled the recruitment of individuals (i.e., Claimants) to stage trip-and-fall and/or worksite accidents and/or falsely claim injuries and undergo invasive treatment unrelated to such accidents.

246.    At all relevant times, Subin Defendants employed Runner/Support Defendants to recruit Claimants to the Fraud Scheme.

247.    At all relevant times, Subin Defendants, in cooperation and mutual understanding with each other, represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of Subin Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to GNY, various courts within the State of New York, and all named parties in those lawsuits.

248.    Subin Defendants, directly and through employed medical coordinators, paralegals and case managers, directed the Claimants to seek medical treatment from Medical Provider Defendants specifically, knowing and understanding that Medical Provider Defendants would

provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to Medical Provider Defendants

249.    Subin Defendants arranged for funding to Claimants to ensure cooperation, and to induce the fraudulent treatment protocols and surgeries by Medical Provider Defendants, needed to accomplish the Enterprise's common purpose.

250.    Subin Defendants caused the creation of and subsequently packaged and presented the fraudulent medical documentation *via* affiliated workers' compensation law firms, including the Villamar Firm, to extort, or attempt to extort, prolong litigation, and defraud Plaintiff and others similarly situated.

b.    The Gatekeeper Clinics

251.    Similar to *Rainford, supra*, Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants are integral to the Fraud Scheme and the Enterprise operations, as they "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." 110 F. 4th at 73. These clinics chart and falsely justify the course of unnecessary diagnostics, escalating treatment, false exhaustion of conservative treatment, and justification for high-dollar valuation surgeries.

252.    As discussed herein, Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants provided falsified documentation to Subin Defendants, and referred Claimants to one or more Medical Provider Defendants, including MRI providers, neurologists and surgeons, in furtherance of the Fraud Scheme and the Enterprise.

253.    As part of the Fraud Scheme, Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants intentionally submitted or

caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement, including from one or more Funding Defendants, for medical services that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accidents.

254.    As part of the Fraud Scheme, Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accidents.

255.    As part of the Fraud Scheme, Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Subin Defendants knowing the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits and related workers' compensation claims, thereby prolonging inflating the settlement value of such lawsuits.

256.    Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants knowingly profited from upfront payment from Funding Defendants and liens for the alleged medical and diagnostic services rendered by these Defendants, which were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accidents, but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

257.    Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme for whom they provided medical and diagnostic services and received reimbursement for such services.

258.    Metro Point Defendants, Washington Medical Defendants, All Boro Defendants and Hasanuzzaman PC Defendants were not sought to treat; they were sought to issue causality statements and set the stage for ever escalating and more invasive treatment to falsely substantiate serious injuries where none exist. Their primary purpose is paper for litigation and subsequent referral for unnecessary MRIs and surgical consults.

259.    All Boro Defendants have been sued for their involvement in RICO schemes to defraud.  *See Union Mut. Fire Ins. Co. v. Subin, supra.*

        c.      Kolb Defendants – Fraudulent MRIs

260.    Kolb, as a radiologist and principal of Kolb Radiology, controlled and directed the medical services provided to patients by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

261.    As part of the Fraud Scheme, Kolb Defendants knowingly and intentionally submitted or caused the submission of fraudulent medical documentation either directly or indirectly to Plaintiff  and others for which Kolb Defendants were paid that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident or did not exist.

262.    Kolb Defendants have repeatedly been named as defendants in fraud and RICO actions wherein the veracity of their MRI readings were called into question.[14]

263.    This is of particular note where (a) Kolb recently failed to renew his authorization, removed from the list of authorized providers for the NY WCB, as of July 1, 2025, and (b) Kolb's own former business partner provided sworn allegations of the following:

> e.    When I was not in the office, Dr. Kolb began using my signature stamp to finalize draft reports authored by me even though I had not finalized the reports.
>
> f.    Dr. Kolb modified MRI reports generated more than six (6) months before to include non-substantive modifications in order to enhance their value in personal injury litigation, in order to ingratiate himself with referring attorneys at the expense of my reputation.

---

[14] *See Roosevelt Road Re, LTD v. William Schwitzer & Assocs., P.C.*, 25-cv-03386 (E.D.N.Y., July 16, 2025); *Union Mut. Fire Ins. Co. v. Subin*, *supra*; *Ionian RE, LLC. v. Gorayeb & Assocs., P.C.*, 24-cv-07098 (E.D.N.Y., October 8, 2024); *Roosevelt Road Re, LTD v. Wingate*, 24-cv-06259 (E.D.N.Y., September 6, 2024); *Union Mut. Fire Ins. Co. v. Kolb Radiology, P.C.*, 24-cv-06082 (E.D.N.Y., August 29, 2024); *Hajjar, supra*; *Julio Cesar PUAC v. BG 37th Avenue Realty LLC*, Index No. 702770/2022, Doc. No. 83 (Third-Party Summons and Complaint) (Queens Cnty. Sup. Ct., Oct. 31, 2024) (alleging that the Kolb Practice fraudulently misrepresented radiological findings to provide a false predicate for surgeries and fraudulently inflate the value of the underlying personal injury lawsuit); *Progressive Adv. Ins. Co. v. Taveras*, Index No. 613233/2024 (Nassau Cnty. Sup. Ct., July 29, 2024) (alleging that Kolb Defendants, among others, obtained patients through a network of runners whom they paid cash in exchange for each insured that they delivered to the healthcare providers, who then submitted large-scale fraudulent billing to insurers); *Progressive Direct Ins. Co. v. Mathieu*, Index No. 612495/2024 (Nassau Cnty. Sup. Ct., July 17, 2024) (same); *Progressive Max Ins. Co. v. Tobon*, Index No. 619488/2023 (Nassau Cnty. Sup. Ct., Nov. 30, 2023) (same); *Progressive Cas. Ins. Co. v. Urgiles*, Index No. 601818/2024 (Nassau Cnty. Sup. Ct., Jan. 31, 2024) (alleging ongoing fraudulent scheme involving, inter alia, staged accidents, illegal referrals and kickbacks, and billing fraud, and alleging that Kolb Radiology made illegal cash payments in exchange for patient referrals and committed billing fraud by performing and billing for multiple needless MRIs and x-rays).

*In re Thomas M. Kolb*, Index No. 653464/2015, Doc. No. 10 at p. 7 ¶ 21(f) (Dec. 12, 2015). (Affidavit of Jacob Lichy, M.D.) (N.Y. Cnty. Sup. Ct., Dec. 3, 2015).

264.    Dr. Lichy also averred that he believed that Dr. Kolb had arranged a "back door" agreement with a marketing "expert" to pay for patient referrals in violation of federal anti-kickback statutes.  *Id.* at pp. 8–9 ¶ 21(n).

265.    It has been confirmed by Kolb's staff that Kolb's practice outside of his breast cancer specialty exists solely to service personal injury attorneys:

> Q    The radiology work he does for neck and back and other orthopedic injuries, that's for litigation work; is that right?
>
> A    Correct.  That's what he does for the MRI practice.  He reviews the body parts, any body part for the facility where I

266.    Kolb has further begun to engage in a disappearing act when called to provide testimony, taking impromptu vacations without informing his staff beforehand where he is going or when he is returning, at the same time as a similarly situated party, and without informing the Court or attorneys on trials scheduled 10 months in advance:

> Additionally, the Court has revisited its earlier determination on the missing witness charge for Dr. Weinstein. The Court found Dr. Kolb's assistant's testimony to be completely incredible, and I suspect that neither Dr. Kolb nor Dr. Weinstein appeared because they didn't want to be subject to cross examination. And for that reason I am going to give a missing witness charge as to both of them. And I wanted to give Counsel for plaintiff notification of that as soon as I changed my mind in the event you can, between now and the end of trial, get either one of them into the courtroom.

267.    Kolb Defendants engage in the simple, yet lynchpin, activity for the Enterprise to function - intentional MRI misreads. *Always* over-identifying or overstating non-existent or minor findings, falsely painting them as traumatic, and omitting indicia of pre-existing or degenerative conditions.

268.    The Kolb Defendants would then transmit this false and/or misleading documentation by mail, facsimile and/or email to Legal Service Defendants and/or other Medical Provider Defendants knowing the fraudulent medical documentation would be used or relied upon to initiate or prolong litigation with inflated settlement demands and render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident or did not exist, including surgery.

269.    The Kolb Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom the Kolb Radiology and Kolb provided imaging and diagnostic services and received reimbursement for such services.

Specifically, Kolb Defendants profited from the increased number of patients that were referred to them in exchange for authoring favorable reports.

        d.    <u>Rand Defendants – Fraudulent MRIs</u>

270.    As part of the Fraud Scheme, Rand Defendants knowingly and intentionally submitted or caused the submission of fraudulent medical documentation either directly or indirectly to Plaintiff and others for which Rand Defendants were paid that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident or did not exist.

271.    As with Kolb Defendants, Rand Defendants engage in the simple, yet lynchpin, activity for the Enterprise to function - intentional MRI misreads; Always over-identifying or overstating non-existent or minor findings, falsely painting them as traumatic, and omitting indicia of pre-existing or degenerative conditions.

272.    The Rand Defendants would then transmit this false and/or misleading documentation by mail, facsimile and/or email to Legal Service Defendants and/or other Medical Provider Defendants knowing the fraudulent medical documentation would be used or relied upon to initiate or prolong litigation with inflated settlement demands and render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident or did not exist, including surgery.

273.    Rand Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom the Rand and Boppana provided imaging and diagnostic services and received reimbursement for such services. Specifically, the Rand Defendants profited from the increased number of patients that were referred to them in exchange for authoring favorable reports.

274.    Defendant Boppana, a principal owner of Rand, has been named as a defendant in several fraud and RICO actions. *See Gov. Employees Ins. Co. v. N. Med., P.C.*, 20-cv-1214 (E.D.N.Y. Mar. 3, 2020).

275.    Losik, a radiologist and employee/principal of Rand, has also been named as a defendant in prior fraud and RICO lawsuits. *See Allstate Ins. Co. v. Radiology of Westchester, P.C.*, 18-cv-2917 (E.D.N.Y. May 16, 2018); *USAA Gen. Indem. Co. v. Westchester Radiology & Imaging, P.C.*, 20-cv-582 (E.D.N.Y. Feb. 3, 2020); *Allstate Ins. Co. v. Offenbacher M.D. PLLC*, 21-cv-1013 (E.D.N.Y. Feb. 25, 2021).

e.    The Surgeon Defendants

276.    Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants, Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants are part of a group of surgeons which have functioned as Subin Firm's go-to surgeons.

277.    Since at least 2018, Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants have been involved in the medical treatment of numerous Claimants involving purported personal injury claims in furtherance of and as a necessary step for the execution of the Fraud Scheme.

278.    Katzman controlled and directed the medical services provided to Claimants by Advanced Ortho, including evaluating, diagnosing, and performing surgeries (including primarily ACDF (as defined herein)) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

279.    Macagno and Moura controlled and directed the medical services provided to Claimants by NYSI, including evaluating, diagnosing, and performing surgeries (including primarily ACDF) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

280.    Gerling controlled and directed the medical services provided to Claimants by Gerling Institute, including evaluating, diagnosing, and performing surgeries (including primarily lumbar surgeries) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

281.    Wert controlled and directed the medical services provided to Claimants by Wert PC, including evaluating, diagnosing, and performing surgeries (including primarily arthroscopies) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

282.    Sherban controlled and directed the medical services provided to Claimants by NYNJ Ortho, including evaluating, diagnosing, and performing surgeries (including primarily ACDF and lumbar surgeries) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

283.    Rovner controlled and directed the medical services provided to Claimants by Rovner PLLC, including evaluating, diagnosing, and performing surgeries (including primarily arthroscopies) that were unnecessary, excessive, unwarranted, and/or costly, and not causally

related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

284.    McCulloch controlled and directed the medical services provided to Claimants by McCulloch Ortho, including evaluating, diagnosing, and performing surgeries (including primarily arthroscopies) that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

285.    As part of the Fraud Scheme, Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement, including from one or more Funding Defendants, for medical services that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident.

286.    As part of the Fraud Scheme, Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers and referred Claimants to MRI providers knowing the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and not causally related to the alleged accident.

287.    As part of the Fraud Scheme, Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC

Defendants and McCulloch Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Subin Defendants knowing the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits and related workers' compensation claims, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

288.    As part of the Fraud Scheme, Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants engaged in the use of interstate facilities and interstate travel with intent to promote, carry on, and/or facilitate the promotion or carrying on of specified unlawful activity and did in fact promote, carry on, and/or facilitate same.

289.    Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants knowingly profited from reimbursements and upfront payments from Funding Defendants for the alleged medical and diagnostic rendered by Advanced Ortho Defendants, NYSI Defendants, Gerling Institute Defendants and Wert PC Defendants, NYNJ Ortho Defendants, Rovner PLLC Defendants and McCulloch Ortho Defendants, that were unnecessary, excessive, unwarranted, and/or costly, and not causally related to the alleged accidents, but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

290.    Katzman recently resigned his authorization to treat injured workers and conduct reviews of records regarding variance requests before the NY WCB, effective October 15, 2024. His resignation followed a string of disciplinary actions by medical oversight commissions in several states, including New York, Florida, Michigan, Georgia, Ohio, and California in 2014 and 2023 through 2025 for, among other things, making "deceptive, untrue, or fraudulent

representations in an operative report" and in or related to the practice of medicine, and failing to obtain informed consent before performing procedures. Katzman has also paid out over $1.6 million in medical malpractice settlements, including two that resulted in patient deaths in Florida alone. As demonstrated herein, Katzman also has direct ties to Subin Firm and Lupi.

291. Gerling Institute Defendants have a history of engaging in similar schemes to defraud insurers. In *Gov't Emp. Ins. Co. v. NY Orthopedics*, the plaintiffs-insurers alleged that since at least 2017, the Gerling Institute Defendants, as well as other professional healthcare companies that Gerling owned and controlled and employees thereof, had engaged in a $2.2 million scheme to defraud in violation of RICO by submitting thousands of fraudulent charges for examinations and surgeries that were not provided and/or were medically unnecessary, and were performed pursuant to a pre-determined protocol, engaging in unlawful self-referrals, and engaging in unlawful patient brokering scheme with two unlicensed individuals through a series of shell companies, through which the defendants received unlawful compensation in exchange for providing unnecessary, invasive and expensive surgeries, which were designed to "artificially drive up the supposed value of the patients' prospective personal injury settlements." 23-cv-7693, ECF No. 1 (Complaint) (E.D.N.Y. Oct. 16, 2023). One of those unlicensed individuals had previously been sued for a similar scheme to defraud and had invoked his Fifth Amendment privilege against self-incrimination in response to virtually every question posed to him at his deposition in connection therewith, resulting in the court awarding summary judgment to the plaintiff on their RICO conspiracy and aiding and abetting fraud claims. *Id.* The unlicensed individuals were alleged to have "solicited payments from a series of personal injury attorneys", who then paid the corporate shell entities for putative "advertising services", but which were in fact for "unlawfully 'brokering' automobile accident victims to the personal injury attorneys." *Id.*

69

"Once the patients were referred by [the unlicensed individuals] to the personal injury attorneys, [the unlicensed individuals] would then cause the patients to enter into financial agreements, whereby the patients would receive cash advances against their prospective personal injury case settlements, which were often tied to the patients' unwillingness to undergo invasive, expensive, and medically unnecessary surgeries; and (ii) [two of the shell companies controlled by the unlicensed individuals] would issue payments – using the funds paid to [the purported "advertising" company that they also controlled] by the personal injury attorneys representing the patients – to surgeons [including Gerling] to incentivize those surgeons to perform invasive, expensive, and medically unnecessary surgeries." *Id.* at ¶¶ 96-97. "Gerling knew the surgeries he performed on these patients were invasive, expensive, and medically unnecessary. Therefore, Gerling entered into an agreement with [the unlicensed individuals and one of their shell companies] whereby: (i) [they], and the various personal injury attorneys would cause patients to be referred to Gerling and [Gerling Institute] for surgical procedures; (ii) [they] would pay Gerling to perform invasive, expensive, and medically unnecessary surgeries; and (iii) in exchange, and as compensation for the referral, Gerling would perform expensive and medically unnecessary surgical procedures." *Id.* at ¶ 98. Among other damning evidence presented in that lawsuit, the plaintiffs-insurers alleged in striking detail, five representative examples of instances where the unlicensed individuals paid Gerling Institute Defendants for cervical discectomy and fusion, and lumbar discectomy surgeries, and included copies of a $33,650.00 check issued by one of the shell companies to the Gerling Institute with "ACDF surgery" written in the subject line, and a $5,000 check to a patient for a purported "loan" as compensation for the ACDF surgery, issued on the same day, as shown below:



*Id.* at ¶¶ 102-105.

292.    More recently, Gerling Institute Defendants were sued for two similar schemes to defraud involving violations of RICO. *See Uber Tech., Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP*, 25-cv-0522, ECF No. 68 (E.D.N.Y., July 23, 2025) (alleging scheme to defraud whereby law firms recruited personal injury claimants to manufacture claims and undergo medically unnecessary treatment, including chiefly, spinal fusion surgeries, by "directly or indirectly making above-market payments" to, among others, Gerling Institute Defendants, "for the corrupt purpose of inducing false diagnoses, false statements, and false testimony" to fraudulently inflate the settlement value of those claims); *Union Mut. Fire Ins. Co. v. Subin*, *supra*, ECF No. 1 (alleging substantially identical scheme to defraud involving Subin Defendants to the scheme alleged herein).

293.    McCulloch Ortho Defendants have been sued multiple times for their involvement in RICO schemes to defraud.  *See American Transit Ins. Co. v. All City Family Healthcare Inc., et al.*, 24-cv-8606 (E.D.N.Y., Dec. 17, 2024) (alleging participation in fraudulent investor/referral

scheme, whereby illegal kickbacks for referrals were disguised as returns on his purported investment in several of ambulatory surgical centers, and fraudulently billed for medically unnecessary procedures); *Roosevelt Road Re, LTD v. Schwitzer, supra*; *Union Mutual Fire Ins. Co. v. Liakas Law, P.C., et al.*, 25-cv-01857 (E.D.N.Y., April 3, 2025); *Roosevelt Road Re, LTD v. Liakas Law, P.C., et al.*, 25-cv-00300 (E.D.N.Y., February 3, 2025).

294.    Rovner PLLC Defendants have been sued multiple times for their involvement in RICO schemes to defraud.  *See Allstate Ins. Co. v. Dr. Ronald P. Mazza D.C., P.C.*, 16-cv-5946, Doc. No. 76 (E.D.N.Y., April 4, 2017) (alleging, inter alia, that Rovner PLLC was fraudulently incorporated); *Gov't Emp. Ins. Co. v. Trnovski*, 16-cv-4662, Doc. No. 75 (E.D.N.Y., July 10, 2018).

295.    Wert PC Defendants have also been sued for their involvement in RICO schemes to defraud.  *See Union Mut. Fire Ins. Co. v. Subin, supra.*

## C.    FRAUDULENT ACCIDENT, TREATMENT AND CLAIM/LAWSUIT IN FURTHERANCE OF FRAUD SCHEME

296.    Defendants engaged in the Fraud Scheme resulting in a hundreds (if not thousands) of fraudulent lawsuits being filed.  In furtherance of and as a necessary step for the execution of the Fraud Scheme, Legal Service Defendants represented the following Claimants who, on information and belief, staged accidents and/or claimed injuries that did not exist or were unrelated to an alleged accidents in claims and lawsuits Legal Service Defendants knew or should have known were fraudulent.  In each case, Medical Provider Defendants provided unnecessary, excessive, unwarranted and/or costly treatment that was not causally related to the alleged accidents.  In several instances, Funding Defendants provided high-interest funding loans to Claimants, the proceeds of which were redistributed among Defendants to the detriment of those Claimants.

297.    The medical treatment of the Claimants was carried out deliberately, intentionally, and with the knowledge and agreement of (and orchestrated by) Subin Defendants, following pre-determined protocols that bore no connection to the alleged accidents.

298.    For each of the Claimants, including those discussed below, one or more Subin Defendants, in coordination with Medical Provider Defendants, and/or their agents, servants, employees, and/or others acting on their behalf or under their direction and control, provided by mail and/or by electronic service to the New York State Courts, Plaintiff, Plaintiff's defense counsel, all named parties in the personal injury lawsuits, NY WCB, Medical Provider Defendants, and/or others, fraudulent documents containing false or misleading assertions regarding Claimants' accidents, the existence of and the extent of Claimants' injuries, and/or the necessity of medical treatment that Claimants required.  The purpose was to falsely bolster and add value to Claimants' personal injury lawsuits and related workers' compensation claims, thereby inflating settlement value and ultimately, Defendants' financial gain.

299.    The following exemplar Claimants represent only a fraction of the participants in the Fraud Scheme between 2018 to present.

      a.    <u>Claimant A (Labor Law Claim)</u>

300.    Claimant Freddy Fajardo ("Claimant A"), who was nineteen (19) years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on debris while working at a construction site at West 79th Street, New York, New York on November 24, 2021.

301.    Similar to the other claimants discussed herein, Claimant A is Hispanic and, at the time of his purported accident, was not a U.S. Citizen, spoke limited (if any) English and had limited financial means.

302.    Upon consulting with one or more Subin Defendants and/or others acting on their behalf, Claimant A's initial complaints, which consisted of neck, low back, right knee, and left leg pain, expanded to include the head, bilateral shoulders, bilateral wrists/hands, bilateral sacroiliac joints, and neurological complaints, resulting in three costly and invasive surgeries, including cervical fusion surgery.

303.    A few months prior to his accident, Claimant A paid a "coyote" a few thousand dollars to be smuggled into the United States.  On information and belief, shortly after arriving in the United States, Claimant A moved in with Erik M. Barrezueta Orellana ("Barrezueta"), another claimant who was represented by Subin Firm in connection with a staged construction accident discussed in a separate RICO action against Barrezueta and Subin Firm, amongst others.[15]

304.    Though he had a workers' compensation claim through which all of his casually related and medically necessary healthcare would have been reimbursed, Claimant A entered into at least two litigation funding loans with Nexify Capital and Pegasus in connection with his purported accident, as evidenced by UCC filings reflecting the same.

305.    Prior to working at the jobsite, Claimant A had been working as a barber at a barbershop in New York.

306.    On information and belief, by March of 2022, Claimant A had resumed work as a barber, as evidenced by a TikTok video, which, on information and belief, was posted by Barrezueta's aunt and depicts him cutting the hair of a likely client.

307.    Nevertheless, Subin Firm served Claimant A's Bill of Particulars, dated September 7, 2023, which indicated that Claimant A "was incapacitated from employment since the date of the accident", "alleged $92,000 and continuing" in lost wages."

---

[15] *See Cedillo, supra.*

(d) Period of time lost from employment: Plaintiff was incapacitated from employment since the date of accident.

(e) Amount of wages lost: Approximately $92,000 and continuing exclusive of overtime, anticipated raises and additional benefits. Plaintiff reserves the right to amend and/or supplement this amount up to and including time of trial.

*Claimant A September 7, 2023 Bill of Particulars*

308.     On information and belief, Claimant A's Bill of Particulars dated September 7, 2023, was not verified by Subin Firm or Claimant A, as required by the CPLR.

309.     When emergency medical services ("EMS") arrived at the scene, Claimant A was located in the stairwell and reported that he tripped and fell down approximately 10 steps but denied losing consciousness. Claimant A was subsequently transported by EMS to Mount Sinai Morningside Hospital.

310.     At the ER, Claimant A reported that he fell approximately 10 steps, and complained of pain in his neck, low back, right knee and left leg, as well as headaches, but once again denied any loss of consciousness. Neither the EMS nor ER records indicate that Claimant A hit his head.

311.     Upon evaluation at the ER, clinical findings included tenderness in the right femur, bilateral knees, right shoulder, cervical and lumbar spine, with abrasions on the back. His head was examined and found to be normal and atraumatic. The claimant denied any prior history of trauma. Diagnostic imaging of Claimant A's head, abdomen/pelvis, right shoulder, spine, and right femur revealed no acute injuries.

312.     Claimant A was discharged from the ER approximately five hours after he arrived, with instructions to follow up with an orthopedist at the hospital, which he did not do, and was not prescribed any medication upon discharge.

313.    On or before November 29, 2021 (three days after his the alleged accident), Claimant A retained Subin Firm to represent him in connection with his Labor Law claim, as is evidenced by a power of attorney, executed by Claimant A and dated November 29, 2021, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records, which was notarized by DeLeon.

314.    At his initial consultation with Subin Firm, Claimant A met with someone named "Jorge" who held himself out as a paralegal for Subin Firm and informed him that his case could have value, and, thereafter, did not meet with any attorneys or anyone else at Subin Firm other than "Jorge."  On information and belief, "Jorge" was Lupi.

315.    The next day, on November 30, 2021, the Villamar Firm certified and filed a C-3 Form, signed by Claimant A, with the NY WCB in connection with Claimant A's purported accident. Per his C-3 Form, Claimant A reported that he was "carrying bricks" when he "fell on staircase" and expanded the scope of his purported injuries to include injuries to his left shoulder and bilateral wrists/hands, despite making no complaints of any injuries to these body parts to EMS or at the ER, as well as injuries to his head, neck, back, and bilateral knees.  In his C-3, Claimant A also reported that he injured his right knee in an MVA approximately two months earlier (in September of 2021), despite having denied any prior trauma at the ER a few days earlier, where he also complained of right knee pain.

316.    Claimant A's recent, pre-existing right knee injury and prior MVA would be rarely (if ever) discussed throughout the course of his treatment for his right knee which ultimately resulted in surgery, and which Claimant A claimed was causally related to his November 24, 2021 accident.

317.    On November 30, 2021 (the same day that he initiated his workers' compensation claim and after he had already retained Subin Firm), Claimant A presented for his first post-hospital treatment at a multidisciplinary clinic located at 59-07 94th Street in Elmhurst, New York (the "59-07 Clinic"), for a physiatry initial consultation with Metro Point, where he was seen by Bayner, and further expanded the scope and severity of his purported injuries.

318.    At the November 30, 2021 visit with Bayner, Claimant A now reported that he fell "head first", and sustaining injuries to multiple body parts, including his head, neck, bilateral knees, bilateral shoulders, and bilateral wrists, and briefly lost consciousness, despite no indications in EMS or ER records that he hit his head or lost consciousness.  Bayner also recorded that Claimant A complained of neck pain radiating into both shoulders and arms, mid and lower back pain, bilateral sacroiliac joint pain, and radiating pain and numbness in both legs at the ER, despite that neither the EMS nor the ER noted any complaints of radiating pain or numbness.

319.    At the November 30, 2021 physiatry initial consultation, Bayner diagnosed Claimant A with many conditions, including post-traumatic headaches, cervical spine pain, bilateral cervicobrachial syndrome, thoracic and lumbar sprains, bilateral sacroiliac joint sprains, and pain affecting the shoulders, wrists, knees, and left ankle, as well as myofascial pain syndrome, and referred for a panoply of diagnostic tests and treatment, including physical therapy, acupuncture, trial of K-laser, FCT (functional capacity training) and algometry, as well as pain medications and muscle relaxers.  Bayner also indicated that he should consider MRIs of the right shoulder and left knee, trigger point injections and joint injections, and administered a trigger point injection to the cervical spine that same day.

320.    Claimant A continued to receive treatment at the 59-07 Clinic and specifically, in Suite E8, through the summer of 2023, including evaluations, office visits, physical therapy,

acupuncture, "high power laser therapy" ("K-Laser"), trigger point injections, and "radial pressure wave therapy" to the aforementioned body parts, administered by Bayner or a nurse practitioner at Metro Point. Claimant A would also undergo EMG studies of his upper and lower extremities at the 59-07 Clinic, performed by Bayner of Metro Point, in August of 2023.

321.    Demonstrative of the fraudulent nature of his purported treatment, the physical therapy session progress notes are virtually identical, and provide little to no insight into what "treatments" were allegedly performed, including by failing to even indicate what areas were treated, other than a reference to pain, tenderness, spasm with regard to either the "LB", "L knee", "R knee", "neck" "R sh", "R shoulder" or "L shoulder", presumably meaning that those were the only body parts treated at those visits. Moreover, other than illegible signatures of the purported rendering provider, none of the physical therapy records indicate the name of the provider or facility that purportedly performed these services.

322.    Though Bayner had only indicated that Claimant A should consider MRIs of his right shoulder and left knee at his initial visit on November 30, 2021, she nevertheless ordered these MRIs, referring him to Rand, before he returned for his first follow-up visit with her.

323.    On December 8, 2021 Claimant A underwent MRIs of his right shoulder and left knee at Rand, interpreted by Losik, which purportedly showed a partial tear of the distal supraspinatus tendon, with impingement of the rotator cuff, fluid and joint effusion for the right shoulder; and an intrameniscal tear in the posterior horn of the medial meniscus and joint effusion in the left knee.

324.    At his first follow-up at Metro Point on December 14, 2021, Bayner also ordered MRIs of the cervical and lumbar spine, referring Claimant A to AMI, and recommended trigger points injections for the neck and back, multiple joint injections and nerve block injection for

headaches, and prescribed migraine medication and topical pain patches, and recommended that he also consider undergoing an EMG.

325.    On January 11, 2022 and January 18, 2022, Claimant A underwent MRIs of his cervical and lumbar spine at AMI, respectively, which purportedly showed herniations at the C5-C6 and C6-C7 levels of the cervical spine and L4-L5 and L5-S1 of the lumbar spine.

326.    At his third follow up visit with Bayner at Metro Point on January 28, 2022, Bayner indicated that she was ordering an MRI of Claimant A's left knee.  However, on February 11, 2022, before his next office visit with Bayner, Bayner referred Claimant A to AMI for MRI of his brain and right knee.

327.    On February 11, 2022, Claimant A underwent an MRI of his right knee and brain at AMI.  According to AMI's MRI report, the right knee MRI showed, at most, a possible sprain and cyst (specifically, "hyperintense PD signal about the anterior cruciate ligament consistent with sprain sequalae" and "parameniscal/popliteal synovial cyst" "near the posterior horn of the medial meniscus").

328.    Notwithstanding that there no evidence of any meniscal tear in his February 11, 2022 MRI for his right knee, at his next office visit at Metro Point on February 25, 2022, the February 11, 2022 MRI was indicated as showing a "medial meniscus tear", and Metro Point repeated this falsity in its reports for Claimant A's subsequent visits with Metro Point to provide a false justification for right knee arthroscopic surgery.

MAGNETIC RESONANCE IMAGING OF THE RIGHT KNEE WITHOUT IV CONTRAST | **EXAM DATE:** | 02/11/2022 9:59 AM

MEDIAL COMPARTMENT: Intact medial meniscus and articular cartilage.

IMPRESSION:
1. Hyperintense PD signal about the anterior cruciate ligament consistent with sprain sequelae.
2. Parameniscal/ popliteal synovial cyst measuring 2.5 x 1.1. cm near the posterior horn of medial meniscus.

*AMI February 11, 2022 MRI Report*

MRI R knee :(2/11/2022) Medial meniscus tear, paramenscal/popliteal cyst. Pls see the full
report

*Metro Point February 25, 2022 Office Visit*

329.    Ultimately, on August 16, 2022, Claimant A underwent arthroscopic surgery of his right knee to purportedly repair a medial meniscus tear, which was performed at Integrated Specialty in Saddle Brook, New Jersey, despite there being no indication on the February 2022 right knee MRI for such surgery.

330.    On information and belief, Claimant A had to travel approximately 24 miles from his residence for right knee arthroscopic surgery of his right knee on August 16, 2022, performed by Integrated Specialty in Saddle Brook, New Jersey.

331.    Though there was no indication in Metro Point's records that Bayner ordered a second MRI of the right shoulder, at Bayner's apparent referral, on April 19, 2022, Claimant A underwent a second MRI of his right shoulder, this time performed by AMI, which, per its MRI report, only showed "mild subluxation of the acromioclavicular joint with significant hypertrophy of the joint capsule" and notably did not show any tears, directly contradicting the December 8, 2021 MRI report of Rand:

IMPRESSION:
1.  Partial tear of the distal supraspinatus tendon.
2.  Low lying acromion with impingement of rotator cuff, in an appropriate clinical setting.
3.  Fluid in the subacromial/subdeltoid bursa suggestive of underlying rotator cuff tears and/or subacromial/subdeltoid bursitis, in an appropriate clinical setting.
4.  Joint effusion consistent with recent trauma or synovitis, in an appropriate clinical setting.

*Rand December 8, 2021 Right Shoulder MRI*

MAGNETIC RESONANCE IMAGING OF RIGHT SHOULDER WITHOUT CONTRAST      EXAM DATE:    04/19/2022 9:29 AM

80

ROTATOR CUFF:

SUPRASPINATUS: The supraspinatus tendon maintains intact tendon fibers. No tendon retraction is found. No skeletal muscle atrophy is seen.
INFRASPINATUS: The infraspinatus tendon maintains intact tendon fibers. No tendon retraction is found. No skeletal muscle atrophy is seen.
TERES MINOR: The teres minor tendon maintains intact tendon fibers. No tendon retraction is found. No skeletal muscle atrophy is seen.
SUBSCAPULARIS: The subscapularis tendon maintains intact tendon fibers. No tendon retraction is found. No skeletal muscle atrophy is seen.

SUBACROMIAL/SUBDELTOID BURSA: No fluid in subacromial-subdeltoid bursa to suggest bursitis.

SYNOVIUM/JOINT FLUID: No joint effusion or synovial thickening.

IMPRESSION:

Mild subluxation of the acromioclavicular joint with significant hypertrophy of the joint capsule.

*AMI April 19, 2022 Right Shoulder MRI*

332.    The results of the April 19, 2022 AMI MRI were consistent with the March 2022 TikTok video of Claimant A, referenced above, where he was observed using both arms to cut a likely client's hair without any apparent issues.

333.    Notwithstanding the results of the April 19, 2022 right shoulder MRI, Metro Point's office visit notes falsely attributed these findings to Claimant A's left shoulder and continued to only report the purported findings of his earlier right shoulder MRI, and repeated this falsity in its reports for Claimant A's subsequent visits with Metro Point to provide a false justification for right shoulder arthroscopic surgery:

MRI R shoulder :(12/8/2021) Partial RCT, bursitis. Pls see the full report
MRI L shoulder :(4/19/2022) mild subluxation of AC joint. Pls see the full report

*Metro Point May 10, 2022 Office Visit*

334.    At Claimant A's initial visit on September 13, 2023 with Rovner, there is only a reference to one MRI that Rovner purportedly reviewed which he described as showing the supraspinatus tear not shown in the April 19, 2022 MRI.

335.    Ultimately, on October 9, 2023, after just one visit with Rovner and despite there being no indication in the April 19, 202 MRI of the right shoulder for such surgery, Claimant A

underwent arthroscopic surgery of his right shoulder to purportedly repair a partial rotator cuff, supraspinatus, subscapularis and anterior labral tears, which was performed by Rovner at Integrated Specialty in Saddle Brook. New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

336.    On information and belief, at the time of the right shoulder surgery, Claimant A and Rovner resided in the State of New York.

337.    On information and belief, Claimant A had to travel approximately 27 miles from his residence in Queens, New York for the right shoulder surgery.

338.    In travelling (and in causing Claimant A to travel) from New York to New Jersey on October 9, 2023 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Rovner thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

339.    On April 27, 2022, Claimant A underwent an MRI of his brain at AMI.  According to AMI's MRI report, the brain MRI was normal (showing "no MR evidence of acute intracranial hemorrhage, or mass effect" and "unremarkable MR brain").

340.    Though Metro Point correctly acknowledged in its reports that the brain MRI was unremarkable, Claimant A continued to receive treatment for alleged neurological issues and, at the apparent referral of his physical therapist (also at Metro Point), was referred to non-party Neurodiagnostics Medical, P.C. where he was seen by non-party Ashwin Malhorta, M.D. on October 20, 2022, for a neuropsychological consultation for a concussion and diagnosed with a traumatic brain injury (TBI), despite no indication in his EMS or ER records that he hit his head

and/or otherwise sustained a concussion. At his visits with Malhorta, Claimant A was now indicated as having fallen a total of "around 16 steps", losing consciousness "for a few minutes", despite having previously indicated that he fell approximately half that distance and prior denials of lost consciousness as indicated in his EMS and ER records.

341.    With regard to Claimant A's neck and low back, following his January 2022 cervical and lumbar spine MRIs, Claimant A underwent lumbar trigger point and epidural injections on March 25, 2022, and cervical trigger point and epidural injections on April 6, 2022, performed by non-parties Daniel Feldman, M.D. and Cristy Purdue. M.D., respectively, of Metropolitan Medical at Triborough ASC, despite no indication that he ever met with anyone at Metropolitan Medical prior to receiving these injections.

342.    Thereafter, on October 10, 2022, Claimant A presented to NYSI, where he was seen by orthopedic surgeon Macagno. Despite this being his first visit with this provider, Macagno indicated that Claimant A was a candidate for extensive cervical and lumbar fusion surgeries, including anterior cervical discectomy and fusion ("ACDF") surgery at C5-C6 and possibly C6-C7, and Claimant A agreed to proceed with the proposed surgery.

343.    On December 21, 2022, Claimant A presented to Advanced Ortho, where he was seen by Katzman. Though this was his first visit with this provider, Katzman recommended extensive cervical spinal fusion surgery (ACDF at C5-C6 and C6-C7).

344.    Claimant A did not see anyone from Advanced Ortho again until on or about March 26, 2023,[16] when he underwent extensive ACDF surgery, including insertion of biomechanical devices and anterior instrumentation and use of allograft and autograft bones, performed by

---

[16] The procedure notes for this surgery contradictorily indicate that it occurred on March 25, 2023 and/or March 26, 2023.

Katzman of Advanced Ortho at Mountain Surgery, in West Orange New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

345.    Claimant A did not understand what this ACDF surgery was, because no one explained this surgery to him in Spanish.

346.    On information and belief, at the time of the ACDF surgery, Claimant A and Katzman resided in the State of New York.

347.    On information and belief, Claimant A had to travel approximately 36 miles from his residence in Queens, New York to New Jersey for the ACDF surgery.

348.    In travelling (and causing Claimant A to travel from) New York to New Jersey on March 26, 2023 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Katzman thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

349.    Katzman did not even attempt to hide the fraud involved. Lupi, a known runner for Subin Firm, is listed twice on Claimant A's forms, dated December 21, 2022, in connection with this surgery:

FAJARDO, FREDDY    (    )
JR HEATHER\r\nSR\r\nLUPI\r\nTRIP AND FALL LOP

350.    In his procedure note for the cervical fusion surgery, Katzman falsely claimed surgery was indicated because Claimant A "failed a conservative treatment approach" and that Claimant A's injuries were casually connected to Claimant A's accident.

351.    According to Advanced Ortho's records, it billed Claimant A **$476,775.20 for this surgery**, despite that Advanced Ortho billed Claimant A for a different amount (**$244,525.20**) for

the same surgery, omitting the CPT Codes for the physician assistant (CPT 22551AS, 22552AS and 22853AS), which, per Advanced Ortho's bill, were billed at the same rate as the surgeon (Katzman).[17]

352.    Advanced Ortho's bill specifically noted that the ACDF surgery was not related to Claimant A's employment (despite that he was alleging a worksite injury), and thus, was not related to his related Labor Law lawsuit, and Subin Firm is referenced on both bills as the insurer.

353.    Prior to this cervical fusion surgery, Katzman had submitted a request for authorization for the surgery to the NY WCB, however, the NY WCB had not approved the surgery as of March 26, 2023, and ultimately denied the request in its entirety after the surgery had already occurred.

354.    On information and belief, the above-referenced bills (as well as other bills including for related anesthesia and/or from Mountain Surgery) were not submitted to Claimant A's workers' compensation carrier and instead were reimbursed through one or more of Claimant A's litigation funding loans, including with Pegasus and/or Nexify, as evidenced by Subin Firm's name on those bills, as well as the UCC filing for Claimant A's litigation funding loan with Nexify, which was filed on January 24, 2023, approximately two months prior to this surgery, and despite that Claimant A had Medicaid at the time.

355.    On November 4, 2024, a UCC filing for Claimant A's second litigation funding loan was filed by Pegasus.

356.    On information and belief, Advanced Ortho's $476,775.20 bill for Claimant A's cervical fusion surgery was far in excess of what any legitimate healthcare providers would bill

---

[17] *Compare Fajardo v. The Board of Managers of the Park Belvedere Condo.*, Index No. 703464/2022, Doc Nos. 96 and 98 (Queens Cnty. Sup. Ct.).

(or what Medicaid or any legitimate health insurance company would ever reimburse) for such surgery.

357.    On August 4, 2023, Claimant A underwent EMG studies of his lower and upper extremities at Metro Point, conducted by Bayner, both of which were interpreted as normal and showing no evidence of lumbar or cervical radiculopathy, peripheral neuropathy, or carpal tunnel syndrome.  On information and belief, despite having recommended EMG studies over a year prior to Claimant A's cervical fusion surgery and at least as early as February 25, 2022, no such studies were performed until after Claimant A's extensive cervical spinal fusion surgery.

358.    On March 20, 2024, Subin Firm filed a Consent to Change Attorney, dated February 12, 2024, substituting Moshe Borukh of Levy Borukh, PLLC as counsel of record for Claimant A.

359.    On November 19, 2024, despite already filing a consent to change and thus having substituted out as counsel of record for Claimant A, Subin Firm filed an order to show cause seeking to withdraw from the case at the advice of ethics counsel because they did "not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct."

360.    Notably, Subin Firm requested that if additional details were required, that the court hold an ex parte hearing and allow them to explain the justifications in camera.

361.    The Subin Firm's request to withdraw was filed just two business days after a RICO complaint was filed in New York federal court against Subin Firm asserting RICO and fraud claims similar to those raised herein.[18]  That complaint specifically identified Claimant A's alleged accident, discussed herein, as being "staged."

---

[18] *See Cedillo, supra.*

362.    On March 3, 2025, defense counsel filed an affirmation opposing Subin Firm's withdrawal, specifically referencing the Ionian lawsuit as well as the suspicious circumstances surrounding Subin Firm's withdrawal.  Specifically, defense counsel provided the Court with a spreadsheet identifying more than 120 cases where Subin Firm sought to withdraw as counsel between January and May 2024.  In virtually every instance, Subin Firm provided the same basis for withdrawal provided in Claimant A's case.

363.    On June 4, 2025, before the Court had ruled on its motion to withdraw, Subin Firm filed yet another Consent to Change Attorney, this time substituting Worley LLC as counsel of record for Claimant A.  In an attempt to explain the apparently duplicative filing, Subin Firm claimed the original Consent was filed mistakenly and should have been filed in another lawsuit that they had purportedly withdrawn from relating to a Claimant with the same name as Claimant A (and specifically referenced as under Index No. 712724/2024).  However, the other Claimant A lawsuit (Index No. 712724/2024), was not even commenced until June 18, 2024 (well after the February 12, 2024 consent to change attorney was executed) and, thus, no consent to change attorney would have been needed for that claimant to change attorneys, thus calling into question the veracity of Subin Firm's proffered explanation.

364.    Despite the above suspicious sequence of events and pending motions by defendants to amend their answer to assert counterclaims sounding in fraud, on June 9, 2025, the Court issued an order permitting Subin Firm to withdraw as counsel.

365.    On June 13, 2025, less than two weeks after appearing as counsel of record for Claimant A, Worley prepared and executed a Stipulation of Dismissal disposing of all claims in the underlying lawsuit with prejudice.

366.     In creating the multitude of falsified reports purporting to support that the ACDF surgery performed on Claimant A, who had no objective signs of acute injury on the date of accident, was medically necessary, Advanced Ortho Defendants knew or should have known such records to be false, and further knew or should have known such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and/or transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

367.     In creating the multitude of falsified reports purporting to support that the right shoulder surgery performed on Claimant A, who had no objective signs of acute injury on the date of accident, was medically necessary, Rovner knew or should have known such records to be false, and further knew or should have known such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and/or transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

368.     In creating the multitude of falsified reports purporting to support that the surgeries, injections and treatment performed on Claimant A, who had no objective signs of injury on date of accident, was plausibly justified, Metro Point Defendants, Rand Defendants, NYSI Defendants and Mountain Surgery knew or should have known such records to be false, and further knew or should have known, such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the

underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

369.    On February 15, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified and filed a Verified Complaint on behalf of Claimant A, alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant A "sustained serious injuries" and "was rendered, sick, sore, lame and disabled" by the events of November 24, 2021, whereafter Claimant A showed no objective sign of any injury.

370.    On or about March 27, 2023, at the direction of H. Subin, E. Subin,  Eisen, Baum, and/or May, an attorney of Subin Firm signed and mailed and/or emailed the Bill of Particulars on behalf of Claimant A, alleging that Claimant A suffered injuries to his cervical spine, lumbosacral spine, bilateral shoulders, bilateral knees, as well as various head injuries, including post-concussion syndrome, as a result of the events of November 24, 2021, whereafter Claimant A showed no objective sign of any injury.

371.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

372.    In performing the utterly unjustified and/or unrelated ACDF surgery, Advanced Ortho Defendants, in agreement and with the assistance of Subin Firm, Metro Point Defendants, Rand Defendants and NYSI Defendants, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

373.    In performing the utterly unjustified and/or unrelated right shoulder surgery, Rovner, in agreement and with the assistance of Subin Firm, Metro Point Defendants, Rovner PLLC Defendants, and Rand Defendants, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

b.    Claimant B (Trip-and-Fall Claim)

374.    Claimant Gina Lombana ("Claimant B"), who was thirty-seven years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a raised sidewalk flag at 4045 Elbertson Street, Queens, New York, on November 27, 2021.

375.    Claimant B is Hispanic and, at the time of her purported accident, was not a U.S. citizen, spoke limited (if any) English and had limited financial means.  Claimant B testified that she came to the United States a few months prior to her purported accident, and specifically in April 2021.

376.    Claimant B did not seek or obtain any medical treatment immediately following her purported accident, notwithstanding later claiming in her lawsuit that her injuries were so severe as to warrant four separate surgeries (right knee arthroscopy, cervical fusion surgery, lumbar fusion surgery, and a complete coccygectomy (i.e., removal of the tailbone)).

377.    Prior to her purported accident, Claimant B underwent at least seven extensive cosmetic surgeries.  Medical records indicate Claimant B underwent tummy tuck surgery in 2005, BBL (Brazilian Butt Lift) surgery in 2010, and rhinoplasty, face-lift, and breast augmentation surgeries in 2021.  According to the report from her IME in the underlying lawsuit, Claimant B also underwent arm plastic surgery (brachioplasty) and had a second breast implant surgery.

378.    The day following her alleged accident (November 28, 2021), Claimant B presented to the ER at Elmhurst Hospital, complaining of pain in her right shoulder, right hand, right wrist, right hip, right knee, diffuse back pain, and headaches. Examination revealed that Claimant B was in no apparent distress and further revealed full passive range of motion of her right shoulder and her right knee with no effusion. The ER records indicated some tenderness, but no swelling and normal range of motion. Claimant B's cervical back was defined as "normal range of motion and neck supple."  Notably, Claimant B **made no complaints of any injuries or pain to her neck while in the ER and denied any loss of consciousness**. X-rays of Claimant B's right knee and right arm performed in the ER were all "unremarkable," and Claimant B was discharged shortly after with instructions to take Tylenol and/or Ibuprofen for pain. Claimant B utilized her Medicaid to pay for her ER visit.

379.    On or before November 30, 2021 (three days after her alleged accident), Claimant B retained Subin Firm to represent her in connection with her trip-and-fall claim, as evidenced by a power of attorney, executed by Claimant B and dated November 30, 2021, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain her medical and other records, which was notarized by DeLeon.

380.    As discussed above, Claimant B testified at her deposition that her "friend", Claimant C, referred her to Subin Firm.

381.    On December 2, 2021, after retaining Subin Firm, Claimant B presented to non-party JPM Physical Therapy, P.C. ("JPM") at a multidisciplinary clinic, located at 40-11 Warren Street, in Elmhurst, New York (the "40-11 Warren Clinic") for her first post-hospital visit, whereat she was seen by a physical therapist for an initial physical therapy evaluation, and expanded the scope and severity of her purported injuries.  At this visit, Claimant B complained of 7-9/10 pain

to her neck, as well as her upper back, mid back, low back, right shoulder, right wrist, and bilateral knees, despite making no complaints of neck pain in the ER and also underwent her first physical therapy treatment session.

382.    On information and belief, by the time of her December 2, 2021 visit, Claimant B had already entered into a litigation funding loan and/or a lien arrangement, facilitated by Subin Firm and/or Lupi.

383.    On information and belief, all (or nearly all) of Claimant B's purported treatment in connection with her purported trip-and-fall accident rendered on and after December 2, 2021, was thereafter billed and paid for through the litigation funding loans and/or lien arrangements, despite that Claimant B had Medicaid during this time.

384.    On December 8, 2021, Claimant B had an initial examination at the 40-11 Warren Clinic with Hasanuzzaman, whereat she was seen by a nurse practitioner, and complained of pain to her head, neck, upper, middle, and lower back, chest, bilateral shoulders, right wrist, right hand, left thigh, right knee, and left leg. Claimant B now reportedly indicated loss of consciousness, and was referred for panoply of diagnostic tests and treatment, including MRIs of her brain, bilateral shoulders, and right knee at non-party Aris Diagnostic Medical, P.C. ("Aris"), an orthopedic surgeon, a neurologist, a chiropractor, an acupuncturist, pain management, and a physical therapy evaluation (despite that Claimant B had already purportedly underwent a physical therapy evaluation on December 2, 2021).

385.    On December 14, 2021, Claimant B returned to the 40-11 Warren Clinic for a chiropractic initial exam with non-party Liberty Park Chiropractic, P.C. ("Liberty Park"), whereat she was purportedly seen by non-party Edward Desvernine, D.C. ("Desvernine"). According to the treatment notes, Claimant B complained of neck, mid-back, low back, right shoulder and

bilateral knee pain, but reported no loss of consciousness, and was referred for MRIs of her cervical, thoracic and lumbar spine, and chiropractic treatment for 6-8 weeks at 2x per week. Claimant B declined the lumbar spine MRI, indicating that it was her thoracic spine that hurt. Claimant B commenced chiropractic treatment that same day (December 14, 2021) and underwent a total of 12 chiropractic treatment sessions, with her last treatment on May 26, 2022.

386.    Demonstrative of the fraudulent nature of his purported treatment, all of Claimant B's chiropractic treatment, occurred on the same dates that she purportedly also underwent physical therapy, and all of the chiropractic session notes are identical, including the trigger points, objective findings, pain levels for her neck, mid-back, and low back were rated at eight (i.e., "severe pain"), despite that on many of these dates, her physical therapist progress notes indicated that her pain was "moderate" or "mild."  Each and every chiropractic session progress note is identical.

387.    On January 20, 2022 Claimant B returned to the 40-11 Warren Clinic for an initial orthopedic consultation with non-party Christopher Durant, M.D. ("Durant") of non-party CitiMed Complete Medical ("CitiMed"), whereat Claimant B reported that she "fell on both her knees" and also strained her right shoulder, and was recommended to undergo steroid injections for her right shoulder (which Claimant B refused "due to side effects") and referred for an MRI of the left knee.

388.    On January 25, 2022, Claimant B was seen by Katzman of Advanced Ortho at 535 Fifth Avenue, New York, New York, whereat she complained of 10/10 pain for her neck, mid and low back, and was recommended cervical facet blocks and was referred for an MRI of her lumbar spine.

389.    On January 4, 2022 and February 1 2022, Claimant B underwent MRIs of her right shoulder, cervical spine, thoracic spine and brain, and lumbar spine, respectively, at Aris.  Claimant

93

B also underwent MRIs of her right and left knees at non-party Fast Care Medical Diagnostics ("Fast Care") on January 19, 2022 and February 15, 2022, respectively.

390.    Though records from Liberty Park indicated that an MRI of Claimant B's lumbar spine would not be performed and the only other doctor that referred her for a lumbar spine MRI was Katzman of Advanced Ortho, "Dr. Wassef" was listed as the referring provider on Claimant B's lumbar spine MRI, with his listed phone number (929-429-2300), which matches the phone number on public records for Hasanuzzaman.  On information and belief, Claimant B never treated with Dr. Wassef.

391.    According to the MRI reports of Aris and Fast Care: (i) the right shoulder MRI showed mild hypertrophy of the acromioclavicular capsule mainly projecting superiorly, mild capsular hypertrophy abuts the bursal surface of the supraspinatus muscle, and a small amount of fluid in the subcoracoid portion of the shoulder joint; (ii) the right knee MRI showed a grade III full thickness ACL tear and flap tear involving the posterior horn of the lateral meniscus; (iii) the left knee MRI showed small knee effusion and question of a linear area of decreased signal involving the superior aspect of the patella with normal signal from the adjacent osseous structures; (iv) the cervical spine MRI showed C4-C5 and C5-C6 disc bulges; (v) the thoracic spine MRI was normal; (vi) the lumbar spine MRI showed mild levoscoliosis (curvature of the spine), 1 mm posterolisthesis of L4 upon L5 and L5 upon S1, and disc bulges at L4-5 and L5-S1 with broad-based central disc herniation at L5-S1; and (vii) the brain MRI was normal.

392.    Claimant B was not seen again by Katzman until April 26, 2022, who indicated that he reviewed Claimant B's cervical spine MRI (but not her thoracic spine MRI, which was normal) and again recommended cervical spine injections, and referred Claimant B to Kolb Radiology for additional cervical and thoracic spine MRIs "this time with a 3T magnet", which were performed

on June 29, 2022. Kolb Radiology's MRI reports indicated that the cervical spine MRI showed C4-5 and C5-6 shallow posterior disc herniations impinging the thecal sac with narrowing of the neural foramina bilaterally, and that the thoracic MRI showed a disc bulge at T8-9, impinging upon the thecal sac.  The MRI reports were thereafter transmitted to Katzman, thereby creating a pretext for further medical treatment and inflating the value of the claim.  Kolb Radiology's MRI reports were conspicuously and purposefully devoid of any mention of chronic and degenerative injuries.

393.    After only one treatment visit (on January 20, 2022) with an orthopedist for her right knee, and without any recommendations for, or otherwise undergoing, any injections of the right knee, on May 27, 2022, Durant performed right knee arthroscopic surgery on Claimant B at Surgicare of Brooklyn.

394.    The IME expert in the underlying personal injury lawsuit who reviewed Claimant A's right knee injury and surgery concluded that she "did not sustain any injury to her right knee on 11/27/21 that would require surgical intervention:

> It is my opinion that the claimant did not sustain any injury to her right knee on 11/27/21 that would have required surgical intervention.  My opinion is based on the fact that the claimant had no complaints referable to the right knee when she was seen in the emergency room at the time of the accident which is inconsistent with a serious injury to the right knee that would eventually require surgical intervention.

*Expert Report of Dr. Edward A. Toriello*

395.    According to a single page record attached to Claimant B's September 6, 2022 Supplemental Bill of Particulars, served by Subin Firm, on May 25, 2022, two days prior to her right knee arthroscopic surgery, Claimant B underwent bilateral cervical facet blocks at C4-C7 administered by Katzman of Advanced Ortho.  Despite the single page record indicating a date of service of May 25, 2022, Claimant B's Supplemental Bill of Particulars indicated that the cervical facet blocks occurred on January 25, 2022.   Advanced Ortho never produced any records

documenting the administration of bilateral cervical facet blocks on any date to defendants in Claimant B's trip-and-fall lawsuit.

396.    Notably, Claimant B's Supplemental Bill of Particulars dated September 6, 2022, as well as her Bill of Particulars dated June 21, 2022, both of which were served by Subin Firm, were not signed by the Subin, as required by 22 NYCRR § 130-1.1a(b), and were not verified by Subin Firm or Claimant B, as required by the CPLR.

397.    According to JPM and Liberty Park's records, on that same date that she purportedly received bilateral cervical facet blocks, presumably at Advanced Ortho's offices at 545 5th Avenue, New York, New York, Claimant B also underwent physical therapy for her neck, and on the next day (May 26, 2022), underwent both physical therapy and chiropractic treatment for her neck, all of which was purportedly rendered at the 40-11 Warren Clinic in Queens, New York, notwithstanding that it is generally recommended to wait at least 24-48 hours following bilateral cervical facet blocks before undergoing any physical therapy or chiropractic treatment.

398.    At her third visit with Katzman on July 7, 2022, now armed with the Kolb Radiology MRIs, Katzman recommended extensive cervical spinal fusion surgery with implants (specifically, ACDF at C4-5 and C5-6, with biomechanical device, anterior instrumentation, and use of autograft and allograft) and Claimant B agreed to proceed with the proposed surgery.

399.    In his July 7, 2022 report, Katzman claimed that the neck pain had "progressed" and "worsened", in direct contradiction with her physical therapy records, which showed a significant sustained reduction in her pain (by nearly half) following the bilateral cervical facet blocks, and then falsely claimed that Claimant B's purported cervical injuries were "permanent" and "directly related to the 11/26/2021 accident", and the extensive cervical fusion surgery was "medically necessary and indicated."  Specifically, Claimant B's physical therapy records, which

had noted a pain grade of "moderate" and a pain level of 7 (not 9 or 10 as purportedly reported to Katzman) in the weeks prior to and on the date of her bilateral cervical facet blocks, was thereafter downgraded to (and consistently reported as) "mild", with the neck pain level reduced from 7 to a pain level of 4 through July 5, 2022.  It was not until the day of her July 7, 2022 appointment with Katzman, that Claimant B's pain grade suddenly and without explanation increased to "severe", despite that contemporaneous physical therapy records only noted a pain level of 5 for the neck.

400.    Moreover, despite a significant sustained reduction in her pain following the bilateral cervical facet blocks and no indication that she suffered any adverse consequences from the injections, Katzman's July 7, 2022 records indicated, without any further explanation, that Claimant B stated that "she does not want any more" blocks and instead opted to have the significantly more invasive cervical spinal fusion surgery.

401.    On August 8, 2022, Claimant B underwent extensive cervical spinal fusion surgery (specifically, ACDF with anterior instrumentation and insertion of biomedical devices at C4-5 and C5-6 and use of allograft bones), which was performed by Katzman at Mountain Surgery in West Orange, New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

402.    As discussed above, Claimant B listed Claimant C as her emergency contact for this surgery, and her insurer was listed as "Subin & Associates (Jorge Lupi)."

403.    On information and belief, at the time of the cervical fusion surgery, Claimant B and Katzman resided in the State of New York.

404.    On information and belief, Claimant B had to travel approximately 35 miles from her residence in Queens, New York for cervical fusion surgery.

405.    In travelling (and in causing Claimant B to travel) from New York to New Jersey on August 8, 2022 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Katzman thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

406.    According to Mountain Surgery's records, it billed Claimant B $228,257.28 for the August 8, 2022 surgery.

407.    On information and belief, Mountain Surgery's $228,257.28 bill was reimbursed through one or more of Claimant B's litigation funding loans with Cartiga, Amedico and EFA and/or Cherokee, despite that Claimant B had Medicaid at time.

408.    All three experts that conducted IMEs un the underlying personal injury lawsuit of Claimant B regarding her neck injuries, concluded that her neck injuries (if any) were not causally related to her accident, but instead were entirely degenerative, mild, chronic, and/or age-related conditions, and also that the cervical spinal fusion surgery that Katzman performed was medically unnecessary:

> Relative to the cervical spine, post-incident imaging studies including cervical spine MRI scan dated 1/4/2022 revealed multilevel disc bulges without evidence of herniated disc, spinal stenosis or any neural impingement.  These imaging findings are pre-existing in nature, degenerative in origin, mild, chronic, age-related structural changes that are unrelated to the subject incident sustained on 11/27/2021.  As a result, there is no direct association to the subject incident sustained on 11/27/2021 to the need for cervical spine fusion surgery.  Additionally, the lack of neural compression on the pre-operative cervical MRI scan calls into question the merit and validity of the cervical spine fusion surgery.

*Feb. 21, 2025 Expert Report of Dr. John Bendo*

> The claimant underwent cervical spine surgery for bulging discs at C4/5 and C5/6, with no acute disc herniations. Based on the images I reviewed, there was minimal or no indication to perform the surgery at C4/5 and C5/6 by Dr. Scott Katzman.

*Sept. 7, 2023 Expert Report of Dr. Ira Chernoff*

98

> causally related to the accident.  It is my opinion that the claimant did not sustain any injury to her neck on 11/27/21 that would have required surgical intervention.  My opinion is based on the fact that the MRI of the cervical spine that was done following the accident revealed no evidence of a causally related injury to the cervical spine that would have required surgery.

*June 28, 2023 Expert Report of Dr. Edward Toriello*

409.    Claimant B returned to Advanced Ortho for her first post-cervical spinal fusion surgery visit with Katzman on August 30, 2022, whereat he wrongly indicated that the ACDF surgery that he performed only four weeks earlier (on August 8, 2022), had occurred on May 8, 2022 and also wrongly noted that her continued complaints of neck pain were "not unusual" because it had "only been a couple of months post operatively."  At this visit, Katzman also noted that Claimant B had "adequate range of motion" in her lumbar spine.

410.    At the next visit with Katzman, on September 13, 2022, Katzman noted that Claimant B's cervical spine was "doing well" and that she could "start physical therapy."  At the next two visits with Katzman on February 9, 2023 and March 28, 2023, Claimant B made complaints regarding her mid-back and continued to report improvement to her neck, with good range of motion noted at the latter visit.  Katzman also indicated in these treatment visit notes that Claimant B underwent thoracic injections, which gave her temporary relief.  On information and belief, no records were ever produced documenting these purported injections.

411.    It was not until her next visit with Katzman on September 6, 2023, that Claimant B began complaining of low back pain.  Other than her initial January 25, 2022 visit with Katzman, this was the first time that Claimant B made any complaints to Katzman regarding her low back.  At this September 9, 2023 visit, Katzman claimed that Claimant B's lumbar spine had tenderness, spasm, decreased flexion, and positive radiculopathy, despite having previously indicated in his August 30, 2022 visit notes that her  lumbar spine had "adequate range of motion," and referred

Claimant B to non-party Lenox Hill Radiology ("Lenox Hill") for an additional "updated MRI" of her lumbar spine, noting that she "may require surgical correction because her pain is a great [sic]."

412.    On September 14, 2023, Claimant B underwent a lumbar spine MRI at Lenox Hill. Lenox Hill's MRI report indicated disc herniations at L4-5 and L5-S1, in contrast to the February 1, 2022 lumbar spine MRI discussed above, which did not show any herniation at L4-5.

413.    By the time of her next appointment with Katzman on September 20, 2023, Claimant B reportedly had 10/10 "severe low back pain" that was "sharp, miserable, incapacitating and…constant" and Katzman recommended extensive lumbar spinal fusion surgery with implants (right-sided L4-5 and L5-S1 laminectomy, foraminotomy, partial facetectomy and discectomy at L4-5 and L5-S1 levels, transforaminal lumbar interbody fusion, pedicle screws and bone grafting, and possible posterolateral fusion with surgery).

414.    At the September 20, 2023 visit, Katzman incredibly claimed that he thought that the proposed extensive, lumbar spinal fusion surgery was "medically necessary and indicated" and appeared to be related to Claimant B's November 2021 accident, despite that Claimant B initially refused a lumbar spine MRI, only complained to Katzman on two occasions of low back pain (and made no such complaints with regard to her low back between January 25, 2022 and September 6, 2023), and Katzman's finding of "adequate range of motion" of the lumbar spine on August 30, 2022.

415.    Katzman's belief that this proposed extensive, lumbar spinal fusion surgery was "medically necessary and indicated" is also belied by the fact that Claimant B had never undergone any injections for her lumbar spine and Katzman never made any recommendation that she do so, even though, as noted above, Claimant B had previously reported significant relief after receiving

purported injections to her cervical spine, as well as temporary relief for purported injections to her thoracic spine.

416.    Additional evidence belying Katzman's claim that the proposed spinal fusion surgery was medically necessary and indicated also includes the IME of Claimant B in the underlying lawsuit, conducted by Dr. Edward A. Toriello, M.D. on June 27, 2023, in which his examination of the lumbar spine revealed "full pain free range of motion" and was otherwise normal, and Claimant B's chiropractic and physical therapy records, which indicated that she had stopped all such conservative treatment over a year earlier, specifically, on May 26, 2022 and September 9, 2022, respectively.

> LUMBOSACRAL SPINE:  Examination of the lumbosacral spine reveals full pain free range of motion as follows:  Flexion of 60 degrees (normal is 60-75 degrees), extension of 25 degrees (normal is 25-30 degrees), bilateral lateral bending of 25 degrees (normal is 25-35 degrees).  There was no paralumbar muscle spasm and no CVA tenderness. Deep tendon reflexes were bilaterally symmetrical in the lower extremities.  Straight leg raising was bilaterally full and pain free.  Vascular examination of the lower extremities was within normal limits.  There were no motor or sensory deficits in the lower extremities. Ambulation is independent and normal and there was normal heel and toe gait.  There was no muscle atrophy of the lower extremity muscles.

*Expert Report of Dr. Edward Toriello*

417.    Though none of Katzman's prior treatment visit notes mentioned any complaints regarding the tailbone (coccyx), or referrals for any diagnostic studies of the sacrum or coccyx, on September 22, 2023, at the apparent referral Katzman, Claimant B underwent an x-ray of her sacrum and coccyx at Citimed that found "no gross fracture" and was otherwise normal.

418.    At her next visit with Katzman on October 11, 2023, at which Claimant B presented for the purpose of "answering additional questions regarding her upcoming [lumbar spinal fusion surgery], Katzman, for the first time, noted tenderness over the tailbone and assessed Claimant B as having "coccydynia" (tailbone pain).

419.    On October 23, 2023, Katzman performed L4-5 and L5-S1 laminectomies, foraminotomies, complete facetectomies, discectomies, and fusions complete with the insertion of hardware on Claimant B's lumbar spine at Mountain Surgery in West Orange, New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

420.    On information and belief, at the time of the lumbar fusion surgery, Claimant B and Katzman resided in the State of New York.

421.    On information and belief, Claimant B had to travel approximately 35 miles from her residence in Queens, New York, for this surgery.

422.    In travelling (and in causing Claimant B to travel) from New York to New Jersey on October 23, 2023 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Katzman thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

423.    According to its records, Advanced Ortho billed Claimant B **$680,775.20 for this surgery**, billing the same rate under several CPT codes for his physician assistant (identified in the billing records as SHARM) as Katzman (identified in the billing records as SK).

424.    According to its records, Mountain Surgery also billed Claimant B **$374,236.68 for this surgery**, billing different amounts under several of the same CPT codes also billed under Advanced Ortho, as well as for the implants and/or other equipment used in connection with the surgery.

425.    On information and belief, all or a part of Advanced Ortho Defendants and Mountain Surgery's above bills were reimbursed through one or more of Claimant B's litigation

102

funding loans including with Cartiga, Amedico and EFA, and/or Cherokee, despite that Claimant B had Medicaid at time.

426.    Neither of the above bills include the additional anesthesia fees that, on information and belief, were also billed to Claimant B and reimbursed through one or more of Claimant B's litigation funding loans, including with Cartiga, Amedico and EFA and/or Cherokee, despite that Claimant B had Medicaid at time.

427.    On information and belief, Advanced Ortho and Mountain Surgery's bills, which together totaled more than $1 million, were far in excess of what any legitimate healthcare providers would bill (or what Medicaid or any legitimate health insurance company would ever reimburse) for Claimant B's October 23, 2023 surgery.

428.    The two experts who reviewed Claimant B's lumbar spinal fusion surgery both concluded that her injuries were pre-existing, degenerative and/or unrelated to the subject accident, and that her lumbar spinal fusion surgery was medically unnecessary:

> Relative to the lumbar spine, post-incident imaging studies including lumbar spine MRI scans dated 2/1/2022 and 9/14/2023, and lumbar spine x-rays dated 9/22/2023 revealed multilevel degenerative disc disease, disc bulges, facet osteoarthritis, with borderline stenosis L4-S1, L5-S1. These imaging findings are pre-existing in nature, degenerative in origin, mild, age-related structural changes that are unrelated to the subject incident sustained on 11/27/2021. As a result, there is no direct association to the subject incident sustained on 11/27/2021 to the need for lumbar spine fusion surgery. The last CT scan performed on 7/23/2024, indicated the possibility of pseudoarthrosis of the L4-S1 fusion.

*Expert Report of Dr. John Bendo*

> In reference to the lumbar spine, MRIs of the lumbar spine, which I personally reviewed, showed spinal stenosis with bulging discs L4/5 and L5/S1 with facet joint hypertrophy and degenerative changes. Noted, since my initial report on September 7, 2023, was that the claimant underwent lumbar spinal surgery at L4/5 and L5/S1 with intradiscal cages and pedicle screw instrumentation, right-sided only, with medial
>
> ***
>
> or no indications, since bulging discs are a normal finding. The lumbar spine surgery was performed for arthritis of the lumbar spine. Noted was medial placement of the screws at L4/5 and S1 on the right with unilateral rod placement and screw placement through the facet at L3/4 on the right.

103

*Addendum Expert Report of Dr. Ira Chernoff*

429.    The Kolb Defendants and the Advanced Ortho Defendants omitted the degenerative, chronic and pre-existing nature of the conditions of Claimant B's spine, which otherwise would have demonstrated that her conditions were not causally related to her purported accident, in order to provide a false justification for invasive and unwarranted treatment, including surgery, and fraudulently inflate the value her claim.

430.    At Claimant B's first lumbar spinal fusion surgery follow-up visit with Advanced Ortho on November 11, 2023, Claimant B was not seen by her surgeon (Katzman) but instead was seen by another doctor who noted that she had "very minimal low back discomfort" and did not mention anything regarding her tailbone or coccyx.

431.    At Claimant B's next visit with Advanced Ortho, December 6, 2023, she was seen by Katzman who now stated, <u>for the first time</u>, that Claimant B "injured her back and coccyx" after having an accident and falling "back in January" (as noted above, Claimant B's trip-and-fall accident purportedly occurred on November 27, 2021, and not in January). Katzman noted that she "still" had coccyx pain, which was described as "terrible" and 10/10, and indicated that Claimant B was now going to require extensive "coccygectomy" (i.e., removal of the tailbone). Katzman further noted that "an x-ray of the tailbone did not show any displaced fracture", but nevertheless, referred her for "coccyx dynamic x-rays."

432.    At this December 6, 2023 visit, Katzman went on to incredibly state that Claimant B's purported coccyx **"was certainly injured at the original time on 01/24/2022 [not the purported accident date of November 27, 2021], she was landed on her tailbone and it has been problematic ever since and she has mentioned this to me on almost every visit"**, despite that Claimant B had no less than 10 office visits with Katzman prior to December 6, 2023, and in

the records for all but one of those visits, the tailbone and/or coccyx was never mentioned. Katzman also incredibly referred to her purported coccyx injury as "permanent" and "directly related to the accident of 01/24/2022." From this point onward, Katzman would refer to Claimant B's slip and fall accident as occurring on January 24, 2022 (one day prior to her initial visit with him).

433.    Either Claimant B sustained injuries in connection with an accident on January 24, 2022 that the Advanced Ortho Defendants and Subin Firm would then falsely claim were causally related to her purported November 27, 2021 accident and/or Katzman's records are grossly inaccurate and, thus, entirely unreliable.

434.    On December 12, 2023, at the referral of Katzman, Claimant B underwent a second x-ray of her sacrum and coccyx, performed at Citimed Complete that once again found "no gross fracture" and was otherwise normal.

435.    At the next visit, on December 27, 2023, Katzman indicated that Claimant B was going to "start" physical therapy "now." On information and belief, following this visit, Claimant B only attended one physical therapy session on January 8, 2024, and never underwent any physical therapy evaluations or re-evaluations. At the January 8, 2024 physical therapy session at JPM, Claimant B reported "feeling much better today" and was assessed as tolerating "the maximum level."

436.    On January 2, 2024, at the referral of Katzman, Claimant B underwent a third x-ray of her sacrum and coccyx, performed at Citimed that once again found "no gross fracture" and was otherwise normal.

437.    At the next visit, on January 17, 2024, though Claimant B had undergone three x-rays of her sacrum and coccyx, all of which were ordered by Katzman, Katzman claimed that "the

quality of the imaging on the x-rays is poor" and incredibly claimed that a "fracture does appear to be at the tip of the tailbone around the C1-C2 area and it does appear to be anteriorly displaced and fractured", despite no indications of any such fractures in any of the x-rays, and further indicated that he "would like to get better imaging studies", including another x-ray and also an MRI "just to confirm." Katzman also incredibly indicated that Claimant B's coccyx pain was "ridiculous" and 11/10, and that surgical treatment was "medically necessary."

438. Instead of returning to Citimed Complete for these additional diagnostic tests, on January 29, 2024, Claimant B underwent a fourth x-ray and also an MRI of her sacrum and coccyx at Lenox Hill, both of which were unremarkable other than noting degenerative changes (specifically "mild bilateral sacroiliac joint degeneration"). The MRI also showed "symmetric enlargement of both gluteus maximus muscles despite moderate fatty muscular atrophy," "ovoid nodular soft tissue lesions within the gluteus maximus muscle bilaterally," "findings likely reflect the sequelae of prior aesthetic surgery/procedure", which was likely the Brazilian Butt Lift surgery that she underwent in 2010.

439. Incredibly, at her next visit, Katzman left a blank space regarding the results of her coccyx study, but nevertheless, indicated that Claimant B was now "scheduled to have coccygectomy" as well as a right sacroiliac joint injection at the same time.

440. In the report for her next visit on February 28, 2024, Katzman incredibly claimed that Claimant B "had a coccyx fracture", despite four x-rays and one MRI, all of which he had ordered, that did not show any fractures, whatsoever, and which were entirely normal other than minor degenerative changes only to the sacroiliac joint, that would otherwise be expected in an individual of Claimant B's age, and would never serve as a basis for removing Claimant B's tailbone. Katzman also recommended an "EMG/NCV of upper extremities and then eventual

possible need for [yet another] surgical treatment to the neck" and specifically ACDF "at the C6-C7 level versus a posterior fusion."

441.    On May 20, 2024, Katzman performed a complete coccygectomy of Claimant B at Mountain Surgery in West Orange, New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

442.    On information and belief, at the time of the coccygectomy surgery, Claimant B and Katzman resided in the State of New York.

443.    On information and belief, Claimant B had to travel approximately 35 miles from her residence in Queens, New York to New Jersey, for this surgery.

444.    In travelling (and in causing Claimant B to travel) from New York to New Jersey on May 20, 2024 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Katzman thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

445.    In Katzman's operative report in relation to Claimant B's May 20, 2024, complete coccygectomy, Katzman gave a pre-operative diagnosis of coccyx fracture, knowing full well there was absolutely no diagnostic testing to support such diagnosis.

446.    The expert who reviewed the coccyx injury and surgery gave an unqualified opinion that there was no evidence of a fracture to Claimant B's coccyx, or any indication for such an extensive surgery:

Relative to the coccyx and sacrum, post-incident imaging studies including x-rays of the sacrum and coccyx dated 9/22/2023, 12/12/2024, 1/2/2024, 1/29/2024, and MRI scan of the sacrum and coccyx dated 1/29/2024, revealed that both the sacrum and coccyx were essentially within normal limits.  As a result, there was no direct association to the subject incident sustained on 11/27/2021 to the need for coccygectomy.  Dr. Katzman's office notes and operative reports indicate that there was evidence of a coccyx fracture with non-union.  None of the pre-operative imaging studies indicated this, thereby calling into question the merit and validity of the coccygectomy.

*Expert Report of Dr. John Bendo*

447.    Katzman did not even attempt to hide the fraud involved. Lupi, a known runner for Subin Firm, is listed in the top right corner of Claimant B's Consent to Surgery and Other Procedures form for her May 20, 2024 surgery:



448.    On information and belief, despite having Medicaid during the course of all of her treatment, Claimant B utilized litigation funding loans, including through Cartiga, Amedico and EFA and/or Cherokee, pursuant to which she "sold" a portion of her interest in her legal action, pay for all of the treatment and surgeries that she would later allege in her trip-and-fall lawsuit, and also to obtain cash advances on or about December 7, 2021 (less than two weeks from the date of accident), June 14, 2022 (approximately two months before Claimant B's August 8, 2022 cervical spine fusion), and September 9, 2022 (approximately one month before Claimant B's October 22, 2023 lumbar spine fusion), as evidence by the collateral description in the UCC filing for her litigation funding loan with Cartiga.

449.    Importantly, both Medicaid and funding loans assert liens on the proceeds of any eventual settlement.  However, the Medicaid lien would be limited to the amount paid out, whereas

108

the funding loan includes origination fees and high interest rates, typically in excess of 40% per annum, which must be paid in addition to the principal amount loaned.

450.    On information and belief, pursuant to kickbacks and/or unlawful referrals, Defendants coordinated the litigation funding loans' undertakings so that Medical Provider Defendants who purported to treat Claimant B, including Advanced Ortho Defendants, were able to charge (and be reimbursed for) substantially higher fees for surgeries than would have been recoverable through Claimant B's Medicaid.  Again, in accordance with the fraudulent treatment protocol, the four surgeries that were performed, including the three surgeries at Mountain Surgical, were critical to the Fraud Scheme's goal of inflating the value of Claimant B's claim.

451.    At her deposition, Claimant B admitted to having received multiple loans, "more than two," in connection with her litigation. Claimant B also testified that her attorney told her that "I shouldn't pay [the loans back] if we don't win the lawsuit" and that there was no way that she would ever have to personally pay back any of the loans she took out.[19]

452.    In addition to Cartiga, Claimant B also entered into litigation funding loans with Amedico, Cherokee and/or EFA, as evidenced in court filings.[20]

453.    According to litigation funding loan records produced in her lawsuit, Claimant B was advanced $262,689.27 from EFA and/or Cherokee, but only received $20,000 with the remaining funds used for buyouts of her prior litigation funding loans with Cartiga and Amedico, as well as a $9,999.00 fund transfer processing fee and $15,000 origination fee.  Upon transferring her litigation funding loans to EFA and/or Cherokee, Claimant B's per annum interest rate

---

[19] *See Lombana v. Elmback Owners LLC*, Index No. 705764/2022, Doc No. 81 at pp. 86-87 (Queens Cnty. Sup. Ct.).
[20] *See Lombana, supra*, Doc No. 130 (litigation funding loan records produced in response to subpoena duces tecum to Cherokee); *Cherokee Funding II, LLC v. Express Funding of America, LLC*, Index No. 653433/2024, Doc No. 80 (Cherokee's July Reconciliation) (N.Y. Cnty. Sup. Ct.) (listing Cherokee's principal for Claimant B in the amount of $265,324.78).

ballooned to 59.92%. That litigation funding loan agreement was signed by Baum of Subin Firm, and was written entirely in English, despite that Claimant B spoke little (if any) English.[21]  On March 20, 2024,Subin Firm filed a Consent to Change attorney, substituting Pianko Law Group PLLC ("Pianko Firm") as Claimant B's counsel for her trip-and-fall lawsuit.

454.    Via stipulation, dated February 3, 2025, Pianko Firm withdrew Claimant B's claims relating to her coccyx, including the May 20, 2024 surgery.

455.    According to court filings, in March 2025, Pianko Firm made a $6.5 million demand in the trial scheduling part of the N.Y. Supreme Court in Queens County for Claimant B's trip-and-fall lawsuit.

456.    Two weeks later, on April 2, 2025, Pianko Firm filed an Order to Show Cause to withdraw as B's counsel based upon a purported "breakdown in communication and disagreement over litigation strategy."

457.    This sequence of events, in which trial counsel initiated an abrupt withdrawal following such an aggressive monetary demand, is highly unusual.

458.    On July 25, 2025, Worley filed a Consent to Change Attorney substituting in as counsel for Claimant B.  Three days later, after conducting a hearing at which Claimant B testified, the Court signed an order permitting Pianko Firm to withdraw.

459.    In creating the multitude of false or misleading reports purporting to support that the ACDF, lumbar spine, and complete coccygectomy surgeries performed on Claimant B, who had no objective signs of acute injury on date of accident, were medically necessary, Advanced Ortho Defendants knew or should have known such records to be false, and further knew or should

---

[21] *See Lombana, supra*, Doc No. 130 (Queens Cnty. Sup. Ct., Sept. 15, 2025) (litigation funding loan records produced in response to subpoena duces tecum to Cherokee Funding II, LLC).

have known such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

460.    In creating the multitude of false or misleading reports purporting to support that the surgeries, injections and treatment performed on Claimant B, who had no objective signs of acute injury on date of accident, was plausibly justified, Kolb Defendants, Hasanuzzaman PC Defendants and Mountain Surgery knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

461.    On March 16, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, May of Subin Firm verified and filed a Verified Complaint on behalf of Claimant B alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant B was "caused to sustain serious, harmful, permanent injuries," as well as "great bodily injuries and pain, shock, [and] mental anguish]" by the events of November 27, 2021, whereafter Claimant B showed no objective sign of any acute injury.

462.    On or about June 21, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed the Bill of Particulars on behalf of Claimant B alleging that Claimant B suffered injuries to her cervical spine, lumbosacral spine,

bilateral knees, and right shoulder, as a result of the events of November 27, 2021, whereafter Claimant B showed no objective sign of any acute injury.

463.    On or about September 6, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant B alleging that Claimant B underwent the aforementioned cervical spine surgery on August 8, 2022, performed by Katzman, as a result of the events of November 27, 2021, whereafter Claimant B showed no objective sign of any acute injury.

464.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

465.    In performing three utterly unjustified and/or unrelated surgeries, Advanced Ortho Defendants, in agreement and with the assistance of Subin Firm, Kolb Defendants and Hasanuzzaman PC Defendants, engaged in force or violence in an attempt to extort money from Plaintiff,  through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

466.    Claimant B's lawsuit remains pending and Plaintiff continues to incur damages.

            c.      Claimant C (Trip-and-Fall Claim)

467.    Claimant Sixto Delgado ("Claimant C"), who was thirty-one years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a raised sidewalk flag at 50-05 43rd Avenue in Queens, New York, on November 9, 2021.

112

468.    Claimant C is Hispanic and, at the time of his purported accident, was not a U.S. citizen, spoke limited (if any) English and had limited financial means.

469.    Claimant C's "accident" occurred less than three weeks before his "friend" who he referred to Lupi and Subin Firm, Claimant B, purportedly tripped and fall over a strikingly similar raised sidewalk flag, and one day after Claimant G also purportedly tripped and fell over a raised sidewalk flag.

470.    Claimant C resided at the same address as Claimant G and, on information and belief, non-claimant, Zoila E. Obregon Delgado ("Z. Delgado"), who is a relative or wife/former wife of Claimant C and/or Claimant G and was also represented by Subin Firm in connection with a purported trip-and-fall accident that occurred on October 25, 2022 and related lawsuit, and, according to UCC filings, took out a funding loan with Nexify.

471.    All four of the above trip-and-fall accidents (Claimants B, C, G and Zoila E. Obregon Delgado) occurred within approximately two miles of each other in Queens, New York.

472.    Claimant C did not seek or obtain any medical treatment immediately following his purported accident.  Upon consulting with one or more Subin Defendants and/or others acting on their behalf, Claimant C's initial complaints, which consisted only of tenderness to the right shoulder, right knee, lumbar paraspinal tenderness and muscle spasm, morphed to included injuries to his cervical spine resulting in three costly and invasive surgeries, including cervical discectomy and fusion.

473.    On the day after his purported accident, Claimant C went to the ER of Jamaica Hospital Medical Center at approximately 10 a.m.– over twenty-four (24) hours after his alleged accident, and reported tripping on an uneven sidewalk and complained of pain to his back, neck, right shoulder, and bilateral knees.

113

474.    Physical examination of Claimant C at the ER revealed "no obvious injuries", right shoulder and right knee tenderness with full range of motion and no significant swelling, lumbar paraspinal tenderness and muscle spasm with no midline tenderness. X-rays of Claimant C's bilateral knees, right shoulder and cervical spine revealed no acute injuries or effusion.  Claimant C was discharged from the ER less than four hours later with prescriptions for Motrin and Robaxin, and instructions to follow-up with his primary doctor, which he did not do.

475.    On or before November 12, 2021 (three days after his alleged accident), Claimant C retained Subin Firm to represent him in connection with his trip-and-fall claim, as  evidenced by a power of attorney, executed by Claimant C and dated November 12, 2021, appointing Subin Firm (and specifically Eisen, Baum, and May) to obtain his medical and other records, which was notarized by DeLeon.

476.    On the same day (November 12, 2021), Claimant C saw Bayner for a physiatry initial consultation at Metro Point at a multidisciplinary clinic located at 59-07 94th Street in Elmhurst, New York (the "59-07 Clinic"), and specifically in Suite E8, whereat Claimant C reported falling onto the right side of his body and 8-9/10 pain to his neck, low back, mid back, bilateral sacroiliac joints, bilateral legs, right shoulder, and right knee.  Bayner diagnosed Claimant C with post-traumatic headaches, cervical, thoracic, lumbar, bilateral sacroiliac joint, right shoulder and right knee sprains, and myofascial pain syndrome, and referred Claimant C for MRIs of his right shoulder and right knee, physical therapy, acupuncture, trial of K-laser, FCT (functional capacity training) and algometry, and also recommended possible shockwave therapy, and trigger point and joint injections.

477.    Claimant C confirmed at an IME in the underlying lawsuit conducted by Daniel J. Feuer, M.D. that he was referred to Metro Point by Subin Firm.

114

subsequently released for outpatient care. As an outpatient, he states his attorney referred him to "METRO Point" Medical office. He describes undergoing multispecialty

*July 10, 2024 Daniel J. Feuer, M.D. IME Report*

478.    On November 18, 2021, Claimant C returned to Metro Point's clinic where he underwent initial evaluations for acupuncture and physical therapy, and "radial pressure wave therapy" for his lumbar spine.  He would subsequently also undergo "radial pressure wave therapy" for his right knee and thoracic spine.  The acupuncture and radial pressure wave therapy and, on information and belief, the physical therapy, was all performed by Metro Point.

479.    According to his initial physical therapy evaluation, Claimant C was instructed to attend six weeks of physical therapy, three times per week.  Instead of following the treatment plan, Claimant C attended just five physical therapy sessions on: December 9, 2021, December 23, 2021, January 11, 2022, January 25, 2022, and February 7, 2022.

480.    Demonstrative of the fraudulent nature of his purported treatment, all of Claimant C's purported acupuncture took place on the same dates as physical therapy (November 18, 2021, December 9, 2021, December 23, 2021, January 11, 2022, January 25, 2022, and February 7, 2022), with the purported radial pressure wave therapy also occurring on three of those same dates (November 18, 2021, December 9, 2021, December 23, 2021), and in the same Suite (E8) at the 59-07 Clinic.  Claimant C's treatment visits with Metropolitan Medical would also take place at the 59-07 Clinic.  Other than illegible signatures of the purported rendering provider, none of the physical therapy records indicate the name of the provider or facility that purportedly performed these services.

481.    Further demonstrative of the fraudulent nature of his purported treatment, all of the physical therapy session progress notes are virtually identical and fail to indicate any assessment or plan, or what areas were treated, other than a reference on each visit note to a complaint with

regard to the "LB", presumably meaning that the low back was the only treated body part at each of these visits.  Moreover, Claimant C appears to have been pre-signing records for his physical therapy sessions before such treatment occurred, as demonstrated below:



482.    On November 30, 2021 (exactly three weeks after his purported accident), Claimant C was seen by Bayner at Metro Point for a follow-up evaluation.  In her report, Bayner indicated that Claimant C was **"working (due to financial necessity)", despite that Claimant C's Bill of Particulars, dated June 28, 2022, indicated that he was "incapacitated from work since the date of the accident" and was confined to bed for approximately one month following the accident, and initially claimed lost wages in his trip-and-fall lawsuit.**[22]

483.    Notably, Claimant C's Bill of Particulars dated June 28, 2022, which was served by Subin Firm was not signed by Subin Firm, as required by 22 NYCRR § 130-1.1a(b), and were not verified by Subin Firm or Claimant C, as required by the CPLR.

484.    At the November 30, 2021 follow-up visit, Bayner administered a lower thoracic and lumbar back trigger point injection and indicated that Claimant C needed to receive more injections, and that he was moderately, 50% disabled.

485.    Claimant C returned to Metro Point on January 11, 2022, where, once again in direct contradiction to his June 28, 2022 Bill of Particulars, Bayner noted that Claimant C was **"[c]urrently working part time due to financial needs."**  At this visit, Bayner also indicated that

---

[22] The Subin Firm ultimately withdrew the claim for lost earnings via stipulation filed on March 11, 2024.

Claimant C should "continue" physical therapy and acupuncture "2x week" which, as indicated above, he had not been doing and did not do, and referred him to Metropolitan Medical for an orthopedic consultation for his right shoulder and right knee.

486.    On December 17, 2021, Losik of Rand conducted MRIs of Claimant C's right shoulder and right knee.  In its MRI Reports, Rand indicated that the right shoulder MRI showed partial tears of the supraspinatus and distal subscapularis tendons, and the right knee MRI showed intrameniscal tear of the medial meniscus.

487.    On February 15, 2023, Dr. Dr. Edward Toriello conducted an IME of Claimant C n the underlying lawsuit and found that **the December 17, 2021 MRIs "revealed no evidence of a causally related injuries to the right shoulder or right knee that would have required surgery."**

488.    Bayner subsequently referred Claimant C to non-party American Medical Initiatives, P.C. ("AMI") for cervical and lumbar MRIs, both of which were performed on February 4, 2022. In its MRI reports, AMI indicated that the cervical MRI showed C3-4, C4-5, C5-6, and C6-7 broad-based central disc herniation, resulting in compression and impingement of the ventral CSF space, and narrowing of neural foramina bilaterally; and that the lumbar MRI showed straightening of the lumbar lordosis, L4-5 and L5-S1 broad based central disc herniation resulting in compression and impingement upon the ventral thecal sac and narrowing of neural foramina bilaterally.

489.    Claimant C presented to Lenox Hill on March 15, 2023, for additional cervical and lumbar MRIs.  In direct contradiction with the prior February 4, 2022 MRIs, these MRIs reports indicated that the cervical MRI showed only one (1) herniated disc at C5-C6, and no disc bulges, herniations, foraminal impingement or canal stenosis at C2-3 and C3-4, and rather showed disc

117

bulges causing impingement (but no herniations) at C4-5 and C6-7, and straightening of the cervical lordosis; and that the lumbar MRI showed no herniated discs, and instead, showed disc bulges causing impingement at L2-3 and L5-S1, as well as 3 mm grade 1 spondylolisthesis with bilateral pars defects and neural foramina at L5-S1, as well as contact with exiting bilateral L5 spinal nerves.

490.    Per records from Claimant C's surgeon at NYNJ Ortho, Claimant C was referred to Lenox Hill by De Moura, who, per public records, is the owner of NYSI.  On information and belief, Claimant C never treated with NYSI or De Moura prior to March 15, 2023.  It is unknown how or why De Moura referred Claimant C for MRIs at Lenox Hill.

491.    The Subin Firm chose to entirely disregard the findings of the MRIs performed by Lenox Hill and instead relied solely on the prior MRI reports of AMI in Claimant C's Bill of Particulars, which as noted above, was not signed or verified as required by the CPLR and 22 NYCRR § 130-1.1a(b).

492.    On February 7, 2022, Claimant C underwent an initial orthopedic consultation with Metropolitan Medical at the 59-07 Clinic, where he was seen by a physician assistant who was purportedly supervised by non-party Andrew Miller, M.D. ("Miller"), with an addendum added by Gladstein on March 11, 2022, and, yet again, in direct contradiction to his June 28, 2022 Bill of Particulars, the physician assistant noted that Claimant C was **"working part-time."**  Notably, Gladstein has been named as a defendant in multiple RICO suits for allegedly perpetuating fraud schemes strikingly similar to the described herein.[23]

---

[23] *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Spec. P.C.*, 21-cv-5523 (E.D.N.Y. Oct. 5, 2021); *American Transit Ins. Co. v. Advanced Comp. Lab'y, LLC*, 21-cv-413 (E.D.N.Y. Jan. 25, 2022); *Liberty Mut. Mid Atlantic Ins. Co. v. Advanced Comp. Lab'y, LLC*, 22-cv-3541 (E.D.N.Y. June 16, 2022); *Allstate Ins. Co. v. Advanced Comp. Lab'y LLC*, 23-cv-6108 (E.D.N.Y. Oct. 27, 2023).

493.    At the February 7, 2022 visit, though the SOAP notes indicate that Claimant C was not taking any active medications and was NAD (i.e., in no acute distress), he purportedly complained of "constant" 10/10 pain in his right shoulder and right knee.  Though this was his first visit with an orthopedic provider, he had only completed 5 physical therapy sessions and had not completed his recommended course of 18 physical therapy visits (6 weeks at 3x per week), and he only met with a physician assistant, he was recommended for surgery for both his right shoulder and right knee.  Claimant C was also instructed to continue physical therapy, which, as indicated above, he did not do.

494.    On March 16, 2022, Claimant C returned to Metro Point's clinic for a follow-up visit with the same physician assistant for Metropolitan Medical, who purportedly discussed his case with Gladstein.  SOAP notes indicate that Claimant C again reported 10/10 pain in his right shoulder and right knee, despite that he was not taking any active medications and was "pleasant, in NAD" (i.e., no acute distress).  Though he had not been to any physical therapy since February 7, 2022, he was instructed to "continue physical therapy", and the provider wrongly referred to the wrong side of his body – indicating that "arthroscopy of the left shoulder and left knee are pending."

495.    On April 22, 2022, after only five (5) physical therapy sessions, which apparently only treated his low back, and only two (2) treatment visits with an orthopedic provider, where he was only seen by a physician assistant, Claimant C underwent right knee arthroscopic surgery at Triborough ASC, LLC ("Triborough"), located in the Bronx, New York.  The right knee arthroscopy was not performed by either of the orthopedic surgeons (Miller and Gladstein) who purportedly oversaw Claimant C's treatment at Metropolitan Medical, but instead was performed by an entirely new doctor non-party Azriel Benaroya, M.D. ("Benaroya").

496.    On May 18, 2022, Claimant C returned to Metropolitan Medical for a follow up visit, where he was once again seen only by a physician assistant, whereat he reported that his pain had reduced from a 10/10 to a 3/10 following his right knee surgery, but reported "constant" 10/10 pain for his right shoulder, despite once again being described as "pleasant, in NAD" (i.e., no acute distress).  He was recommended to start post-surgical physical therapy for his right knee, which, on information and belief, he did not do.

497.    On July 21, 2022, less than three (3) months after Claimant C's right knee surgery, and after only five (5) physical therapy sessions, which apparently only treated his low back, and only two (2) treatment visits with an orthopedic provider, where he was only seen by a physician assistant, Claimant C underwent a right shoulder arthroscopic surgery at Triborough located in the Bronx, New York.  Once again, the surgery was not performed by either of the orthopedic surgeons (Miller and Gladstein) who purportedly oversaw Claimant C's treatment at Metropolitan Medical, but instead was performed by an entirely new doctor, non-party Frank S. Segreto, M.D. ("Segreto").

498.    On information and belief, despite defense counsel's diligent efforts to obtain better quality intraoperative photos for his right knee and shoulder surgeries, the only photographs that were produced during the course of Claimant C's trip-and-fall lawsuit were of such a low quality that they could not be assessed by the doctor that conducted Claimant C's orthopedic IME in the underlying lawsuit.

499.    On December 9, 2023, Claimant C underwent a third, even more extensive spinal fusion surgery (specifically, ACDF at C5-6 with interbody fusion cages and bone graft and implantation of an anterior cervical plate), performed by Sherban of NYNJ Ortho at non-party Fifth Avenue Extension Surgery Center.  **On information and belief, Claimant C was never**

**indicated for any cervical or back surgeries whatsoever, and never had any treatment with NYNJ Ortho, or with any cervical or back specialists, prior to his December 9, 2023 surgery. It is not known how Claimant C was able to obtain (or why Sherban agreed to perform or Fifth Avenue authorized) this surgery.**

500.    It is indisputable that Claimant C's spinal fusion surgery was medically unnecessary and excessive. Dr. Daniel J. Feuer, M.D., conducted a neurology IME of Claimant C in the underlying lawsuit on or about July 10, 2024, in which he found that **"there are presently no objective clinic deficits referable to the central or peripheral nervous system  to support his subjective complaints or to support a diagnosis of radiculopathy"** and that **the medical records failed to support the medical necessity for his spinal fusion surgery**, and concluded that Claimant C "does not demonstrate any object neurological disability or neurological permanency", that he was "neurologically stable to engage in fully active employment as a driver, as well as the full activities of daily living without restriction."  At this IME, **Claimant C was not familiar with the word "radiculopathy", stating he had "never seen this term"**, and **could not "recall the name of any of his treating physicians including his surgeons."**  Claimant C also "mounted and dismounted the table without assistance" and was "observed bending over with unrestricted range of motion of the lower back to pick up his shoes from the floor."

501.    It is also indisputable that Claimant C's right shoulder and right knee surgeries were medically unnecessary and excessive. Dr. Edward A. Toriello, M.D., conducted an orthopedic IME of Claimant C in the underlying lawsuit on or about February 14, 2023, and found that Claimant C **"did not sustain any injury to his right shoulder or right knee on 09/11/21 that would have required surgical intervention"**, that there was "no objective evidence of continued disability" and has was "able to return to work and normal daily living activities without restriction."

502.    Via consent to change attorney, dated April 19, 2024, but not filed until March 20, 2025, the Park Firm (the same firm that represented Lupi in his trip-and-fall lawsuit[24]) substituted as Claimant C's counsel.

503.    On information and belief, Claimant C's medically unnecessary, excessive and fraudulently inflated medical treatment and surgeries were nearly entirely (if not entirely) paid for via liens and/or litigation funding loans, including with Nexify Capital

504.    In creating the multitude of falsified reports purporting to support that the ACDF surgery performed on Claimant C, who had no objective signs of acute injury on the date of accident, was medically necessary, NYNJ Ortho Defendants knew or should have known such records to be false, and further knew or should have known such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and/or transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

505.    In creating the multitude of false or misleading reports purporting to support that the ACDF, right knee and right shoulder surgeries performed on Claimant C, who had no objective signs of acute injury on date of accident, were medically necessary, Metro Point Defendants, Metropolitan Medical Defendants, and Rand Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud

---

[24] *See Jorge Gonzalez-Lupi v. Gourdet*, Index No. 709105/2016 (Queens Cnty. Sup. Ct., Aug, 3, 2016).

Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

506.    On November 11, 2021 at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, May of Subin Firm verified and filed a Verified Complaint on behalf of Claimant C alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant C was "caused to sustain serious, harmful, permanent injuries," as well as "great bodily injuries and pain, shock, [and] mental anguish]" by the events of November 9, 2021, whereafter Claimant C showed no objective sign of any acute injury.

507.    On or about June 28, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed the Bill of Particulars on behalf of Claimant C alleging that Claimant C suffered injuries to his cervical spine, lumbar spine, right knee, and right shoulder as a result of the events of November 9, 2021, whereafter Claimant C showed no objective sign of any acute injury.

508.    On or about January 10, 2024, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May an attorney of Subin Firm mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant C alleging that Claimant C underwent the aforementioned cervical spine surgery as a result of the events of November 9, 2021, whereafter Claimant C showed no objective sign of any acute injury.

509.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

510.    Claimant C's lawsuit remains pending and Plaintiff continues to incur damages.

d.    Claimant D (Labor Law Claim)

511.    Claimant Israel Murgueitio ("Claimant D"), who was thirty-four years old at the time, alleged to have sustained multiple injuries as a result of falling construction debris while working at a construction site at 50 E.77th Street, New York, New York, on March 7, 2022.

512.    Claimant D is Hispanic and, at the time of his purported accident, was not a U.S. citizen, spoke limited (if any) English and had limited financial means.

513.    Claimant D gave varying and contradictory accounts of how his accident purportedly occurred and did not seek or obtain any medical treatment until four days after his purported accident.  Upon consulting with one or more Subin Defendants and/or others acting on their behalf, Claimant D's complaints, which consisted only of pain to the head and neck, morphed to included injuries to his head, neck, back, bilateral shoulder, right leg, right knee, right hand, right wrist, lower back, thoracic spine, right leg and cervicalgia resulting in a costly and invasive cervical discectomy and fusion and a recommendation for right shoulder surgery.

514.    On information and belief, on the day of his purported accident, Claimant D did not report any injuries, left the jobsite on his own, and returned to work, on full duty and without any apparent issue, before ultimately seeking medical treatment four days later.

515.    On March 11, 2022, four days after the alleged accident, Claimant D first sought treatment for his purported accident, bringing himself to East Orange General Hospital. At the ER Claimant D gave conflicting accounts regarding the mechanism of injury, with the nurse notes indicating that he was struck by a "box" and the physician's notes indicating he was struck by a "vase."  Claimant D purportedly complained of headache, occasional dizziness, neck, head, and back pain, but there is no mention in any of the ER records of any complaints or issues with respect

to his shoulders.  CT scans of his head and cervical spine showed no acute pathology, and the physical examination revealed no neurological deficits or visible trauma.  He was discharged less than three hours after arriving at the ER, was not prescribed any medication, and instead was told to take Tylenol and/or Ibuprofen and follow-up with his primary care physician.

516.    On or before March 14, 2022, Claimant D retained Subin Firm to represent him in connection with his Labor Law claim, as evidenced by a power of attorney, executed by Claimant D and dated March 14, 2022, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records, which was notarized by DeLeon.

517.    On the same date (March 14, 2022), the Villamar Firm served and certified a C-3 Form, signed by Claimant D, with the NY WCB in connection with his purported accident.  His C-3 Form provided yet another explanation for his purported accident, indicating that Claimant D was injured when a "garbage can" fell on his head, and indicated injuries to his head, heck, back, bilateral shoulder, right leg, right knee, right hand and right wrist.



518.    Ultimately, in his Complaint and Bill of Particulars, both of which were verified and filed by Subin Firm on May 16, 2022 and December 10, 2024, respectively, it would be alleged that Claimant D was struck by falling construction debris or equipment.

519.    Following his ER visit five days after his purported accident, on information and belief, Claimant D did not seek any further treatment for 11 more days, until March 22, 2022, when he had an initial consultation with non-party Mohammad Dorri, D.C. ("Dorri") at non-party North American Spine and Pain Institute ("NASPI").  According to the treatment notes for this visit, Claimant D now reported being struck on the head by a "commercial garbage dumpster" and

denied loss of consciousness. Though the treatment notes for this visit indicate that Claimant D had already started conservative care and chiropractic therapy for his neck and back, no such treatment was mentioned in his C-3 Form or submitted in connection with his WC claim.

520.    Despite Claimant D alleging only head, neck and back pain at the ER, at this visit, Dorri reported that Claimant D was now also suffering from right hand pain, in addition to low back pain and cervicalgia, a whiplash-type cervical injury, with possible myofascial pain, cervicogenic headache, radiculopathy, facet syndrome, or discogenic pain. This was despite Dorri's own examination of the cervical spine, showing normal cervical alignment, no step-off, no bruising, no muscle spasms, no motor defects and a negative Spurling's test; and the lumbar spine, showing normal lumbar alignment. The right hand examination showed no evidence of swelling or visible scars. Dorri further reported that the lumbar spine and right hand had normal range of motion and full strength in all muscles. Notably, there was no indication that Dorri recorded objective range of motion measurements, which are required under WCB Medical Treatment Guidelines in order to adequately assess patient progress, and instead made vague reference to a decreased range of motion of the cervical spine, without providing any specific degrees, but also recorded full strength in all related muscles and no related deficits. Dorri recommend a course of physical therapy, ordered an X-ray of the right hand, and prescribed Ibuprofen and muscle relaxers.

521.    At his next treatment visit, on March 25, 2022, Claimant D was seen by non-party Jorge De La Torre, D.C. ("De La Torre") at non-party Montclair Spine and Sports Rehab ("Montclair") for an initial chiropractic evaluation at the apparent referral of Dorri (despite that Dorri had not referring him for any chiropractic therapy), whereat Claimant D now claimed that he was injured when a "heavy garbage bag" fell on his head. After completing his assessment, De La Torre expanded Claimant D's diagnoses to include multiple new injuries including cervical and

lumbar radiculopathy, cervical and thoracic sprains, back spasms, wrist pain, temporomandibular joint disorder, shoulder pain, and post-traumatic headache, none of which were documented at his initial ER visit, which only recorded head and neck complaints.

522.    Notably, at this initial chiropractic visit, as well as at his subsequent physical therapy visits, it was noted that Claimant D had returned to work for at least two days immediately following his accident and prior to seeking any treatment in connection therewith:

maternal to move to different location on the job site when heavy garbage bag fell from the top floor onto his head  He reveals he up his hand up to try and deflect the garbage bag when he heard screaming   After the incident, the owner of the company transported him home to rest and was instructed to return to work for light duty the next day.  He informs he returned to work the following day for light duty then the next day was put back to regular duty  After working a few hours on regular duty his

*Montclair Spine March 25,2022 Chiropractic Visit*

reports that the garbage bag hit the back of his head and patient reports that once the garbage bag hit him, he put his hand up on top of his head.  Patient reports that after the incident, the owner of the company transported him home to rest and was instructed to return to work for light duty in 2 days  Patient reports that he returned to work in 2 days for light duty and was put back to regular duty the following day  Patient reports that after working a few hours on regular duty the following day, his

*Montclair Spine May 27, 2022 Physical Therapy Visit*

523.    Notwithstanding the foregoing, Claimant D's C-3 Form, certified and served by the Villamar Firm on March 14, 2022, and the Bill of Particulars, verified and served by Subin Firm on February 27, 2023, indicated that Claimant D did not return to work following his purported March 7, 2022 accident.

524.    On March 28, 2022, at the referral of De La Torre, Claimant D underwent X-rays of Claimant D's skull, cervical spine, lumbar spine, right wrist, and right hand at non-party ODI Diagnostic Imaging of Newark ("ODI") which were interpreted by non-party Ketang Modi, M.D. ("Modi").  The skull X-ray again showed no abnormalities, while the cervical x-ray showed only degenerative changes—"mild spondylosis at C5-6" and "straightening of the normal lordotic curvature, and correlate clinically for muscle spasm", "normal alignment without fracture or spondylolisthesis" and disc heights that were maintained.  These findings contradict the hospital's earlier CT scan.  Claimant D also underwent X-rays of the lumbar spine, right wrist, and right

hand, despite no complaints pertaining to the right wrist or right hand at the initial hospital visit and Dorri having documented normal strength and range of motion days earlier. These X-rays revealed no fractures, dislocations, or abnormalities, yet further imaging was still suggested, underscoring the fraudulent treatment pattern.

525.    Despite initially finding a normal cervical spine with a negative Spurling test, as well as the largely normal CT and X-rays of the cervical spine, on April 18, 2022 Dorri now claimed "kyphotic" cervical alignment, muscle spasms, and a positive Spurling test for the cervical spine, and reported that Claimant D had "cervical herniated discs" and had "failed to respond to long term conservative treatments and physical therapy," despite that the purported accident had only occurred six weeks prior, and Claimant D had yet to undergo any physical therapy and had only undergone 2 sessions of chiropractic therapy.  Dorri also changed his lumbar spine findings, reporting mild spasms, decreased range of motion, a positive straight leg raise, which was not documented in the initial lumbar physical exam, and that Claimant D had "lumbar herniated discs", despite also acknowledging that a purported lumbar spine X-ray on March 28, 2022 showed "no significant radiographic abnormality." Dorri used these purported findings to then justify MRIs of the lumbar and cervical spine, and EMG studies of the upper and lower extremities.

526.    On April 29, 2022, at the referral of Dorri, Claimant D underwent cervical and lumbar MRIs at Contemporary Diagnostic. Subin Firm was listed as the insured plan on the Health Insurance Claim Form. The cervical MRI reportedly showed herniations at C3-4, C4-5 and C5-6, with the latter compressing the spinal cord and thecal sac, and a bulging disc at C6-7; and the lumbar MRI reportedly showed a concentric disc bulge contacting the existing nerve roots at L3-4 and L4-5.  These MRIs would later be used to justify extensive, invasive, but ultimately unnecessary treatment on Claimant D, including ACDF surgery by Macagno of NYSI.

527.    On May 5, 2022, EMG studies of the upper and lower extremities were performed by Dorri, which purportedly showed evidence of right C6 and bilateral L5 radiculitis.  That same day, Dorri scheduled Claimant D for three epidural injections at C5-6, C6-7, and L4-5, noting in his report that surgical intervention would also be scheduled when the injections failed.

528.    On May 25, 2022, Dorri performed lumbar epidural steroid injections at bilateral L4-L5 on Claimant D at Integrated Specialty in Saddle Brook, New Jersey.  Though this visit was billed through Claimant D's WC claim, Subin Firm was listed as the insurance plan on the bill.

529.    Claimant D was next seen by non-party Christine Corradino, M.D. on May 16, 2022 for complaints of right shoulder and right upper arm pain.  Physical examination of the right shoulder revealed moderate subacromial tenderness, decreased and painful range of motion, rotator cuff weakness decreased sensation, and tenderness with resisted abduction and external rotation, and Dr. Corradino recommended physical therapy.

530.    According to his WC claim records, Claimant D did not treat with any physical therapists until May 27, 2022, when he returned to Montclair and was seen for an initial physical therapy evaluation for his right shoulder, at the apparent referral of Dorri (despite no indication that Claimant D ever complained of or was treated by Dorri (or anyone else at NASPI) for his right shoulder).  Accoridng to the visit notes, Claimant D claimed that "his physician" administered an injection to his right shoulder region two days prior to this visit, but none of the documentation submitted to the NY WCB reflects such a procedure, and there is no indication that the physical therapist discussed whether the injection alleviated any of Claimant D's symptoms.  The physical therapist diagnosed Claimant D with a right shoulder rotator cuff sprain and recommended four weeks of physical therapy.

531.    On June 16, 2022, Plaintiff had an initial evaluation with Macagno at NYSI in Commack, New York.  While the bill for this initial visit indicated that Claimant D was referred to Macagno by "word of mouth", subsequent bills from NYSI revealed the truth—Claimant D was referred to Macagno by Subin Firm:



*June 16, 2022 Bill from NYSI*

*May 9, 2023 Bill from NYSI*

532.    In his initial assessment on June 16, 2022, Macagno reported that Claimant D injured his head, neck, and lower back when a "pale of garbage fell from several floors above." Claimant D did not report any injuries to Macagno other than those listed above.  After completing an examination that allegedly revealed decreased range of motion and spasms in Claimant D's cervical and lumbar spine, and after purportedly reviewing the MRIs from Contemporary Diagnostic, Macagno recommended that Claimant D proceed with extensive cervical fusion surgery (ACDF at C4-5 and C5-6), and noted that Claimant D would be a candidate for lumbar surgery if he did not improve with conservative treatment.  In his report, Macagno falsely claimed that Claimant D had "tried extensive conservative treatment, including … physical therapy" despite that Claimant D had not undergone any physical therapy treatment for his neck or low back prior to this visit.

533.    On August 9, 2022, Claimant D reported right shoulder pain (8/10) to Dorri for the first time, despite never mentioning any pain in his right shoulder at his initial hospital visit or during any previous visits with Dorri. Dorri noted subacromial tenderness, limited rotation, and mild impingement, but attributed these findings to a prior MVA.

534.   On August 8, 2022, Dr. Sean Lager conducted a NY WCB-ordered IME.   During this visit, Claimant D provided a new account, claiming that a large bucket filled with debris and material struck him, causing loss of consciousness—contradicting his earlier admission to Dorri that he did not lose consciousness. This account of the mechanism of injury contradicted Claimant D's prior accounts of being injured by a garbage can, a garbage bag, garbage dumpster, a box and a vase.

535.   At this IME, Claimant D claimed bruising to the head and injuries to the right shoulder, hand, wrist, lower right leg, back, neck, and head, and that he began treating for his purported injuries three days after the purported accident, contradicting ER records documenting only head and back pain.

536.   Dr. Lager diagnosed Claimant D with a cervical sprain/strain and a right wrist/hand sprain/strain that had resolved and concluded that there was no "direct injury to his upper back or lower right leg" related to the purported accident.   In an addendum report, Dr. Lager also denied the existence of any causal relationship as to the right shoulder, noting that there was "no evidence that the claimant suffered any injury in the accident."   Dr. Lager recommended a course of three cervical epidural steroid injections but denied the need for any additional treatment for the right hand/wrist.

537.   Despite Dr. Lager's determination that the right wrist resolved and the right shoulder and upper back injuries were unrelated to the March 7, 2022 incident, Claimant D continued chiropractic and physical therapy treatment, ultimately accumulating 48 chiropractic sessions (for multiple body parts, including the right shoulder, right wrist and upper back) and 36 physical therapy sessions (all for the right shoulder) through November 7, 2022, with De La Torre and Montclair.

538.    On August 12, 2022, at the referral of Dorri, Claimant D underwent a right shoulder MRI at Contemporary Diagnostic, which purportedly revealed AC joint arthrosis, supraspinatus tendinopathy, bursitis with fraying, biceps anchor tear with tenosynovitis, anterior capsular thickening, and joint effusion.  Once again, Subin Firm (and not the workers' compensation carrier) was listed as the insurer for this MRI.

539.    Despite Dr. Sean Lager's determination that the alleged shoulder injury was not causally related to his purported accident, on October 10, 2022 Claimant D saw Wert of Wert PC, for an initial orthopedic evaluation in Flushing, New York. Though this was Claimant D's first visit with Wert, on the bill for this visit Wert listed himself as the referring provider.

540.    At the October 10, 2022 visit, Claimant D provided yet another account of how his alleged accident occurred, claiming that "a bucket filled with cement and material fell from the roof and hit him."  Wert relied on this false account to attribute the shoulder injury to the incident and recorded the Claimant's disability as "total."  Wert claimed an impingement test could not be performed due to pain, despite that Claimant D was previously documented as only having mildly positive impingement. Wert then repeated these findings, without variation, across four subsequent appointments through January 15, 2024.

541.    At a NY WCB hearing on November 17, 2022, in an attempt to amend his WC claim to include the right shoulder, Claimant D provided testimony under oath that was flatly contradicted by his medical records and employer.  Specifically, Claimant D claimed, for the first time that, after his purported accident, "[w]hen he awake he felt terrible pain in his head, back and his right shoulder", despite not reporting any injuries on the date of his purported accident and returning to work without issue before first seeking treatment four days later, whereat he did not

report any injuries or complaints with respect to his right shoulder; and claimed that he requested, but his employer denied him an ambulance.

542.    Claimant D had follow-up appointments at NYSI on October 11, 2022, where he was seen by a physician assistant, and January 10, 2023, where he was seen by Macagno. The examination reports for those visits were virtually identical to the initial June 16, 2022 evaluation, with range of motion measurements for both cervical and lumbar spine identical to the initial evaluation, lumbar recommendations unchanged despite prior injections, and only minor updates to age and planned cervical surgery.

543.    On January 19, 2023, despite Dr. Lager's determination that Claimant D's right hand and wrist injuries had fully resolved, he was seen by hand surgeon non-party Salvatore R. Lenzo, M.D. in New York, New York, for an initial evaluation, and was diagnosed with traumatic rupture of the right radiocarpal ligament, attributed to the hand being caught, crushed, jammed, or pinched at a construction site, completely contrary to Claimant D's accounts of the accident. X-rays of the right hand, wrist, and forearm taken during that visit were negative.  Lenzo performed a cortisone injection at the scapho-lunate joint, provided a custom joint orthosis, and discussed potential right-hand arthroscopy, further extending treatment, without medical necessity. The NY WCB ultimately deemed this treatment excessive and denied the cortisone injection.

544.    On February 1, 2023, at the referral of De La Torre, and in clear disregard of Dr. Lager's IME, Claimant D underwent a thoracic spine X-ray performed by Contemporary Diagnostic, which reportedly showed dextroscoliosis, endplate herniations at T10–T12, a 30% height loss old T8 compression fracture, and multiple disc herniations and bulges from T5–T12 causing central canal and neuroforaminal encroachment, despite normal cord signal. Once again, Subin Firm was listed as the insurer alongside his WC carrier.

545.    On February 2, 2023, Claimant D underwent ACDF surgery at C4–C5 and C5–C6 (including placement of Altura titanium interbody cages with bone graft, and stabilization with a Zion Altura locking plate) performed by Macagno at Hudson Regional Hospital in Secaucus, New Jersey.  This surgery was performed despite that Claimant D had not undergone any physical therapy for his neck. "Subin & Associates Law Firm" was listed as the primary insurance plan for the cervical surgery, directly linking Subin Firm to the authorization and payment of this unnecessary procedure. Hudson Premier Medical PC billed **$291,513.00**, just for the assistant surgeon's services for this surgery, which NY WCB audited and denied in its entirety as excessive or not in accordance with the Medical Fee Schedule and for improper use of CPT codes, among other things.  Hudson Regional Hospital also submitted a bill for the ACDF surgery totaling **$211,207.92**, with treatment authorization codes noting "Neck Not Established" and "signed liens on file," and listed Subin Firm as the secondary insurer. In addition to other providers not discussed herein, CANJ Anesthesia LLC, Macagno and New York Medical Monitoring PC also submitted bills totaling $14,869.75, $18,638.00 and $6,651.90, respectively, thus totaling over **$470,000** billed for the ACDF surgery.

546.    On information and belief, at the time of the ACDF surgery, Macagno resided in New York.

547.    In travelling from New York to New Jersey on February 2, 2023 for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Macagno thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

548.    During a second IME with Dr. Lager on February 23, 2023, Claimant D continued to complain of neck, back, right shoulder, and right wrist pain, but raised no issues regarding his right knee, and claimed that his initial injuries included a bruised right arm and that he underwent whole-body imaging, conflicting prior statements and ER records. Dr. Lager reaffirmed that the right shoulder was unrelated to the accident, recommended that Claimant D meet with an orthopedic surgeon for his lumbar spine and claimed that Claimant D had completed nine months of physical therapy, four months of chiropractic therapy, and an epidural injection, without significant improvement, despite that Claimant D had only underwent three physical therapy visits for his low back prior to the date of this IME.[25]

549.    At another orthopedic IME on June 1, 2023, Dr. Lager questioned why Claimant D remained under post operative surgical restrictions that prevented a cervical range of motion exam, noting that "some of his physical examination findings d[id] not correlate" and, thus, suggesting concealment of the Claimant's true condition.

550.    Notably, contrary to what Dr. Lager was told at the June 1, 2023 IME, visit notes indicated that on March 15, 2023 and May 9, 2023 (both occurring after ACDF surgery) Claimant D's cervical range of motion had been measured by Montclair and Macagno at NYSI.

551.    Despite the repeated findings of Dr. Lager that the purported right shoulder injury was not causally related, at a treatment visit on October 2, 2023 of Wert PC, Wert prescribed physical therapy and a cortisone injection for the right shoulder, and discussed right shoulder arthroscopic surgery, claiming to have submitted an MG-2 form to the NY WCB seeking authorization for the surgery, despite that Claimant D's workers' compensation file contained no such record. On January 15, 2024, Wert then scheduled right shoulder surgery to take place on

---

[25] On April 1, 2025, Dr. Lager resigned his authorization to perform IMEs for the NY WCB.

January 31, 2024, without medical clearance and continued to prescribe physical therapy, further disregarding Dr. Lager's determinations and extending treatment without objective medical justification.

552.    Board Certified Emergency Medicine expert, Bernard P. Chang, M.D., Ph.D., affirmed that there was "no indication" that Claimant D sustained "any significant injuries as a result of the [purported accident]" and concluded that "the injuries claimed in the Bill of Particulars [signed and verified by an attorney for Subin Firm were], "inconsistent with his initial presentation and the contemporaneous medical records", specifically noting that "there was no evidence to support any significant acute cervical, thoracic, or lumbosacral spinal injury resulting from the trauma", that the alleged injuries to the upper and lower extremities in the Bill of Particulars were "unsupported by the plaintiff's own complaints to the ER staff and unsupported by their physical findings and examinations," and that there was "no evidence to support any significant acute head injury resulting from the accident."

553.    On May 21, 2024, Subin Firm filed an order to show cause seeking to withdraw from Claimant D's lawsuit at the advice of ethics counsel because they did "not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct."  The Subin Firm requested that if additional details were required, the Court hold an *ex parte* hearing and allow them to explain the justifications *in camera.*

554.    On September 20, 2024, the Court denied Subin's request, explaining that Subin Firm provided "no reason, let alone good cause," sufficient to justify withdrawal and that the Court lacked the authority to hold the *ex parte* hearing requested by Subin Firm.  The Judge invited Subin Firm to submit an affirmation detailing the reasons for seeking withdrawal.  However, rather than

file a sworn document explaining the basis for withdrawal, Subin Firm elected to remain counsel of record for Claimant D.

555.    In creating the multitude of false or misleading reports purporting to support that the ACDF surgery performed on Claimant D, who had no objective signs of acute injury on date of accident, was medically necessary, NYSI Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

556.    In creating the multitude of false or misleading reports purporting to support that the surgery and treatment performed on Claimant D, who had no objective signs of acute injury on date of accident, as well as the recommendation of right shoulder surgery, were plausibly justified, Wert PC Defendants and Contemporary Diagnostic knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

557.    On May 16, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified and filed a Verified Complaint on behalf of Claimant D alleging

directly and under penalty of perjury, and not "upon information and belief," that Claimant D "sustained serious injuries" and "was rendered, sick, sore, lame and disabled" by the events of March 7, 2022, whereafter Claimant D showed no objective sign of any acute injury.

558.    On or about February 27, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified, signed and mailed and/or emailed the Bill of Particulars on behalf of Claimant D alleging under penalty of perjury that Claimant D suffered injuries to his cervical spine, lumbar spine, thoracic spine, right shoulder, right knee, and right hand/wrist, as well as various head injuries including loss of consciousness, as a result of the events of March 7, 2022, whereafter Claimant D showed no objective sign of any acute injury.

559.    On or about October 24, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified, signed and mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant D alleging under penalty of perjury that Claimant D underwent the aforementioned unnecessary ACDF surgery as a result of the events of March 7, 2022, whereafter Claimant D showed no objective sign of any acute injury, that Claimant D was impacted by a falling piece of construction debris "which consisted of Marble", despite no indication in any records that he was hit with anything consisting of marble, and also wrongly referring to the ACDF surgery as relating to the lumbar spine and occurring on January 6, 2021.

560.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

561.    In performing the utterly unjustified and/or unrelated ACDF surgery, NYSI Defendants, in agreement and with the assistance of Subin Firm and Contemporary Diagnostic engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

562.    Claimant D's lawsuit remains pending and Plaintiff continues to incur damages.

e.    Claimant E (Labor Law Claim)

563.    Claimant Bryan Cabrera ("Claimant E"), who was twenty years old at the time, alleged to have sustained multiple injuries when he fell while descending a ladder while working at a construction site located at 252 7th Avenue, New York, New York on November 29, 2021.

564.    Claimant E is Hispanic and, at the time of his purported accident, was not a U.S. citizen, spoke limited (if any) English and had limited financial means. Practically all of Claimant E's purported treatment, including numerous physical therapy, chiropractic and acupuncture sessions, took place in Queens, New York, at least an hour away from his residence in New Jersey.

565.    Upon consulting with one or more Subin Defendants and/or others acting on their behalf, Claimant E's version of the accident changed substantially and his initial complaints of left shoulder, left wrist, and lumbar spine pain, morphed to included injuries to his neck, both shoulders and knees, resulting in costly and unnecessary treatment, and recommendations for left knee surgery and lumbar discectomy surgery.

566.    Another worker who witnessed the accident, reported that Claimant E was on the second to last rung and only about two feet off the ground when he "slipped", but that "nothing happened" and Claimant E was uninjured.

567.    After the alleged accident, Claimant E left the job site without reporting the accident to his foreman.  Several hours later and after multiple failed attempts, his foreman reached Claimant E on the phone, at which time Claimant E stated that he had fallen, his mother had picked him up, and he was going to the hospital.  Claimant E provided no description of how the accident happened or his supposed injuries, and never returned to work.

568.    In the afternoon of November 29, 2021, Claimant E reported to the ER at Robert Wood Johnson University Hospital Rahway, whereat he purportedly complained of pain in his left shoulder, left wrist, and lumbar spine.  Claimant E denied hitting his head and did not complain of any head or neck pain.  During the physical examination, tenderness in the left shoulder, left wrist, and lumbar spine was noted, but no swelling, deformities or objective signs of acute injury were identified, and X-rays of those body parts were normal.  Claimant E was discharged three hours later with instructions to take over-the-counter pain medication.

569.    On or before November 30, 2021 (one day after the alleged accident), Claimant E retained Subin Firm to represent him in connection with his Labor Law claim, as evidenced by a power of attorney, executed by Claimant E and dated November 30, 2021, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records, which was notarized by DeLeon.

570.    Claimant E did not seek any further treatment until December 10, 2021, when he was seen for an initial evaluation by a chiropractor, non-party Mark Rodrigues, D.C. ("Rodrigues"), whereat he expanded the scope and severity of his injuries in a handwritten Consultation Admittance Record that he signed, indicating for the first time complaints of pain in his neck, right shoulder, left knee and low back.  The Consultation Admittance Record appears to

contain two sets of handwriting, with certain body parts (specifically "'left" knee and "bilat" shoulder) that appear to have been filed out by someone else:

Describe Your Pain/Complaint in Detail:

my neck, shoulder, lower back, Knee ache Left
Bilat.

State Cause of Pain / Activity that Caused it:

Due to a fall from the ladder while coming down on a
Step ladder I slipped and fell down on the
floor

571. In the Consultation Admittance Record, Claimant E listed Rosario Cedillo (who, on information and belief, was represented by Subin Firm in connection with a staged construction accident discussed in a RICO action against her and Subin Firm[26]) as his "emergency contact."

572. In the treatment note for his initial evaluation, Rodrigues noted that Claimant E was experiencing pain only in his neck (9/10), lumbar spine (8/10), left shoulder (7-8/10) and left wrist (7-8/10), which were the only areas Rodrigues assessed/treated during this visit, suggesting that the complaints related to the bilateral shoulders and left knee in the Consultation Admittance Record were added after the evaluation had been completed.

573. On information and belief, the above Consultation Admittance Record form was altered after the visit to conform to Claimant E's C-3 Form, filed (and, on information and belief, completed and certified) by the Villamar Firm, on or about the same day (December 10, 2021).

574. After running an extensive number of tests and despite no evidence of acute injury being detected at the ER, Rodrigues reported swelling, tenderness, and subluxations in Claimant E's cervical and lumbar spine, spasms and reduced range of motion in his left shoulder, reduced

---

[26] *See Cedillo, supra.*

range of motion in his left wrist, and a host of other subjective findings, ultimately concluding that Claimant E was 100% disabled, and provided chiropractic treatment. Claimant E returned to Rodrigues on December 15, 2021 and 21, 2021, with the same complaints.

575. On January 4, 2022, Claimant E returned to Rodrigues and reported left knee (7-8/10) and left ankle pain (8/10) that he attributed to the accident at issue. Aside from the handwritten notation on the Consultation Admittance Record and the C-3, this was the first mention of any complaints regarding these areas. Rodrigues performed an assessment of Claimant E's left knee, allegedly observing decreased range of motion, swelling, popliteal spasm, as well as indications of a torn meniscus and ligamentous instability, but did not perform any assessment nor make any diagnoses related to Claimant E's left ankle.

576. On January 5, 2022, Claimant E returned to Rodrigues, who, after performing identical assessments and treatment, referred Claimant E for MRIs of the lumbar spine, cervical spine, left shoulder and left ankle, as well as interventional pain management and orthopedic evaluations. Despite claiming indications of a torn meniscus and ligamentous instability in Claimant E's left knee (and no assessment of the left ankle), Rodrigues did not request a left knee MRI and instead ordered an MRI of Claimant E's left ankle.

577. On January 13, 2022, Claimant E underwent MRIs of his lumbar and cervical spine, left shoulder and left ankle by Contemporary Diagnostic, which purportedly showed scoliosis and disc bulges in the lumbar and cervical spines, without evidence of neural compression, tendinopathy in the left ankle and tendinopathy and minor fraying in the left shoulder. Each of the above-referenced findings is degenerative in nature and not causally related to the alleged incident. After audit, Contemporary Diagnostic's charges of $21,935.64 to Claimant E's WC carrier were reduced to $5,997.20.

578.    On January 18, 2022, Rodrigues reviewed the lumbar, cervical, and ankle MRIs, omitting the left shoulder MRI, and continued to deem Claimant E "100% temporarily disabled" until his final visit on February 1, 2022, with each visit summary being virtually identical. Rodrigues never provided an explanation for Claimant E's sudden discharge.  In total, Claimant E underwent 13 chiropractic sessions with Rodrigues, consisting of identical treatments limited to the lumbar and cervical spine, with no indication of any improvement.

579.    On February 5, 2022, Claimant E presented to a multidisciplinary clinic located at 59-01 94th Street in Elmhurst, New York (the "59-01 Clinic"), over an hour by car from his residence in Rahway, New Jersey, for an initial physical therapy evaluation with non-party Richard Santiago, P.T. ("Santiago PT").  According to the bill submitted by Santiago PT, Claimant E was referred to by non-party Ketan D. Vora, D.O. ("Vora"), a solo practitioner with an office at 2801 Glenwood Road, Brooklyn, New York 11210, who, on information and belief, never saw Claimant E in connection with  the purported accident.

580.    At the initial evaluation with Santiago PT, Claimant E complained of 7-8/10 pain in his neck, lower back, bilateral shoulders, left knee and left wrist, with this being the first confirmed instance (other than the Consultation Admittance Record and the C-3) of Claimant E reporting complaints related to his right shoulder.  The initial assessment was performed by a physical therapist, who allegedly observed decreased range of motion and tenderness to palpation in each of the complained of areas.  The physical therapist also observed the same limitations in the right knee, which Claimant E had never complained about. That same day, Claimant E attended his first physical therapy session at Santiago PT.

581.    In total, Claimant E underwent at least 200 physical therapy sessions at Santiago PT.  The physical therapy session progress notes provide little to no insight into what "treatments"

were allegedly performed and are virtually identical from February 5, 2022 until May 13, 2022, other than changing the pain rating between 7 and 8, and then are virtually identical from May 16, 2022 through at least October 31, 2023, other than changing the pain rating between 6 and 7.

582.    On February 9, 2022 (just four days after the physical therapy initial evaluation), Claimant E returned to the 59-01 Clinic, where he was seen by Harhash of Washington Medical for an initial examination.  At this visit, Claimant E now claimed that he "was going down the building stairs when he slipped and fell due to snow."  Harhash recorded normal range of motion in the right shoulder, in stark contrast to the limited motion documented by Santiago PT one month earlier. He also noted positive Spurling, straight leg, McMurray, and Neer's tests to support diagnoses of cervical and lumbar radiculopathy, as well as a left medial meniscus tear, despite the absence of any imaging for that body part. Harhash recommended a panoply of medically unnecessary interventions, including trigger point injections, EMG studies, physical therapy, acupuncture, and potential epidural injections and surgery, further escalating treatment and billing, and claimed that Claimant E was 100% disabled.

583.    The pattern of escalating treatment and examination of body parts not previously evaluated continued at the 59-01 Clinic with a session of acupuncture therapy by Bayner of SMB Medical on February 18, 2022.  Though the acupuncture session notes indicate that Claimant E's initial visit was on February 17, 2022, there were no records of any initial acupuncture evaluation on any date.

584.    Thereafter, on March 7, 2022, Claimant E underwent four trigger point injections to the lumbar and cervical spine under ultrasound guidance, performed by Harhash of Washington Medical at the 59-01 Clinic.

585.    On information and belief, Claimant E had to travel approximately 30 miles from his residence in Rahway, New Jersey on March 7, 2022 for the injections.

586.    On March 18, 2022, at the apparent referral of Harhash, Claimant E underwent a second round of MRIs for his lumbar and cervical spine at non-party All County, LLC ("All County"), which differed significantly from the MRIs performed by Contemporary Diagnostic just two months earlier.  Specifically, the MRIs showed a bulging disc at L2-3 "without stenosis", left foraminal herniation at L3-4 impinging the exiting L3 nerve root, a bulging disc at L4-5 with foraminal encroachment, L5-S1 normal, no stenosis at C3–4 or C4–5, thecal sac impingement at C5–6, and a left paracentral herniation at C6–7, with incidental findings. The repeated MRIs, both of which were audited and reduced to $0.00, provided no new medically necessary information, instead escalating perceived pathology to justify further treatment.

587.    On March 21, 2022, Claimant E returned to the 59-01 Clinic and underwent musculoskeletal ultrasounds of the cervical spine, trapezius muscles, lumbar spine, and sacroiliac joints, and autonomic nervous system testing, performed by non-party Richard C. Denise, M.D. ("Denise"). The ultrasound identified only mild, localized inflammation in select cervical facets and trapezius muscles, with no lumbar or sacroiliac abnormalities.

588.    On that same day (March 21, 2022), in addition to also undergoing physical therapy at Santiago PT, Claimant E also had an initial evaluation by a physician assistant at non-party Roman Isaac MD PLLC ("RI PLLC")'s office in Elmhurst, New York.  At this visit, Claimant E's complaints suddenly expanded to include alleged injuries in both knees. Without any supporting imaging, the physician assistant expanded the diagnoses to bilateral medial meniscus tears and added a right shoulder sprain.  The physician assistant also referred Claimant E for MRIs of both shoulders, despite that an MRI of the left shoulder had already been performed approximately two

months earlier and instructed him to continue physical therapy for both knees and shoulders. Despite the new bilateral knee diagnoses and a referral for physical therapy now including the right knee, none of Claimant E's subsequent physical therapy records mentioned the right knee.

589.    On April 21, 2022, Claimant E underwent a second MRI of the left shoulder at All County, which contradicted the January 2022 MRI, showing bursitis but no labral fraying. The right shoulder MRI, performed the same day, purportedly revealed supraspinatus tendinosis, bursitis, and effusion.

590.    The scheme escalated further on April 22, 2022 when non-party physician assistant Peter Perou ("Perou") at RI PLLC ordered MRIs of both knees that were later performed at All County and reportedly showed posterior horn meniscus tears, retinacular sprains and effusion in both knees.

591.    The fraudulent protocol then pivoted to "treating" these manufactured injuries. Just five days after the shoulder MRIs, on April 26, 2022, Bayner of SMB performed radial pressure wave therapy on Claimant E's right shoulder, citing decreased range of motion, tenderness, and weakness. Yet the very next day, on April 27, 2022, Harhash again documented the right shoulder range of motion as completely normal, directly contradicting Bayner's findings. In that same visit, Harhash relied on the recent March 2022 MRIs to recommend epidural injections to both the cervical and lumbar spine. He limited his exam to the left knee and left shoulder, noting impingement signs and reduced motion on the left side only, while ignoring the right knee entirely. Despite prior diagnoses of bilateral knee and right shoulder pathology by Perou, Harhash dismissed them, noting the right shoulder to have normal range of motion and classified Claimant E as 100% temporarily disabled.

592.    On May 9, 2022, Claimant E underwent a second musculoskeletal ultrasound at the 59-01 Clinic by Denise. This ultrasound, which examined the exact same body regions as a prior March 21, 2022 musculoskeletal ultrasound performed by Denise, produced a wholly different set of results. Inflammation previously documented in the cervical spine and trapezius disappeared, while new findings suddenly appeared at other levels. The lumbar spine and sacroiliac joints, however, remained consistently normal in both studies.

593.    On June 14, 2022, Claimant E again saw Harhash at the 59-01 Clinic, who noted cervical spasms, lumbar tenderness, positive straight leg raises, and left shoulder impingement with limited range of motion, but once again did not examine the right shoulder or right knee, and repeated the same recommendations: continue physical therapy, epidural injections, and upper and lower extremity EMGs, despite also claiming in his report that an upper extremity EMG, which purportedly was positive for bilateral C6 radiculopathy, had just been performed on May 19, 2022. Notably, no records were produced for this purported May 19, 2022 EMG.

594.    On June 20, 2022, Claimant E returned to RI PLLC's Elmhurst, New York office, where he was again seen by Perou, who expanded Claimant E's complaints further, now documenting bilateral knee pain, bilateral shoulder pain, and a left wrist injury, recorded vague shoulder limitations, bilateral knee tenderness with effusion, and positive McMurray's tests, diagnosed rotator cuff tendinosis in both shoulders and medial meniscus tears in both knees, and raised the possibility of arthroscopic surgery for the knees and shoulders.

595.    On June 21, 2022, Claimant E appeared for a NY WCB-ordered orthopedic IME with David Rubinfeld, M.D. Despite months of treatment for alleged bilateral knee tears, shoulder sprains, and a left ankle injury, Claimant E reported only neck, left shoulder, and left knee pain. Dr. Rubinfeld's physical exam stood in stark contrast to the treating providers' reports. He found

both knees with perfect range of motion and no effusion. Both shoulders demonstrated full, pain-free motion. The left ankle was also entirely normal. In the spine, he noted only mild to moderate cervical limitation and minimal thoracolumbar restriction, with no spasms, no trigger points, and negative Spurling's and straight leg tests, directly contradicting the repeated positive findings documented by Claimant E's treating physicians and physical therapist. Dr. Rubinfeld concluded Claimant E was only 25% partially disabled under NY WCB guidelines, capable of lifting up to 40 pounds, and that no further treatment was necessary.

596.    Yet less than five weeks later, at a visit on July 25, 2022 at RI PLLC, Perou documented knee and shoulder findings already ruled out by Dr. Rubinfeld, describing both knees as "improved" with normal flexion and continued to record positive shoulder impingement, and recommended more physical therapy and follow-up visits.

597.    On August 8, 2022, Harhash also disregarded the findings of the NY WCB IME, and recorded a series of positive tests (Spurling's, straight leg raise, Neer's impingement, and McMurray's) across the cervical spine, lumbar spine, left shoulder and left knee, and continued to ignore the right knee and right shoulder, other than noting the right shoulder to have normal range of motion. He declared Claimant E 100% disabled and recommended yet more therapy, injections, and EMG studies. These findings also contradicted the July 25, 2022 visit at RI PLLC, which noted improvement.

598.    In a decision dated August 18, 2022, the NY WCB disallowed MRIs of both shoulders on April 21, 2022 because the shoulders were not established injuries; a March 21, 2022 office consultation, finding insufficient evidence that the visit was causally related treatment/testing for the established sites of injury; and physical therapy from March 23, 2022 to April 26, 2022 and June 13, 2022 to June 20, 2022. Though the decision stated that Claimant E's

knees and shoulders were not established injuries, his treating providers continued to bill and treat as though they were.

599.    Despite the NY WCB August 18, 2022 ruling, on September 14, 2022 and October 12, 2022, Claimant E returned to Harhash, where he was examined for neck, left knee, left shoulder, and middle and low back pain. Harhash submitted nearly identical examination reports, mechanically repeating positive tests and 100% disability findings, with only minor adjustments to pain scores and left shoulder measurements.

600.    On October 13, 2022, Claimant E underwent another NY WCB-ordered IME with orthopedist Salvatore Corso, M.D., which once again directly contradicted the reports of his treating providers. Dr. Corso found full range of motion in both shoulders with no impingement, no spasms in the cervical or lumbar spine, and a negative Spurling's test. The left knee showed near-normal range of motion with no effusion and negative McMurray's test. Dr. Corso concluded Claimant E could work with restrictions, lifting up to 30 pounds, far from the 100% disability repeatedly claimed by Harhash.

601.    Directly inconsistent with the findings of the October 13, 2022 NY WCB IME, less than two weeks later, on October 25, 2022, Claimant E underwent trigger point and cervical epidural injections, performed by Harhash of Washington Medical at CitiMed Surgery Center in Queens, New York.

602.    On information and belief, Claimant E had to travel approximately 35.5 miles from his residence in Rahway, New Jersey on October 25, 2022 for the injections.

603.    On November 16, 2022, Harhash again recycled his exam findings to justify further lumbar epidural injections and an EMG of the lower extremities, continuing the pattern of duplicative testing and escalation. The EMG of the upper extremities performed on November 23,

2022 expanded the diagnosis to C6–C7 radiculopathy, creating the appearance of a "worsening" injury.

604.    Despite not receiving an evaluation for the left knee or right shoulder during his initial treatment with Rodrigues, multiple IMEs noting normal evaluations of the left knee and right shoulder, and Harhash consistently documented the right shoulder as having a normal range of motion, on December 13, 2022, Claimant E returned to the 59-01 Clinic for an initial consultation with orthopedic surgeon non-party Emmanuel Hostin, M.D. ("Hostin") of non-party Hostin Orthopaedics & Sports Medicine ("Hostin Ortho") regarding his left knee and bilateral shoulders.  Though billing records indicated that Claimant E had been referred by Santiago PT, the consultation was addressed to Perou. At this visit, Claimant E provided a new account of the incident, claiming he fell from a "4 foot ladder."

605.    In contrast to prior examinations by Harhash, at the December 13, 2022 visit, Hostin documented limited range of motion in both shoulders and the left knee, and a positive O'Brien's test on the left shoulder demonstrating post-traumatic impingement. Despite that it was Claimant E's first treatment visit with this doctor, Hostin recommended arthroscopic debridement of the left knee medial meniscus and a corticosteroid injection for the left shoulder.

606.    On December 28, 2022, Harhash conducted another examination of the cervical spine, thoracolumbar spine, left knee, and left shoulder. Despite Dr. Corso's October 2022 IME, demonstrating no trigger points, no muscle spasms and no abnormal findings, Harhash documented markedly reduced range of motion to justify further interventions, including an EMG of the lower extremities, additional cervical and lumbar epidural steroid injections, and trigger point injections.

150

607.    On February 3, 2023, Claimant E underwent cervical epidural steroid injections at C5–T1 under fluoroscopic guidance and trigger point injections at the C7–T1 paraspinal muscles, performed by Harhash of Washington Medical at CitiMed Surgery Center in Queens, NY, despite prior IMEs finding no muscle spasms.

608.    On information and belief, Claimant E had to travel approximately 35.5 miles from his residence in Rahway, New Jersey on February 3, 2023 for the injections.

609.    Less than three weeks later, on February 23, 2023, Claimant E was seen again by Harhash, who again issued a nearly identical examination report, with the right shoulder once again documented as having normal range of motion.  In treatment notes from multiple visits, Bayner of SMB documented limitations and complaints regarding right shoulder contradicting Harhash's findings.

610.    On February 28, 2023, Hostin again recommended arthroscopic surgery to the left knee, citing a medial meniscus with restricted flexion and pain.

611.    Just two days later, on March 2, 2023, Claimant E underwent a NY WCB-ordered IME with Dr. Louis McIntyre, M.D., who found Claimant E fully capable of work without restriction, and that Claimant E had 0% scheduled loss, *i.e.*, no permanent impairment, of his left shoulder and left knee, directly contradicting Claimant E's treating physicians. Examination of both knees, shoulders, and the cervical and lumbar spine revealed full range of motion and no deficits.  In his IME questionnaire Claimant E claimed that at the time of the incident he injured his neck, low back, right shoulder, and left knee (despite having made no complaints regarding his neck, right shoulder or left knee at the ER) and stated that he currently had pain to "all the body."

612.    On March 13, 2023, ten days after Dr. McIntyre's IME, Subin Firm served and verified Claimant E's Bill of Particulars alleging injuries to the cervical spine, lumbar spine, left

151

shoulder, and left wrist, including pain, joint effusion of the knee, and muscle spasms around the spine, and alleged that Claimant E was temporarily 100% disabled.

613.    The verified Bill of Particulars contained contradictory accounts of the incident, including that Claimant E fell from an unsecured extension ladder and elsewhere from an A-frame ladder at an elevated height, directly conflicting Claimant E's prior accounts to Rodrigues (fall from step ladder), Hostin (fall from 4-foot ladder (i.e., a step ladder)), Harhash (slip on building stairs due to snow), and the June 2022 IME with Dr. Rubinfeld (fall on stairs).

614.    In furtherance of the Fraud Scheme, Subin Firm knowingly and intentionally altered the description of Claimant E's accident, falsely representing that the incident involved an A-frame or unsecured extension ladder, rather than a step ladder, to fabricate a greater elevation differential and falsely invoke the protections of Labor Law §240(1), which imposes strict liability for elevation-related accidents.  This deliberate misrepresentation was calculated to deceive insurers, including Plaintiff, as well as courts and opposing parties, to create the illusion of statutory liability where none existed, and to unlawfully inflate the perceived value and settlement potential of Claimant E's workers' compensation claim and Labor Law lawsuit.

615.    During a NY WCB hearing on March 28, 2023, Judge William Hahn ruled there was no prima facie evidence that any right shoulder injury was causally related to the incident.

616.    Despite the objective assessments at IMEs demonstrating full function and no disability, Harhash continued repetitive and unnecessary examinations on April 18, 2023, June 9, 2023, and July 7, 2023, continuing to document purported positive findings, as well as repeated decreases in lumbar spine flexion, and falsely claiming 100% temporary disability, to create the appearance of a progressive injury and provide a false justification for further medical intervention, including cervical and lumbar epidural injections, and, as of July 7, 2023, indicating that Claimant

E would "be scheduled for lumbar discectomy surgery", with possible percutaneous lumbar discectomy.

617.    On September 12, 2023, Claimant E appeared for a NY WCB–ordered IME with orthopedic surgeon Dr. Satish Kashyap and once again expanded his list of claimed injuries, claiming to immediately have felt pain after the "accident" in his right knee and right shoulder, as well as the cervical and lumbar spine, left knee, and left shoulder, despite contradicting ER records, and wrongly indicated that he was scheduled for neck surgery (in addition to left knee surgery).

618.    Dr. Kashyap's IME findings stood in stark opposition to those documented by Harhash. The cervical spine was shown to have a negative compression test with normal range of motion. Similarly, where Harhash had promoted a narrative of lumbar pathology severe enough to justify a discectomy and repeated EMG studies, Dr. Kashyap found a negative straight leg raise bilaterally, with no signs of radiculopathy. Both shoulders demonstrated full or near-full range of motion, and no effusion, or impingement. The knees were likewise unremarkable: the right knee had a normal range of motion, while for the left knee, there was no tenderness, heat, swelling, effusion, no pain on motion, and no evidence of internal derangement.

619.    In direct contrast to Harhash's repeated assertions of "temporary 100% disability," Dr. Kashyap determined, consistent with the other IMEs, that Claimant E was capable of returning to work, subject only to lifting restrictions, and did not need physical therapy. Yet, just days later, Claimant E returned to physical therapy on September 19, 2023 and September 20, 2023, again alleging "6 out of 10" pain in nearly every claimed body part, including the neck, lower back, bilateral shoulders, left knee, and the left wrist. By that point, Claimant E had accumulated nearly 190 physical therapy sessions since February 2022, a number far exceeding reasonable medical necessity and evidencing an intentional effort to prolong care and inflate damages.

620.     On March 26, 2024, Subin Firm filed a motion to withdraw from Claimant E's lawsuit at the advice of ethics counsel because they did "not believe it appropriate for it to continue to litigate this matter pursuant to the New York Rules of Professional Conduct."

621.     In its opposition to Subin Firm's motion, defense counsel noted that Subin Firm had moved to withdraw from 24 cases under similar circumstances in March 2024 alone, 12 of which involved direct allegations of fraud against Subin Firm and the treating medical providers.

622.     On June 28, 2024, the judge granted Subin Firm's motion to withdraw without conducting a hearing.

623.     On September 24, 2024, after Claimant E failed to obtain new counsel and failed to appear at a status conference, the Court dismissed the case with prejudice.

624.     In creating the multitude of false or misleading reports purporting to support that the lumbar and cervical trigger point and epidural injections, and other treatment, performed on Claimant E, who had no objective signs of acute injury on date of accident, was medically necessary, Washington Medical Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel, NY WCB and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

625.     In creating the multitude of false or misleading reports purporting to support that the lumbar and cervical trigger point and epidural injections, and other treatment performed on Claimant E, who had no objective signs of acute injury on date of accident, was plausibly justified, Bayner, SMB and Contemporary Diagnostic knew, or should have known, such records to be false,

and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to Plaintiff, Plaintiff's defense counsel, NY WCB, New York State Courts and/or other parties to the underlying lawsuit and related workers' compensation claim as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

626.    On February 1, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified and filed a Verified Complaint on behalf of Claimant E alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant E was "sustained serious injuries" and "was rendered, sick, sore, lame and disabled" by the events of November 29, 2021, whereafter Claimant E showed no objective sign of any acute injury.

627.    On or about March 13, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified, signed and mailed and/or emailed the Bill of Particulars on behalf of Claimant E alleging under penalty of perjury that Claimant E suffered injuries to his cervical spine, lumbar spine, left shoulder, and left wrist  as a result of the events of November 29, 2021, whereafter Claimant E showed no objective sign of any acute injury.

628.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

f.    Claimant F (Trip-and-Fall Claim)

629.    Claimant Raymond Perez ("Claimant F") alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a sidewalk at 114-63 Queens Boulevard, Queens, New York on June 8, 2021.

630.    On information and belief, Claimant F is Hispanic and, at the time of his purported accident, had limited financial means.

631.    Claimant F was one of at least three individuals, including one other Subin Firm Claimant, who allegedly tripped and fell within days of each other in front of the same group of apartment buildings, and, on information and belief, were all initially represented by former-Subin Firm attorney Alexander Roytblat ("Roytblat").[27]  Claimant F's girlfriend, who was listed as his emergency contact for his left shoulder surgery, also brought a lawsuit for an alleged trip-and-fall in Queens, New York, that occurred within days of the other purported incidents.[28]

632.    At the time of the accident, according to his ER records, Claimant F was residing within 2 blocks of Claimant I (on Lincoln Avenue, Brooklyn, New York) and at least one other non-claimant also represented by Subin Firm.  *See infra.* Though Subin Firm continued to list the Lincoln Avenue address as Claimant F's residence on authorization forms, including those signed by Eisen, through 2023, Subin Firm listed a different residential address for Claimant F on the Summons for Claimant F's Verified Complaint, dated December 21, 2022.

633.    Upon consulting with one or more Subin Defendants and/or others acting on their behalf, Claimant F's initial complaints, which consisted only of pain to his left shoulder and left

---

[27] *See Mena v. Forest Hills S. Owners, Inc.*, Index No. 712782/2022 (Queens Cnty. Sup. Ct.) (alleging trip-and-fall in front of 77-15 113th Street, Queens, New York on June 12, 2021); *Chavez v. Forest Hills S. Owners Inc.*, Index No. 535049/2022 (Kings Cnty. Sup. Ct.) (alleging trip-and-fall in front of 116-03 Queens Boulevard, Queens, New York on June 2, 2021); *see also* https://foresthillssouthowners.com/the-property (last visited Jan. 22, 2026).
[28] *See Sarete v.30-88 21st Street Realty, LLC*, Index No. 727324/2021 (Queens Cnty. Sup. Ct.) (alleging trip-and-fall on May 31, 2021).

knee pain, morphed to included injuries to his left ankle, low back, left knee, both feet, neck and thoracic spine resulting in left shoulder and ACDF surgery, and recommended left ankle and left knee surgeries.

634.    On the day of the accident, Claimant F was transported by a cab to Jamaica Hospital Medical Center, where he complained of left shoulder and left knee pain. ER records noted that Claimant F **"denied back pain and neck pain."** Examination revealed no cervical spinous process tenderness or muscular tenderness, left knee bony tenderness with **no swelling and normal range of motion**. An X-ray of the left knee revealed trace suprapatellar effusion (fluid), but no fractures or dislocations. As for Claimant F's left shoulder, examination revealed tenderness, but **no swelling, no crepitus, and normal range of motion**, and an X-ray revealed no acute injuries. Claimant F was diagnosed with acute pain of the left knee and a contusion of the left shoulder and discharged after approximately three hours, with an ACE bandage and cane for his left knee and instructions to take over-the-counter Ibuprofen for pain and to follow up with their clinic. Upon discharge, Claimant F was in stable condition, observed with a steady gate and was feeling well.

635.    Less than a week later, on June 15, 2021, Claimant F presented to the same ER for a COVID vaccine, at which time he made no complaints of pain to any body parts. Additionally, on August 5, 2021, Claimant F again presented to the same ER for ear pain and again made no mention of pain to any body parts. ER records indicated that Claimant F's musculoskeletal examination showed **no swelling or tenderness, normal range of motion, and that Claimant F had no neck or back pain.**

636.    Instead of following up with the clinic as directed by the ER, Claimant F was directed by one or more Subin Defendants and/or others acting on their behalf to seek treatment

with several of his treating providers including Macagno, McCulloch, Gerling, Weiner and Karafin, as confirmed by Claimant F at his deposition, and also noted in IME and medical records:

> functional as far as activities of daily living. He was able to take a train to our exam today. He was referred to Dr. Gerling, Dr. Macagno, Dr. McCulloch, Dr. Weiner, and Dr. Karafin by his attorney.

| Additional Ref. Doctors | |
|---|---|
| Referral Source | Subin Associates, LLP (212-285-3800) 150 Broadway, New York, NY 10038) |

637.    On June 18, 2021, Claimant F had an initial evaluation at All Boro with Karafin, who indicated that, in addition to injuring his left shoulder and left knee, Claimant F had also **sprained his left ankle and low back, despite having made no complaints regarding his left ankle or low back at the ER following his alleged accident**. Karafin reported that his examination revealed tenderness to the left shoulder with pain on full range of motion, left-sided lumbar pain, pain over the lateral aspect and in the patellofemoral compartment of the left knee, and pain over the deltoid ligament and on eversion for the left ankle. **Claimant F's cervical examination, however, revealed full range of motion.** Karafin referred Claimant F to Kolb Defendants for MRIs of his left ankle, left shoulder and left knee, and to non-party Best Care PT ("Best Care") for physical therapy for his left ankle, low back, left shoulder and left knee, and indicated that he wanted to "observe the results of physical therapy on the low back prior to consider [sic] any additional diagnostic studies."

638.    On June 30, 2021, Claimant F commenced physical therapy at Best Care for his left shoulder, low back, left knee and left ankle, and, thereafter, underwent approximately 49 physical therapy sessions through March 1, 2022, which, on information and belief, were only for the left shoulder and left knee. Demonstrative of the fraudulent nature of his purported treatment, all of

the physical therapy session progress notes are virtually identical, including identical typos such as "Massage Herapy" and "Thereapeutic Exercises", identical photocopied/stamped physical therapist signatures, identical "treatments" and plans, and no indication what body parts were treated other than reference to either the left shoulder or left knee in the subjective complaints, presumably meaning only those body parts were treated.

639.    On July 2, 2021 and July 16, 2021, Kolb Defendants performed MRIs of Claimant F's left shoulder and left knee, and left ankle, respectively, which purportedly showed: (i) a high-grade partial rotator cuff tear involving the supraspinatus and infraspinatus tendons, partial tear of the anterior superior distal insertion of the subscapularis tendon, and SLAP tear extending into the anterior superior labrum for the left shoulder; (ii) and a tear of the posterior horn of the medial meniscus, partial tear of the anterior cruciate, and partial tearing of the posterior tibial insertion of the medial collateral ligament for the left knee; and (iii) a partial Achilles tendon tear, soft tissue edema, tear of the interosseous talocalcaneal ligaments, syndesmosis, partial tearing of the fibular insertion of the posterior talofibular ligament without joint effusion for the left ankle.

640.    On or before August 13, 2021, Claimant F retained Subin Firm to represent him in connection with his trip-and-fall claim, as evidenced by a power of attorney, executed by Claimant F and dated August 13, 2021, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records, which was notarized by DeLeon.

641.    Claimant F did not return to All Boro for five months, finally returning on November 19, 2021, where he was seen by Weiner, purportedly for persistent back pain.  Weiner reported reviewing MRIs of Claimant F's left shoulder, left knee, and left ankle, and that physical examination revealed diminished range of motion of the aforementioned body parts.  Though Claimant F had denied any back or neck pain at the ER, had not otherwise previously reported any

neck pain, had full range of motion of his cervical spine at his June 18, 2021 visit and had already purportedly begun physical therapy for his low back on June 18, 2021, at this visit, Weiner reported observing limited range of motion of the cervical and lumbar spine, and recommended that he "start a course of physical therapy" and follow up with an orthopedic surgeon. Additionally, though he was seemingly unaware that Claimant F had already begun physical therapy for his low back and despite that at his last visit with All Boro, Karafin indicated that he wanted to observe the results of that physical therapy before referring Claimant F for any further diagnostic studies, Weiner nevertheless referred Claimant F to Kolb Defendants for an MRI of his lumbar spine.

642.    Thereafter, on December 21, 2021, Kolb Defendants performed an MRI of Claimant F's lumbar spine, which purportedly showed L5-S1 disc herniation with central and bilateral foraminal narrowing and impingement on the bilateral thecal S1 nerve roots and exiting bilateral L5 nerve roots; L4-L5 disc herniation with central and foraminal narrowing; and L3-L4 broad posterior disc herniation with central and bilateral foraminal narrowing.

643.    On December 28, 2021, Claimant F had an initial examination by a physician assistant at McCulloch Ortho, whereat he complained of left shoulder and left knee pain, but reported "improvement of his painful symptoms with physical therapy", and rated his pain levels at 7/10 for his left shoulder and 4/10 for his left knee.

644.    On January 18, 2022, Claimant F was seen by non-party Siddartha Sharma, DPM ("Sharma") of McCulloch Ortho for an initial examination, whereat, according to treatment notes, Claimant F reported unspecified pain and swelling of his left ankle, examination revealed limited range of motion, and his left ankle MRI was reviewed.  Though this was Claimant F's first visit with this doctor, Sharma recommended extensive ankle surgery (arthroscopy with debridement

repair and tenolysis of Achilles tendon; modified Broström repair of collateral ligaments) and Claimant F agreed to proceed with the proposed surgery.

645.    In his January 18, 2022 report, to justify the proposed left ankle surgery, Sharma falsely stated that Claimant F had exhausted conservative therapy (despite that, at most, the only conservative care that Claimant F had received for his left ankle consisted of a single physical therapy session on June 30, 2021) and that his symptoms and injuries were causally related to his accident (despite Claimant F having made no complaints regarding his left ankle at the ER).

646.    On January 25, 2022, Claimant F returned to McCulloch Ortho for his left shoulder and left knee, and was again seen by the same physician assistant, who reported reviewing Claimant F's MRIs and that the exam results were unchanged.  Though Claimant F had reported improvement with physical therapy, the physician assistant instructed Claimant F to meet with McCulloch to discuss surgical options, including arthroscopic surgeries for the left shoulder and left knee.

647.    On February 18, 2022, Claimant F returned to McCulloch Ortho for his left shoulder and left knee where he was seen by another physician assistant.  Per the follow-up exam report, signed by McCulloch, Claimant F now reported 7/10 pain for both the left shoulder and left knee, despite having previously reported 4/10 pain for his left knee and improvement with physical therapy. McCulloch recommended left knee and left shoulder surgeries (left knee arthroscopic meniscal debridement versus possible repairs followed by left shoulder arthroscopic rotator cuff and labral debridements and decompressions versus possible repairs and MUMFORD) and Claimant F agreed to proceed with the proposed surgeries. In the report, McCulloch, falsely indicated that Claimant F had "failed extensive conservative treatment", despite that near-contemporaneous physical therapy records indicated to continue physical therapy as planned

(which Claimant F proceeded to do ) and repeatedly indicated that Claimant F tolerated physical therapy treatment well, and, on information and belief, Claimant F had only undergone approximately 13 physical therapy sessions over three months for his left knee.

648.    Claimant F had a further follow-up visit with Weiner for his low back on March 14, 2022, where he now complained of numbness to his left leg, and was referred to a spine specialist, physical therapy for his low back, left shoulder, left knee and left ankle (despite having already commenced physical therapy for these body parts), and an EMG study of his lower extremity.

649.    Though Claimant F had already commenced (and had not completed) physical therapy for the same body parts at Best Care PT, with his last visit on March 1, 2022, on March 22, 2022, Claimant F commenced physical therapy at non-party Action Care PT ("Action Care") for the same body parts and thereafter, underwent at least 60 sessions through May 2024.

650.    Claimant F returned to McCulloch Ortho on April 19, 2022, where he was seen by non-party Patricia Meehan, DPM ("Meehan"), and complained of left ankle pain, and was again recommended for surgery to his left ankle, to which Claimant F agreed, indicating that he wanted to proceed with the surgery after undergoing left shoulder surgery.

651.    On May 3, 2022, Claimant F saw Macagno at NYSI for an initial consultation and complained of neck and low back pain.  Despite this being his first visit with this provider and having not received (or been recommended for) any injections for his neck or back, Macagno recommended extensive low back surgery (L3-S1 laminectomy, L5-S1 transforaminal lumbar interbody fusion ("TLIF") and possible L4-5 TLIF), and Claimant F agreed to proceed with the proposed surgery.  In his report, Macagno falsely indicated that Claimant had tried extensive conservative treatment, including physical therapy, despite that Claimant F had not undergone any

physical therapy for his neck, and had only undergone five physical therapy sessions for his low back.

652.    On June 20, 2022, McCulloch performed left shoulder arthroscopy on Claimant F at Fifth Avenue ASC.  On information and belief, this surgery was paid in whole or in part through one or more litigation funding loans with Funding Defendants and/or a lien, as evidenced by "funding" and "pre-funding" on billing records, despite that Claimant F had Medicaid at the time.

653.    On July 22, 2022, Claimant F saw Karafin at All Boro complaining of pain in his left shoulder, low back, left knee and left ankle, and for a second opinion regarding lumbar surgery. Karafin recommended continued physical therapy, referred him to a second spinal orthopedist and for a lower extremity EMG, which Karafin performed at All Boro on July 25, 2022, and which purportedly revealed evidence of bilateral L5-S1 radiculopathy and evidence of left tibial neuropathy.

654.    On October 14, 2022, Claimant F saw Gerling at the Gerling Institute for low back pain. Claimant F testified at his deposition that Subin Firm referred him to Gerling**.**  At this visit, Gerling indicated that Claimant F's trip-and-fall accident occurred in May of 2020, over a year prior to the date of his purported accident.  Though Claimant F's Bill of Particulars, dated February 28, 2023, indicated that he was unemployed at the time of the accident and was unable to seek or accept employment as a result of the accident, Gerling indicated in his October 14, 2022 report, that Claimant F "is employed"  and had been working at the time of his alleged accident "as a linen company in a position that does not require any heavy lifting in excess of 20 lbs."

655.    Notably, Claimant F's Bill of Particulars was not signed or verified by 22 NYCRR § 130-1.1a(b) and the CPLR, instead, contained an unsigned verification page.

656.    At the October 14, 2022 visit, Gerling indicated that Claimant F complained of 7/10 low back pain and that his symptoms had been present for only two months (despite that the "accident" occurred more than 16 months earlier). Gerling reported reviewing the December 21, 2021 low back MRI, and ordered X-rays of the lumbar spine, which were performed the same day and purportedly showed L1-3 lateral listhesis and L2-5 retrolisthesis. Gerling diagnosed Claimant F with lumbar disc herniation aid radiculopathy, and recommended Claimant F for lumbar diskectomy with annuloplasty at L3-S1 (despite also indicating that symptoms were only present for 2 months), and Claimant F agreed to proceed with the proposed surgery. Gerling also reported that the cervical spine was "not focused on today", yet also noted performing a cervical X-ray, despite no indication in the records produced to defendants in the underlying action that such an X-ray was performed. Gerling falsely indicated that Claimant F had attempted physical therapy for the back "[f]or 2 years", despite that, with the exception of his initial PT visit on June 30, 2021, Claimant F had only undergone physical therapy for his low back for seven months. Gerling instructed Claimant F to follow up in two weeks or two months for s/p (status post) diskectomy.

657.    One week later, on October 21, 2022, to provide a false justification for lumbar surgery, Claimant F underwent a lumbar epidural steroid injection, performed by Weiner. This was the only injection Claimant F had prior to undergoing lumbar fusion surgery.

658.    On April 20, 2023, Claimant F underwent lumbar discectomy from an extraforaminal approach at the left L3-4 level, performed by Gerling of Gerling Institute at Bayonne Medical Center in Bayonne, New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

659.    On information and belief, at the time of the lumbar discectomy, Claimant F and Gerling resided in the State of New York.

660.    On information and belief, Claimant F had to travel approximately 29 miles from his residence in Brooklyn, New York for the lumbar discectomy on April 20, 2023.

661.    In travelling (and in causing Claimant F to travel) from New York to New Jersey on April 20, 2023, for the purpose of undergoing a knowingly unjustified surgery, and in performing that procedure and preparing the false documentation thereto, Gerling thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

662.    On information and belief, the April 20, 2023 surgery was paid for, at least in part through one or more litigation funding loans, despite that Claimant F had Medicaid at the time.

663.    On January 24, 2024, Dr. Edward A. Toriello performed an orthopedic IME of Claimant F.  Claimant F was accompanied by a representative from Subin Firm and reported injuring his low back, left shoulder, left knee, left ankle, both feet, neck and thoracic spine, despite that Claimant F never made any complaints to any treating providers of any injuries to his feet or thoracic spine, and made no complaints regarding his left ankle, neck or back at the ER.  Claimant F also stated that he was working as a driver at the time of the accident, despite claims in his Bill of Particulars that he was unemployed and Gerling's indication that he worked for a linen company at the time of the accident.  Dr. Toriello determined that Claimant F revealed no objective evidence of continued disability, was able to return to work and normal daily living activities without restriction and did not require any further orthopedic care.  Dr. Toriello opined that Claimant F did not sustain any injuries to his low back or left shoulder that would require surgical intervention, reasoning that Claimant F made **no complaints of pain in any way in his lower back when seen at the ER following his alleged trip-and-fall, which was inconsistent with a serious injury**

**necessitating eventual surgery** and that Claimant F's left shoulder intraoperative photos did not reveal any evidence of a causally related condition that would have required surgical intervention.

664.    On February 28, 2024, Dr. Joseph C. Yellin performed a neurology IME of Claimant F.  Claimant F was again accompanied by a representative from Subin Firm and reported injuring his low back, left shoulder and left knee.  Claimant F reported that his left shoulder was worse after surgery and that there had been "no relief" following his back surgery, despite no indications that Claimant F sought any treatment for his left shoulder or back following those surgeries.  Dr. Yellin found that there was "no evidence on examination of cervical radiculopathy or lumbosacral radiculopathy" and concluded that there was "no evidence of neurological residual or disability" as a result of the purported accident, and that Claimant F was able to perform his activities of daily living.

162.    In creating the multitude of false or misleading reports purporting to support that the lumbar spine surgery performed on Claimant F, who had no objective signs of acute injury on date of accident, was medically necessary, Gerling Institute Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

163.    In creating the multitude of false or misleading reports purporting to support that the left shoulder surgery performed on Claimant F, who had no objective signs of acute injury on date of accident, was medically necessary, McCulloch Ortho Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false

documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

164.    In creating the multitude of false or misleading reports purporting to support that the lumbar spine and left shoulder surgeries, injections, and other treatment performed on Claimant F, who had no objective signs of acute injury on date of accident, as well as the recommendations for left ankle and left knee surgeries, was plausibly justified, NYSI Defendants, Kolb Defendants and All Boro Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

162.    On December 21, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified and filed a Verified Complaint on behalf of Claimant F alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant F was "caused to sustain serious, harmful, permanent injuries," as well as "great bodily injuries and pain, shock, [and] mental anguish]" by the events of June 8, 2021, whereafter Claimant F showed no objective sign of any acute injury.

163.    On or about February 28, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed a Bill of Particulars on behalf of Claimant F alleging that Claimant F suffered injuries to his cervical spine, lumbar spine, thoracic

spine, left knee/leg, left ankle/foot, and left shoulder as a result of the events of June 8, 2021, whereafter Claimant F showed no objective sign of any acute injury.

164.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance of and as a necessary step in the Fraud Scheme.

165.    In performing the utterly unjustified and/or unrelated lumbar spine surgery, Gerling Institute Defendants, in agreement and with the assistance of Subin Firm, Kolb Defendants, All Boro Defendants and NYSI Defendants engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

166.    In performing the utterly unjustified and/or unrelated left shoulder surgery, McCulloch Ortho Defendants, in agreement and with the assistance of Subin Firm, Kolb Defendants and All Boro Defendants engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

665.    Claimant F's lawsuit remains pending and Plaintiff continues to incur damages.

g.    Claimant G (Trip-and-Fall Claim)

666.    Claimant Richard Loor Merchan ("Claimant G"), who was thirty-years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a raised sidewalk flag at 37-06 69th Street, Queens, New York, at around 6 p.m. on November 8, 2021.

667.    Claimant G is Hispanic and, at the time of his purported accident, was not a U.S. citizen, spoke limited English, had limited financial means and was on Medicaid.

668.    Claimant G did not seek or obtain any medical treatment immediately following his purported accident, notwithstanding later claiming in his lawsuit that his injuries were so severe as to warrant two surgeries (right shoulder and ACDF).

669.    In addition to his close ties to Claimant C and Z. Delgado, as noted above, Claimant G, who like Claimant C is/was also a livery driver, shares a child and lived with another claimant who was also represented by Subin Firm for a purported trip-and-fall accident in Queens, New York. Though that claimant ultimately did not file a lawsuit, UCC filings indicate that she had two litigation funding loans with Nexify.

670.    On November 7, 2021 (before his purported accident even occurred), Claimant G retained Subin Firm to represent him in connection with his trip-and-fall claim, as evidenced by a power of attorney, executed by Claimant G and dated November 7, 2021, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records, which was notarized by DeLeon.



671.    On information and belief, all (or nearly all) of Claimant G's purported treatment and surgeries in connection with his purported trip-and-fall accident were billed and paid for

through one or more litigation funding loans, including with Pegasus, despite that Claimant G had Medicaid during this time.

672.    One day after his accident, on November 9, 2021, at approximately 11:55 a.m. Claimant G presented to the ER at Northwell Health, Long Island Jewish Forest Hills, complaining of pain in his neck, back, right knee and right ankle. Claimant G did not make any complaints with regard to his head and denied any loss of consciousness. Per the ER records, Claimant G stated that he "fell into a hole" "while running", falling "backwards onto his back."  Examination revealed no objective evidence of any injuries.  Claimant G was observed to be in "no apparent distress" and revealed "full range of motion in all extremities" and "no pain, swelling or deformity of joints." An X-ray of his right ankle was "unremarkable," and a CT of the lumbar spine showed only degenerative changes (specifically mild right L4-L5 and L5-S1 neuroforaminal narrowing secondary to disc osteophyte complex). Claimant G was discharged shortly after arriving with instructions to take Ibuprofen for pain.

673.    Following his initial ER visit, Claimant G's purported treatment followed an eerily similar timeline to that of Claimant C.

674.    Specifically, on November 12, 2021, the exact same day that Claimant C first reported to Metro Point, Claimant G presented to Metro Point at the 59-07 Clinic for his first post-hospital visit, where he was seen by Bayner for an initial physiatry consultation, and also underwent an acupuncture initial evaluation and physical therapy initial evaluation.  At this visit, Claimant G expanded the scope and severity of his purported injuries, rating his pain as 9/10, and alleging, for the first time, that he hit his head when he fell, and had pain in his mid-back and right shoulder, despite making no such complaints at the ER.  The physical therapy initial evaluation indicated that the accident involved "WC" (i.e., workers' compensation).  Though Claimant G

ultimately conceded that he had a prior MVA accident on October 25, 2018, for which he filed a lawsuit alleging injuries to his neck, back, knee, shoulder and ankle, Metro Point's records indicated that that there were no prior injuries. At this visit Claimant G also underwent K-Laser treatment.

675. Demonstrative of the pre-determined treatment protocol, at the November 12, 2021 visit, Claimant G was diagnosed with the exact same conditions as Claimant C, specifically: post-traumatic headaches with dizziness, cervical sprain/cervicalgia with muscle spasms, thoracic sprain/thoracalgia with muscle spasms, lumbar sprain/lumbago with muscle spasms, bilateral sacroiliac joint sprain, right shoulder sprain/injury/pain, right knee sprain/injury/pain, and myofascial pain syndrome", and the panoply of recommended treatment was practically identical and included trigger point injections, joint injections, shockwave therapy, and functional capacity testing and algometry. Billing records indicated that all of Claimant G's treatment at Metro Point was paid for via "lien", including a purported visit on November 8, 2021 (the day of the accident), for which no records were produced.

676. On November 30, 2021, the same date that Claimant C was next seen by Bayner at Metro Point, Claimant G returned to the 59-07 Clinic, whereat he was seen by Bayner, and further expanded the scope of his purported injuries to now include his left shoulder and left knee.

677. Demonstrative of the pre-determined treatment protocol, there are striking similarities in Bayner's November 30, 2021 physical examination of Claimant C and Claimant G, including that both Claimants gait was "noted to be antalgic and slow' and were holding a shoulder "in a protected position." The physical examination of the cervical and lumbar spines are also verbatim identical. At the November 30, 2021, as with Claimant C, Claimant G also underwent

trigger point injections for his lower thoracic and lumbar spine, with verbatim procedure notes, including the pain level rated up to 8/10 VAS.

678.    On February 25, 2022, Claimant G returned to the 59-07 Clinic, whereat he was seen by a nurse practitioner, complained of pain to his head, neck, right shoulder, and right knee, and underwent radial pressure wave therapy to his lumbar spine.

679.    Records from the February 25, 2022 indicate that Claimant G was working part-time as a driver, despite that Claimant's Bill of Particulars, dated October 26, 2022 and served by Subin Firm, indicated that Claimant G was "confined to home" and "incapacitated from work" "for approximately five (5) months" following the November 8, 2021 accident.

680.    Notably, as with many other Claimants, Claimant G's Bill or Particulars and Supplemental Bill of Particulars served by Subin Firm, was not signed or verified, as required by 22 NYCRR § 130-1.1a(b) and the CPLR.

681.    On March 12, 2022, at the referral of Bayner, Claimant G underwent MRIs of the Lumbar Spine and Right Knee at AMI, which purportedly showed straightening and disc herniations at the L2-3, L3-4, L4-5 and L5-S1, and a prior ACL reconstruction with a partial tear of the ACL graft, joint effusion and a cyst, respectively.

682.    On May 13, 2022, Claimant G returned to the 59-07 Clinic, whereat he was seen by Bayner, who referred Claimant G for MRIs of the head/brain, cervical spine and right shoulder and for a consult with an orthopedist.

683.    On May 23, 2022 and May 30, 2022, at the referral of Bayner, Claimant underwent MRIs of the right shoulder and cervical spine at AMI, which purportedly showed mild subluxation of the acromioclavicular joint with significant hypertrophy of the joint capsule and tenosynovitis

172

of the extra articular long head of the biceps tendon, and straightening and disc herniations at the C3-4, C4-5, and C5-6, respectively.

684.    The MRI reports were thereafter transmitted to Bayner, thereby creating a pretext for further medical treatment and inflating the value of the claim.

685.    On July 5, 2022, Claimant G was seen by non-party Perdue of Metropolitan Medical for an initial evaluation, and complained of neck pain, right shoulder pain and right knee pain. There were no complaints of pain to the lumbar spine, including on lumbar flexion and extension, and range of motion was indicated as "good."   The records from this visit indicate that Claimant G "was seen for evaluation for injuries sustained in an auto accident", in addition to a trip-and-fall, with an accident date of December 6, 2021 (not November 8, 2021).  Though this was his first visit at Metropolitan Medical and Claimant G had not undergone any injections or conservative care for his neck, Claimant G was nevertheless recommended to undergo extensive cervical fusion surgery (specifically, percutaneous discectomy), to which Claimant G agreed, and the doctor falsely claimed that Claimant G "had not reached maximum medical improvement despite conservative treatment thus far."  The doctor further noted that Claimant G did not want to consider injections, despite that he had received trigger point injections for his lumbar spine.

686.    On July 11, 2022, Claimant G presented himself to Wert of Wert PC for an initial consultation.  Though this was his first visit with Wert and Claimant G had not undergone any injections or conservative care for his shoulder, Wert nevertheless recommended right shoulder arthroscopic surgery, to which Claimant G agreed, and falsely claimed that surgery was necessary due to Claimant G's "unfavorable response to conservative treatment."

687.    On July 29, 2022, Claimant G underwent right shoulder derangement and arthroscopic surgery performed by Wert at New York Surgery Center Queens.  Surgery records indicate that the right shoulder surgery was "funded."

688.    On information and belief, at the time of the right shoulder surgery, Wert resided in the State of New Jersey.

689.    In travelling from New Jersey to New York on July 29, 2022, availing himself of New York's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Wert "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 U.S.C. § 1961(1).

690.    On information and belief, the surgery was paid for by one or more litigation funding loans, including with Pegasus.

691.    On December 21, 2022, Claimant G was seen by Katzman, of Advanced Ortho, for an initial consultation whereat he complained of 10/10 neck pain.  Though this was his first visit with Advanced Ortho and Claimant G had not undergone any injections or conservative care for his neck, Katzman recommended extensive cervical spinal discectomy and fusion surgery (specifically, ACDF at C4-5 and C5-C6), to which Claimant G agreed, and falsely claimed that the surgery was "medically necessary and indicated."

692.    On March 29, 2023, Claimant G underwent ACDF surgery with anterior instrumentation and insertion of biomedical devices at C4-C5 and C5-C6 and use of allograft

bones, which was performed by Katzman at Mountain Surgery in West Orange, New Jersey, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

693.    Prior to undergoing ACDF surgery and right shoulder surgery, Claimant G had not undergone any injections or conservative care for his neck or right shoulder.  The only conservative care that Claimant G received prior to these surgeries consisted of five physical therapy sessions for his low or mid back, six sessions of acupuncture for the low back or right leg, and two sessions of K-Laser and one session of radial wave pressure therapy for the lumbar spine.

694.    On information and belief, at the time of the cervical fusion surgery, Claimant G and Katzman resided in the State of New York.

695.    On information and belief, Claimant G had to travel approximately 30 miles from his residence in Queens, New York for his cervical fusion surgery.

696.    In travelling (and in causing Claimant G to travel) from New York to New Jersey on March 29, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman thereby "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" a kickback scheme, in violation of the Travel Act, a predicate under 18 U.S.C. § 1961(1).

697.    Katzman did not even attempt to hide the fraud involved. Lupi, a known runner for Subin Firm, is listed on Claimant G's forms in connection with this surgery:



|  | PRIMARY INSURANCE |
| --- | --- |
| Insurer: SUBIN & ASSOCIATES (JORGE LUPI) | Insured's Name: LOOR-MERCHAN, RICHARD |

698.    According to its records, Advanced Ortho billed Claimant G **$476,775.20** for this surgery, billing identical amounts for the same CPT codes for the physician assistant and Katzman, listing the insurance as Subin Firm.

699.    According to its records, Mountain Surgery also billed Claimant G $193,767.28 for this surgery, billing different amounts under several of the same CPT codes also billed by Advanced Ortho, as well as for the implants and/or other equipment used in connection with the surgery.

700.    On information and belief, Mountain Surgery's $193,767.28 bill was reimbursed through one or more of Claimant G's litigation funding loans, including with Pegasus, despite that Claimant G had Medicaid at the time.

701.    On information and belief, Advanced Ortho's $476,775.20 bill was reimbursed through one or more of Claimant G's litigation funding loans, including with Pegasus, despite that Claimant G had Medicaid at the time.

702.    Neither of the above bills include the additional anesthesia fees that, on information and belief, were also billed to Claimant G and reimbursed through one or more of Claimant G's litigation funding loans, including with Pegasus, despite that Claimant G had Medicaid at time.

703.    On information and belief, Advanced Ortho and Mountain Surgery's bills, which together totaled more than $650,000.00, were far in excess of what any legitimate healthcare providers would bill (or what Medicaid or any legitimate health insurance company would ever reimburse) for Claimant G's March 29, 2023 surgery.

704.    On information and belief, pursuant to kickbacks and/or unlawful referrals, Defendants coordinated the litigation funding loans' undertakings so that Medical

Provider Defendants who purported to treat Claimant G, including Advanced Ortho Defendants, were able to charge (and be reimbursed for) substantially higher fees for surgery and treatment than would have been recoverable through Claimant G's Medicaid.  Again, in accordance with the fraudulent treatment protocol the two surgeries that were performed, including the ACDF surgery at Mountain Surgical, were critical to the Fraud Scheme's goal of inflating the value of Claimant G's claim.

705.    On October 17, 2024, Subin Firm filed a Consent to Change attorney, substituting the Pianko Firm as Claimant G's counsel for his trip-and-fall lawsuit.

706.    On April 9, 2025, Pianko Firm filed an Order to Show Cause to withdraw as G's counsel based upon a purported "breakdown in communication and disagreement over litigation strategy."

707.    In creating the multitude of false or misleading reports purporting to support that the right shoulder surgery performed on Claimant G, who had no objective signs of acute injury on date of accident, was medically necessary, Wert PC Defendants knew or should have known such records to be false, and further knew or should have known such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

708.    In creating the multitude of false or misleading reports purporting to support that the ACDF surgery performed on Claimant G, who had no objective signs of acute injury on date of accident, was medically necessary, Advanced Ortho Defendants knew or should have known such records to be false, and further knew or should have known such false documentation would

be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

709.    In creating the multitude of false or misleading reports purporting to support that the right shoulder and ACDF surgeries, injections and other treatment performed on Claimant G, who had no objective signs of acute injury on date of accident, was plausibly justified, Metro Point Defendants, Metropolitan Medical Defendants and Mountain Surgery knew or should have known such records to be false, and further knew or should have known such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

710.    On July 28, 2022, at the direction of H. Subin, E. Subin, Eisen, and/or Baum, May verified and filed a Verified Complaint on behalf of Claimant G alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant G was "caused to sustain serious, harmful, permanent injuries," as well as "great bodily injuries and pain, shock, [and] mental anguish]" by the events of November 8, 2021, whereafter Claimant G showed no objective sign of any acute injury.

711.    On or about October 26, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed the Bill of Particulars on behalf of Claimant G alleging that Claimant G suffered injuries to his lumbosacral spine, right shoulder,

thoracic spine, right knee, cervical spine, right ankle and head as a result of the events of November 8, 2021, whereafter Claimant G showed no objective sign of any acute injury.

712.    On or about May 10, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant G alleging that Claimant G underwent the aforementioned cervical spine surgery on March 29, 2023, performed by Katzman, as a result of the events of November 8, 2021, whereafter Claimant G showed no objective sign of any acute injury.

713.    Notably, Claimant G's Supplemental Bill of Particulars dated May 10, 2023, as well as his Bill of Particulars dated October 26, 2022, both of which were served by Subin Firm, were not signed by Subin Firm, as required by 22 NYCRR §130-1.1a(b), and were not verified by Subin Firm or Claimant G as required by the CPLR.

714.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme.

715.    In performing an utterly unjustified and/or unrelated surgery Advanced Ortho Defendants, in agreement and with the assistance of Subin Firm, Metro Point Defendants and Metropolitan Medical Defendants, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

716.    Claimant G's lawsuit remains pending and Plaintiff continues to incur damages.

h.    Claimant H (Trip-and-Fall Claim)

717.    Claimant Wilson Genaro Lopez Mora ("Claimant H"), who was forty-four years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a sidewalk at 60-15 Calloway Street, Queens, New York at around 7:30 p.m. on July 29, 2022.

718.    Claimant H is Hispanic and, at the time of his purported accident, was not a U.S. citizen, spoke limited (if any) English and, on information and belief, had limited financial means. At some point after his lawsuit began, Claimant H was on Medicaid.

719.    At his deposition, Claimant H testified that he had received $15,000 from litigation funding loans which were obtained through Subin Firm and that Jorge Luhan (on information and belief Lupi) assisted with getting him those funds.  On an intake form dated August 12, 2022 and completed by Eli Serran ("Serran"), a now-former employee of Subin Firm (the "Subin Intake Form"), Lupi was also identified as having referred Claimant H to Subin Firm:

| Subin Associates | |
|---|---|
| Intake Sheet | |
| ALL of the following fields MUST be filled out OR filled out with N/A (Not Applicable) | |
| Name of Person filling out this form for Subin Associates: | Today's Date: 8-12-2022 |
| | El. Serran |
| How did the client hear about Subin Associates? | Lupi |

720.    Following his purported accident, the ER made no findings of any acute injuries and Claimant H made no complaints regarding his neck or back, or the left side of his body (including his left shoulder), notwithstanding later claiming in his lawsuit that his injuries were so severe as to warrant extensive lumbar surgery and a recommended left shoulder surgery.

721.    On the day of the purported accident, July 29, 2022, Claimant H was taken by an ambulance to the ER at Elmhurst Hospital, whereat he complained of pain in his right arm, right side of chest (rib), right hip, right shoulder, but reported no pain/complaints regarding his neck,

180

mid or low back, or the left side of his body, and range of motion was normal. ER records noted that Claimant H was "talking on his phone" when he tripped and fell, with the condition described as several times as a "pothole." The hospital made no substantive findings of any acute injury. Examination revealed that Claimant H was in no acute distress. The ER records indicate some tenderness, but no visible trauma was noted, and he was further noted to be "moving all extremities." X-rays of Claimant H's right shoulder, right forearm, right elbow and right humerus showed no acute findings, with his elbow showing only degenerative changes suggestive of a pre-existing chronic ligamentous tug injury. Claimant H was discharged home with instructions to take over the counter Ibuprofen and Acetaminophen and was referred to orthopedics.

722.    On or before August 12, 2022, Claimant H retained Subin Firm to represent his in connection with his trip-and-fall lawsuit, as evidenced by a power of attorney, executed by Claimant H and dated August 12, 2022, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records in connection with his alleged accident, which was notarized by DeLeon, as well as the above-discussed intake form.

723.    Though Claimant H had not made any complaints regarding his neck, back or the left side of his body prior to August 12, 2022, on the Subin Intake Form, then Subin employee Serran indicated that Claimant H had sustained injuries to his neck, back and left arm injuries. On information and belief, Subin Firm provided the Subin Intake Form to Claimant H's treating providers to dictate his treatment, pursuant to the pre-determined protocol designed to maximize treatment and inflate the value of his trip-and-fall claim.

724.    Following the ER visit, Claimant H did not seek any further treatment until nearly three weeks later, on August 17, 2022, when he presented to All Boro in the Bronx and was seen by a chiropractor. At this visit, Claimant H expanded the scope and severity of his purported

injuries, now claiming for the first time that he was experiencing neck pain, mid-back pain and low back pain, in addition to pain in portions of the right side of his body, but made no complaints regarding the left side of his body (including his left shoulder). MRIs of the cervical spine, lumbar spine, right shoulder and right knee were ordered and Claimant H was recommended to undergo chiropractic treatment for 2-3 times per week for the next 4-6 weeks.

725.    Thereafter, Claimant H purportedly underwent approximately 80 chiropractic and/or physical therapy sessions at All Boro through July 19, 2023. According to those treatment notes, between August 18, 2022 and August 25, 2022, Claimant H continued to report only pain in his right shoulder, right knee, and back. Thereafter, with the exception of a few visits in September of 2022 and early October of 2022, Claimant H was not documented as having made any complaints regarding his left shoulder, and at no visits was it noted that Claimant H received any treatment for his left shoulder. Mover, at Claimant H's first visit with Weiner at All Boro on September 19, 2022, he did not note any complaints, diagnoses or treatment with respect to Claimant H's left shoulder. Similarly, at a neurological IME on or about November 6, 2024, Claimant H denied "any injuries to the left side of his body including his left shoulder."

726.    Claimant H later told two IME providers that Subin Firm referred him to a medical clinic (presumably All Boro), but he could not remember the name of the doctors there.

727.    Additionally, the following week on September 6, 2022, Claimant H claimed that his left leg hurt due to pain radiating down from his lumbar spine and that now both of his shoulders hurt, despite that the left shoulder injury was not complained of at the ER.

728.    On October 10, 2022, at the referral of Weiner, Claimant H underwent MRIs of his cervical spine, lumbar spine and right elbow at Kolb Radiology, which were interpreted by Kolb and purportedly showed posterior disc herniation at C3-4 impinging upon the thecal sac; a bulging

disc at the L5-S1 mildly impinging upon the thecal sac; and a partial tear of the common flexor tendon associated with soft tissue edema, respectively.

729.    On October 12, 2022, Claimant H presented again to All Boro, where he was seen by Weiner. Though there was no specific complaint noted with regard to the left shoulder, other than a general reference to "shoulder pain", Weiner purportedly examined the left shoulder, assessed that there was limited range of motion, and referred Claimant H for an MRI.  Weiner further recommended that Claimant H follow up with an orthopedic surgeon for his right elbow and discussed the risk and benefits of epidural injections.

730.    On November 2, 2022, Claimant H underwent an MRI of his left shoulder at Kolb Radiology, which was interpreted by Kolb as showing a complete rotator cuff tear at the anterior distal insertion of the supraspinatus tendon with 1.3 centimeter retraction of the tendon from its distal insertion, complete non retracted tears of the infraspinatus and sub scapularis tendons, tear of the anterior labrum extending superiorly and inferiorly, tear of the inferior labrum and joint and bursal effusions.

731.    On November 14, 2022, Claimant H presented again to All Boro, where he was seen by Karafin and was referred to an orthopedist for his left shoulder.

732.    On November 22, 2022, Claimant H was seen by a physician assistant at McCulloch Ortho, for an orthopedic evaluation regarding his right elbow.  Conservative treatment measures, shockwave therapy and percutaneous tenotomy were discussed and Claimant H was indicated as considering the latter procedure because he had "failed conservative treatment", notwithstanding that the only conservative treatment that Claimant H had received, if any, for his right elbow prior to that date consisted of a single chiropractic treatment session on September 1, 2022.

733.    On December 9, 2022, Claimant H was seen by another physician assistant at McCulloch Ortho, now in in Garden City, New York, for his right elbow and left shoulder. Though this was his first visit with an orthopedist for his left shoulder and Claimant H had undergone, at most, two sessions of conservative care (specifically, chiropractic treatment) for his left shoulder (and no physical therapy or other conservative care), McCulloch nevertheless recommended that he undergo left shoulder surgery "as soon as possible." In the report, McCulloch falsely claimed that such surgery was "medically necessary given … lack of response to conservative measures over an extended period of time and acute change in function associated with the accident in question." Moreover, though Claimant H had, at most, undergone one session of conservative care (consisting of chiropractic treatment) for his right elbow (and no physical therapy), McCulloch nevertheless recommended that he continued with his conservative treatment, including physical therapy.

734.    On January 26, 2023, Claimant H was seen by Wert of Wert PC at All Boro's offices in the Bronx for an initial orthopedic evaluation for his left shoulder. In this report, it was falsely noted that Claimant H was attending physical therapy. Though this was his first visit with Wert and he had not undergone any course of conservative care with respect to his left shoulder (as noted above), Wert nevertheless recommended that Claimant H undergo left shoulder arthroscopic surgery, to which Claimant H agreed. In his report, Wert falsely claimed that it was "definite that the accident … was the competent producing cause of" Claimant H's injuries and symptoms, and that surgery was warranted due to Claimant H's "unfavorable response to conservative treatment." Moreover, though Claimant H had not undergone any physical therapy for his left shoulder, Wert advised him to "continue physical therapy" in the interim for his left shoulder. Between January

26, 2023 and September 22, 2023, Claimant H did not receive any treatment or conservative care for his left shoulder.

735.    On September 22, 2023, Claimant H returned for a follow-up visit at McCulloch Ortho, where he was seen by yet another physician assistant.  Other than a two-sentence entry noting symptoms unchanged for the left shoulder and improvement and minimal pain for the right elbow, the treatment notes/examination for this visit are identical to Claimant H's last visit at McCulloch Ortho on December 9, 2022.  As with the last visit, in the report, McCulloch falsely claimed that such surgery was "medically necessary given … lack of response to conservative measures over an extended period of time and acute change in function associated with the accident in question."

736.    On November 7, 2023, Claimant H was seen by Sherban at NYNJ Ortho in Manhattan for an initial evaluation for his neck and pain, where at he was diagnosed with neck pain with a disc herniation at C4-C4, back pain with lumbar disc pathology at L5-S1, and upper and lower extremity radiculopathy. Surgical and non-surgical options, including injections, were discussed, and Claimant H was referred for updated MRIs.

737.    On December 19, 2023, Claimant H underwent MRIs of his cervical and lumbar spine at CitiMed Diagnostics, which reportedly differed substantially from the MRIs performed by Kolb Defendants in October of 2022.  Specifically, unlike the prior MRIs, the cervical MRI showed no disc bulges or herniations, and the lumbar MRI showed a disc bulge at the L4-L5 and a herniation at L5-S1.

738.    On December 23, 2023, Claimant H returned to NYNJ Ortho.  Notwithstanding the results of the recent cervical MRI showing no herniations or bulges, Sherban discussed surgical options for the neck and back, consisting of C3-C4 ACDF and L4-S1 laminectomy with possible

185

instrumented fusion with a spinal clamp, and recommended continuing conservative care for the neck since the lumbar spine was apparently bothering Claimant H the most.

739.    On January 10, 2024, Claimant H was seen by Rovner at non-party New York Spine & Sports Surgery for an initial evaluation of his left shoulder and right elbow.  Though this was his first visit with Rovner, Rovner nevertheless recommended left shoulder arthroscopy to be scheduled at the next available time.  In his report, Rovner falsely claimed that the diagnosis and symptoms were directly causally related to the accident, and that Claimant H had "been treated with physical therapy and other conservative modalities since the time of the accident."  Prior to January 2024, Claimant H had undergone conservative treatment at, at most, two chiropractic/physical therapy sessions for his left shoulder.  IME doctors

740.    On January 31, 2024, Claimant H underwent the L4-S1 laminectomy surgery with instrumented fusion with a spinal clamp at L4-L5 performed by Sherban of NYNJ Ortho at non-party ASC, Fifth Avenue Extension Surgery Center.

741.    According to its records, NYNJ Ortho billed Claimant H $159,950.00 for this surgery. The bill does not include the additional anesthesia fees that, on information and belief, were also billed to Claimant H.

742.    On information and belief, NYNJ Ortho's 159,950.00 bill, as well as nearly all (if not all) of the bills for treatment of Claimant H from the treating Medical Provider Defendants were reimbursed through one or more of Claimant H's litigation funding loans.

743.    On October 21, 2024, Claimant H was seen by Hasanuzzaman at Hasanuzzaman PC for an initial evaluation at the 40-11 Warren Clinic.  Though he had previously reported only 2/10 lumbar and 5-6/10 cervical pain at his third post-operative visit with Sherban on September 26, 2024, Claimant H now reported 8/10 pain in his cervical and lumbar spine, as well as his right

186

shoulder and elbow.  Though the left shoulder was not mentioned anywhere on the treatment notes (i.e., there were no complaints or examination of the left shoulder), Claimant H was nevertheless referred to physical therapy for his cervical spine, right forearm, and left and right shoulders.

744.    Thereafter, beginning on October 28, 2024, and continuing through January 13, 2025, Claimant H attended an initial and seven subsequent physical therapy sessions by non-party JPM at the 40-11 Warren Clinic.  Though he was prescribed physical therapy for his cervical spine, right forearm, and bilateral shoulders, Claimant H also purportedly received physical therapy for his low back, but not for his left shoulder.  Other than changes to the pain scale from 7/10 to 8/10, the progress notes for these physical therapy sessions, including Claimant H and the provider's signatures, were identical.

745.    On December 17, 2024, Claimant H returned to the 40-11 Warren Clinic for an initial orthopedic exam by non-party U.K. Sinha, M.D. ("Sinha") of non-party UK Sinha Physician, P.C. ("Sinha PC") for his right shoulder.  Claimant H was recommended to undergo steroid injections but refused due to the side effects.

746.    It is indisputable that Claimant H's lumbar surgery was medically unnecessary and excessive. Dr. Ira J. Chernoff, M.D., conducted an orthopedic independent spinal evaluation IME of Claimant H on January 22, 2025, in which he found that though "Kolb Radiology noted a disc bulge at L5/S1. There were no disc herniations noted" and that "[d]isc bulging is a normal finding," and concluded that the lumbar MRI report from Kolb Radiology.  Dr. Chernoff also noted that records noted that Claimant H was talking on his cell phone when he purportedly tripped and fell, which Claimant H denied, and that there were indications that Claimant H was exaggerating/fabricating his injuries:

The claimant states he was unable to tie his shoes with his right hand, although the claimant was observed to be able to tie his shoes with his right hand when getting dressed for the exam today.

The claimant exhibited positive Waddell's signs on exam today, with an inconsistent examination. He had whole arm and leg numbness in a non-anatomic distribution. The claimant was able to move further when interviewed than when asked to do so when being examined.

*Dr. Chernoff January 22, 2025 IME*

747.    Likewise, Dr. Daniel J. Feuer conducted a neurological IME on November 6, 2024 and found that Claimant H did not offer any radicular complaints, that the ER did not document any focal neurological deficits, that the medical records failed to document consistent objective focal neurological deficits to support a radiculopathy diagnosis, and that Claimant H was unfamiliar with a diagnosis of radiculopathy and, thus, that it was "unclear how he was able to provide informed consent to undergo any procedures of the spine regarding this diagnosis." Dr. Feuer concluded that Claimant H did not demonstrate any objective neurological disability or permanency and was stable to engage in full active employment and full activities of daily living without restriction.

748.    Similarly, an examination conducted at an IME by orthopedic surgeon Dr. Edward A. Toriello, on or about October 8, 2024, revealed no issues with respect to both shoulders and elbows, and full, pain-free range of motion, with Dr. Toriello finding that there was only evidence of a resolved left shoulder strain and resolved right elbow contusion, and no objective evidence of continued disability.

749.    Though Claimant H demonstrated full, pain-free range of motion of both shoulders at his IME with Dr. Toriello on October 8, 2024 (consisting of 150 degrees abduction and flexion, 80 degrees internal rotation, 90 degrees external rotation, 40 degrees extension and 30 degrees adduction), Hasanuzzaman and Sinha recorded significantly more limited range of motion at

subsequent visits in December of 2024, with Sinha claiming only 90 degrees abduction, 95 degrees forward flexion, 45 degrees internal rotation and 75 degrees external rotation).

750.    On March 26, 2024, Subin Firm filed a consent to change attorney, substituting Pianko Firm as Claimant H's counsel for his trip-and-fall lawsuit.

751.    In creating the multitude of false or misleading reports purporting to support that the lumbar spine surgery performed on Claimant H, who had no objective signs of acute injury on date of accident, was medically necessary, NYNJ Ortho Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

752.    In creating the multitude of false or misleading reports purporting to support that the lumbar spine surgery and other treatment performed on Claimant H, who had no objective signs of acute injury on date of accident, including the recommendation for left shoulder surgery, was plausibly justified, All Boro Defendants, McCulloch Ortho Defendants, Wert PC Defendants, Rovner PLLC Defendants, Kolb Defendants and Hasanuzzaman PC Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

753.    On October 28, 2022, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, May verified and filed a Verified Complaint on behalf of Claimant H alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant H was "caused to sustain serious, harmful, permanent injuries," as well as "great bodily injuries and pain, shock, [and] mental anguish]" by the events of October 28, 2022, whereafter Claimant H showed no objective sign of any acute injury.

754.    On or about March 22, 2023, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed the Bill of Particulars on behalf of Claimant H alleging that Claimant H suffered injuries to his left shoulder, right elbow, cervical spine, and lumbosacral spine, as a result of the events of July 29, 2022, whereafter Claimant H showed no objective sign of any acute injury.

755.    On or about February 21, 2024, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant H alleging that Claimant H underwent the aforementioned lumbar spine surgery on January 31, 2024, as a result of the events of July 29, 2022, whereafter Claimant H showed no objective sign of any acute injury.

756.    Notably, as with many other Claimants, Claimant H's Bill of Particulars and Supplemental Bill of Particulars served by Subin Firm, were not signed or verified, as required by 22 NYCRR §130-1.1a(b) and the CPLR.

757.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to

the underlying lawsuit were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme.

758.    In performing the utterly unjustified and/or unrelated surgery NYNJ Ortho Defendants, in agreement and with the assistance of Subin Firm, Kolb Defendants, and All Boro Defendants, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

759.    Claimant H's lawsuit remains pending and Plaintiff continues to incur damages.

i.    Claimant I (Trip-and-Fall Claim)

760.    Claimant Felix Marmol ("Claimant I"), who was forty-three years old at the time, alleged to have sustained multiple injuries after an unwitnessed trip-and-fall on a sidewalk at 563 Howard Avenue, Brooklyn, New York State at around 10:10 p.m. on July 24, 2023.

761.    Claimant I is Hispanic and, at the time of his purported accident, spoke limited (if any) English and, on information and belief, had limited financial means and was on Medicaid.

762.    At the time of his purported accident, Claimant I resided at the same address as at least one other non-claimant, Nelson Antonio Aquino Duran, also represented by Subin Firm in connection with a trip-and-fall in Queens, New York on June 25, 2023 (less than one month prior to Claimant I's purported accident).

763.    At his deposition, Claimant I testified that he obtained a litigation funding loan, however, he did not know who he received a loan from, was not familiar with Pegasus (the provider of his litigation funding loan), and did not know that the loan was secured by the proceeds of his lawsuit.

764.    The Subin Firm produced photographs of the alleged defective condition which showed two people, one of whom was holding measuring tape, and a moped/scooter parked directly behind them on the sidewalk.  News articles and court filings have documented a scheme involving a former-Subin Firm attorney, Roytblat, whose former client who was also an investigator for Roytblat was videotaped arriving on a moped/scooter and breaking up portions of a sidewalk hours before a non-claimant staged a fake trip-and-fall accident at the same location. In a recorded call, a former employee for Roytblat described the fraudulent scheme adopted by Roytblat from Subin Firm:

> 1-  Well because if you read the article it's a blueprint for how our cases run that's where he learned it from, Subin. Get an immigrant to stage an accident, make them take high interest loans, make them get fusions, not surgeries, fusions because they're expensive, and then when the case settles, "Sorry you took all the money in loans you only get a few bucks." That's his blueprint. It's like a blueprint for how Alex learned how to run a case like in that New York Post article you read. ▮▮▮▮▮▮

765.    On the day of the purported accident, Claimant I was taken by ambulance to the ER at Interfaith Medical Center in Brooklyn, NY.  In the ambulance, the only assessed injuries were subjective complaints of pain in the left knee and back.  Claimant I denied any head/neck injuries, and both were assessed as normal.  In the ER, Claimant I also complained of pain in his neck, in addition to his upper back and left knee, but was observed moving his neck and both arms "with no issue."    Examination at the ER revealed arthralgias, back pain, joint swelling and mild tenderness, but no edema or erythema.  X-rays of the left knee, and cervical and thoracic spine were ordered, and all were normal/unremarkable, with only minor degenerative osteophytes noted for the thoracic spine.  Claimant I was discharged less than four hours later with instructions to rest, use a warm compress, take over-the-counter medications and follow up with a private doctor.

766.    Claimant I did not seek any further treatment until one month later, on August 24, 2023, when, he was seen by a chiropractor at All Boro in Elmhurst, Queens for an initial examination. At this visit, Claimant I expanded the scope and severity of his purported injuries, now claiming for the first time that he was also experiencing left shoulder and right pinky pain. MRIs of the left shoulder and left knee were ordered, and Claimant was recommended to undergo chiropractic treatment 2-3 times for the next 4-6 weeks.  Bills from All Boro repeatedly classified the accident as an MVA.  Claimant I later admitted that Subin Firm referred him to the medical clinic in Queens.

767.    Thereafter, Claimant I underwent approximately 36 chiropractic/physical therapy sessions for his cervical/thoracic spine at All Boro through May 31, 2024.  During this time, Claimant I's cervical and thoracic spine pain was consistently documented as 9/10 and 8 or 9/10, respectively.  The treatment provided at these visits was identical, with no indication of Claimant I's response to treatment.

768.    On or before October 6, 2023, Claimant I retained Subin Firm to represent him in connection with his trip-and-fall lawsuit, as evidenced by a power of attorney, executed by Claimant I and dated October 6, 2023, appointing Subin Firm (and specifically Eisen, Baum and May) to obtain his medical and other records in connection with his alleged accident.

769.    On information and belief, by the time of his August 24, 2023 visit, Claimant I had already entered into a litigation funding loan and/or a lien arrangement, facilitated by Subin Firm, despite that Claimant I had Medicaid at the time of his treatment at the ER.

770.    On September 18, 2023, Claimant I was seen by Karafin at All Boro for an initial evaluation, and complained of pain in his neck, low back, mid back, left shoulder, right hand and left knee, and was assessed with cervical sprain versus cervical disc herniation, thoracic somatic

dysfunction, and internal derangement of the left shoulder and right knee.  Though Claimant had not yet undergone any physical therapy, he was ordered to continue with his physical therapy.

771.    On September 24, 2023, Claimant I was seen by a physical therapist at All Boro for an initial examination. At this visit, Claimant I did not complain of right hand or pinky pain, and, thereafter, underwent approximately 34 physical therapy sessions (15 for the left shoulder and 19 for the left knee) through June 6, 2024.  With the exception of the body part and three visits where therapeutic massage was provided rather than manual therapy, the treatment provided at these visits was identical.

772.    On September 22, 2023, Claimant I underwent an MRI of the left knee at Kolb Radiology, which was interpreted by Kolb as showing a high-grade tear of the root attachment the anterior horn of the lateral meniscus with soft tissue edema, a cyst; a long tear of the posterior horn and body of the medial meniscus; a high-grade partial tear of the anterior cruciate ligament; a low-grade partial tear of the femoral origin of the posterior cruciate ligament; and a chondral defect at the anterior aspect of lateral femoral condyle and joint effusion.

773.    On September 24, 2023, Claimant I underwent an MRI of the left shoulder at Kolb Radiology, which was interpreted by Kolb as showing a tear of the anterior labrum with avulsion and thickening of the anterior glenoid periosteum, extending into the inferior labrum, and a low-grade partial rotator cuff tear at the anterior distal insertion of the supraspinatus tendon.

774.    On October 13, 2023, Claimant I was seen by Karafin for a follow-up visit at All Boro.  Karafin referred Claimant I to an orthopedic surgeon for his left knee and left shoulder and also ordered an MRI of his cervical and lumbar spine.  In his report, Karafin claimed that he was referring Claimant I to an orthopedic surgeon "[d]ue to him not responding to conservative treatment and his MRI findings," despite that, as of the date of this visit, Claimant I had only

undergone three physical therapy sessions for his left shoulder and two physical therapy sessions for his left knee.

775.    On October 16, 2023, Claimant I was seen by Wert for an initial orthopedic evaluation. Despite other medical records indicating no prior injuries, Wert's treatment visit notes indicated that Claimant I was involved in an MVA over thirty years ago. Though this was his first visit with an orthopedist, Wert nevertheless recommended that Claimant I undergo left shoulder surgery and left knee ACL allograft and falsely claimed that Claimant I had "failed conservative management including ongoing physical therapy…" despite that Claimant I had only undergone three physical therapy sessions for his left shoulder and two physical therapy sessions for his left knee.   In his report, Wert also remarkably claimed that Claimant I did "not need medical clearance."

776.    On November 1, 2023, Claimant I underwent MRIs of his cervical and lumbar spine at Kolb Radiology, which were interpreted by Kolb as showing disc herniations at C3-C4, C4-C5, and C5-C6 with central and foraminal narrowing, and the C3-C4 and C4-C5 herniations abutting the spinal cord, and a shallow posterior disc herniation L5-S1 impinging upon the anterior epidural fat.

777.    On November 17, 2023, after having met with Wert only one time, Claimant I underwent left shoulder surgery (specifically labral repair; a synovectomy complete; an arthroscopic major joint debridement of superior labrum; a partial debridement of the rotator cuff, supraspinatus; lysis and resection of adhesions; and isolated subacromial bursectomy) by Wert at New York Surgery Center Queens, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

778.    On information and belief, at the time of the left shoulder surgery, Wert resided in the State of New Jersey.

779.    In travelling from New Jersey to New York on November 17, 2023, availing himself of New York's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Wert "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 U.S.C. § 1961(1).

780.    On December 7, 2023, Claimant I was seen by Wert for his first postoperative visit and purportedly expressed concerns with his left knee pain worsening. Wert recommended that Claimant I undergo arthroscopy of the left knee and ACL repair, falsely claiming Claimant I "failed conservative management including ongoing physical therapy," despite that Claimant I had only undergone six physical therapy sessions for his left knee.

781.    On December 11, 2023, Claimant I was seen by Karafin at All Boro and was directed to get an EMG of the upper extremities due to the numbness and follow up with a spinal surgeon.

782.    On January 16, 2024, Claimant I was seen by non-party Gbolahan Okubadejo, M.D. ("Okubadejo") at non-party The Institute for Comprehensive Spine Care.  Though this was his first visit with a spine specialist and his strength in his neck muscles and all extremities was assessed to be 5/5 with normal muscle tone, Okubadego nevertheless indicated that Claimant I was a candidate for extensive spine surgery, specifically ACDF at C5-C6.  Though Okubadejo indicated in his report that he discussed with Claimant I that nonoperative treatment "is effective in most

196

cases" and that steroid injections "may be helpful", there is no indication whether Claimant I refused such treatment and, by the time of the next visit regarding his neck (with Karafin at All Boro on April 19, 2024), Karafin indicated that Claimant I was currently pending scheduling for ACDF surgery.

783.    On February 16, 2024, Claimant I underwent left knee surgery (specifically, major synovectomy; anterior cruciate ligament reconstruction; and lysis of adhesions) by Wert at non-party New York Surgery Center Queens, thus availing and exposing the relevant Defendants of New Jersey's laws as set forth in Count IV.

784.    On information and belief, at the time of the left knee surgery, Wert resided in the State of New Jersey.

785.    In travelling from New Jersey to New York on February 16, 2024, availing themselves of New York's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Wert "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" such kickback scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952, a predicate under 18 U.S.C. § 1961(1)..

786.    On July 23, 2024, Claimant I was seen by non-party Dr. Grigoriy Arutyunyan ("Arutyunyan") at non-party Big Apple Spine and Orthopedics LLC for an initial consultation. Though this was his first visit with Arutyunyan, Claimant I was recommended and agreed to undergo ACDF at C5-C6.  Dr. Arutyunyan noted that Claimant I had been "recalcitrant to conservative/nonsurgical treatment" and declined non-operative conservative care, despite that Claimant I had not undergone any injections for his neck.

787.    On September 4, 2024, Claimant I underwent ACDF at C5-C6 at non-party Surgicare of Westside by non-party Arutyunyan.

788.    In connection with the ACDF surgery, Pegasus issued a check on August 22, 2024 (nearly two weeks before the surgery occurred) for $16,000 to Surgicare of Westside.  According to UCC filings, Claimant I entered into a litigation funding loan with Pegasus approximately three weeks prior, on August 9, 2024.

789.    On information and belief, all (or nearly all) of Claimant I's purported treatment and surgeries in connection with his purported trip-and-fall accident rendered after July 25, 2023, were billed and paid for through one or more litigation funding loans with Pegasus, despite that Claimant I had Medicaid during this time.

790.    Daniel J. Feuer, M.D. conducted a neurological IME on or about April 8, 2025 and found that the neurological examination was "within normal limits" and that subjective complaints of tenderness were "not of neurogenic etiology" (i.e., not arising from damage/dysfunction in the nerves). Dr. Feuer further found that the symmetrical C5 sensory loss reported by Okubadejo was not documented by the ER, Wert or Karafin, and that it was "highly unusual for an individual to suffer exact symmetrical sensory loss (C5) secondary to a traumatic event."  Dr. Feuer further determined that there was "no evidence of cervical radiculopathy", "no objective clinical deficits to support a diagnosis of radiculopathy of the cervical spine", and that Claimant I was unfamiliar with a diagnosis of radiculopathy and, thus, that it was unclear how he was able to provide informed consent for the ACDF surgery.

791.    Edward A. Toriello, M.D. conducted an orthopedic IME on or about April 10, 2025 and concluded that Claimant I had a resolved left shoulder contusion, resolved right hand contusion left knee anterior cruciate ligament reconstruction, and concluded that Claimant I did not need any

further orthopedic care.  At both IMEs, Claimant I was accompanied by an agent of Subin Firm and an interpreter.

792.    In creating the multitude of false or misleading reports purporting to support that the left shoulder and left knee surgeries performed on Claimant I, who had no objective signs of acute injury on date of accident, were medically necessary, Wert PC Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§1341 & 1343, predicate acts pursuant to 18 U.S.C. §1961(1).

793.    In creating the multitude of false or misleading reports purporting to support that the three surgeries and other treatment performed on Claimant I, who had no objective signs of acute injury on date of accident, was plausibly justified, All Boro Defendants and Kolb Defendants knew, or should have known, such records to be false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§1341 & 1343, predicate acts pursuant to 18 U.S.C. §1961(1).

794.    On January 5, 2024, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm verified and filed a Verified Complaint on behalf of Claimant I alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant I was "caused to sustain serios, harmful, permanent injuries," as well as "great bodily injuries and

pain, shock, [and] mental anguish]" by the events of July 24, 2023, whereat Claimant I showed no objective sign of any acute injury.

795.    On or about June 3, 2024, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed the Bill of Particulars on behalf of Claimant I alleging that Claimant I suffered injuries, inter alia, to his left shoulder, left knee, and cervical and lumbar spine, and underwent the aforementioned left shoulder surgery on November 17, 2023 and the aforementioned left knee surgery on February 16, 2024), as a result of the events of July 24, 2023, whereafter Claimant I showed no objective sign of any acute injury.

796.    On or about September 12, 2024, at the direction of H. Subin, E. Subin, Eisen, Baum, and/or May, an attorney of Subin Firm mailed and/or emailed a Supplemental Bill of Particulars on behalf of Claimant I alleging that Claimant I underwent the aforementioned ACDF surgery on September 4, 2024 as a result of the events of July 24, 2023, whereafter Claimant I showed no objective sign of any acute injury.

797.    Notably, as with many other Claimants, Claimant I's Bill of Particulars and Supplemental Bill of Particulars served by Subin Firm, were not signed or verified, as required by 22 NYCRR §130-1.1a(b) and the CPLR.

798.    As Subin Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the sworn documents mailed or otherwise transmitted to New York State Courts, Plaintiff, Plaintiff's defense counsel and/or other parties to the underlying lawsuit were knowingly false and mailed in furtherance of and as a necessary step in the Fraud Scheme.

799.    In performing the utterly unjustified and/or unrelated left shoulder and left knee surgeries, Wert PC Defendants, in agreement and with the assistance of Subin Firm, Kolb

Defendants and All Boro Defendants, engaged in force or violence in an attempt to extort money from Plaintiff, through fear of economic loss imposed by and furthered by Subin Firm. These actions amounted to violations of the Hobbs Act, 18 U.S.C. § 1951.

800.    Claimant I's lawsuit remains pending and Plaintiff continues to incur damages.

**D.    PLAINTIFF'S JUSTIFIABLE RELIANCE**

801.    As the predicate acts sounding in mail and wire fraud as set forth against the Count I RICO Defendants herein are alleged to have been foreseeable, in furtherance of, and as a necessary step in the Fraud Scheme.

802.    Similarly, the New Jersey Insurance Fraud Prevention Act ("NJ IFPA"), also alleged herein, imposes no obligation to plead or prove reliance as a separate element.

803.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct.

804.    The mere filing of the subject Complaints in the state Courts mandated an actionable level of reliance – Plaintiff's duty to defend forced it to rely on the misrepresentations of Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments.  Plaintiff would not have taken (or had to take) these actions but for the knowing misrepresentations made by Defendants.

805.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insureds. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses, including legal, administrative and investigative expenses, by Plaintiff in discharging its duty to defend its insured.

806.    Moreover, workers' compensation carriers are under a statutory obligation to promptly and fairly pay or object to workers' compensation claim bills received within 45 days. *See* New York Workers' Compensation § 13-5(1).

807.    The invoices and documentation supporting the Fraud Scheme submitted to Plaintiff, the NY WCB, the New York Unified Court System, and others, contained materially false statements and were designed to mislead and conceal such materially false statements (and/or otherwise containing material omissions) in violation of New York Insurance Law § 403, New York Penal Law § 176.05 and New York Workers' Compensation Law § 114.  Under such laws, Defendants' conduct as demonstrated herein constitutes fraud.

808.    The Fraud Scheme was designed to and did take advantage of this limited timeframe in which to timely pay or object within 45 days and often submitted multiple bills contemporaneously, further constraining the ability of Plaintiff to object or uncover fraudulent billing.

809.    Each of the Complaints, Bills of Particulars, bills, liens, workers' compensation claims and records, and individual medical records created and transmitted by Defendants, when viewed in isolation, do not reveal the fraudulent nature of the underlying claim or the Fraud Scheme. Only when the bills and supporting documentation are viewed together as a whole, in conjunction with their repeated use in numerous cases, do the patterns emerge revealing the fraudulent nature of these submissions.

810.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, required Plaintiff to, at minimum, rely on such submissions in incurring further fees and costs in discharging its legal obligation to provide a

defense to its insured, prolonged litigation, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement.

811.    The numerous subsequent Supplemental Bills of Particulars filed related to fraudulent treatment rendered through the Fraud Scheme were further relied upon, by necessity, in prolonged and unnecessary legal costs, independent medical examinations, experts, investigations, and other expenses.

812.    As to settlements made because of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts.  However, the Fraud Scheme was designed and implemented to circumvent these safeguards.  Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the Fraud Scheme unable to be detected through the use of ordinary due diligence. Any payments made by Plaintiff were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance on the submitted material and proceedings.

813.    As such, Plaintiff justifiably and reasonably relied on submitted legal, medical and other documents as facially valid and was fraudulently induced to direct payment on, at minimum, dozens of claims.

814.    Additionally, regardless of truth, falsity, or any descriptor along that spectrum, documents were sent *via* mail as well as various transmissions sent over the wires which were performed as necessary steps to and in furtherance of the Fraud Scheme, and as components of an overall scheme or artifice to defraud, or to otherwise obtain money under false pretenses.

E.  DAMAGES

815.  Plaintiff is a primary insurance carrier that underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and Legal Service Defendants, with the necessary and substantial assistance of the Medical Defendants, Runner/Support Defendants, and Funding Defendants, as part of the Fraud Scheme.  As a result, Plaintiff is contractually obligated to defend against the personal injury claims and lawsuits asserted by Claimants and pay the sum of any settlement or judgment by or against its insured resulting from said claims and lawsuits.

816.  As a result of the Fraud Scheme, Plaintiff has therefore incurred substantial damages, including payments made by Plaintiff to Legal Service Defendants in the form of settlements and/or judgments obtained through Defendants' pattern of fraudulent conduct, as well as costs related to processing and investigating the fraudulent claims, retention of attorneys, investigators, and experts to defend the fraudulent claims.

817.  On information and belief, a substantial portion of the payments made by Plaintiff to Legal Service Defendants through settlements and/or judgments were subsequently distributed to: (i) Funding Defendants to purportedly repay the high-interest litigation funding loans issued to Claimants; (ii) Medical Provider Defendants as purported reimbursement for healthcare services that were unnecessary, unwarranted, excessive or never occurred, at rates significantly higher than Medical Provider Defendants would have obtained had they utilized the Claimants' health insurance or Medicaid; (iii) Runner/Support Defendants as purported reimbursement for services that were unnecessary, excessive or never occurred; but which, in many instances, were in fact unlawful kickbacks and/or other financial compensation for Claimant referrals and/or fraudulent,

false and/or misleading statements and testimony in connection with Claimants' personal injury lawsuits.

818.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages.  At a minimum, Plaintiff's settlement and other payments on the underlying claims  would be significantly less because the Claimants' actual injuries, if any, were markedly less severe and the healthcare services needed to treat any such actual injuries, if any, would be substantially less and would not include the expensive, invasive and unnecessary surgeries and other treatments described herein, resulting in lower settlement and/or judgment values for such claims, and consequently, would result in significantly less expenses incurred in defending such claims.

819.    Furthermore, each and every predicate act contributed to the damages incurred, as the Fraud Scheme is designed to reinforce itself, becoming more difficult to discern and more expensive to combat, and, thus, more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire transmissions, and through reinvestment in the Fraud Scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for the Fraud Scheme.

820.    Moreover, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims.  As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

821.    Due to Defendants' perpetration of the Fraud Scheme, Plaintiff has incurred compensatory damages paid to Legal Service Defendants for settlements and/or judgments in personal injury lawsuits.

822.    Defendants' patterns of fraudulent conduct caused injury to Plaintiff in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Plaintiff to calculate damages with specificity at this stage in the litigation (whereas Plaintiff's damages continue to accrue), Plaintiff's injuries include, but are not limited to the following:

     a.    Actual and consequential damages for the payments (from the first dollar paid) made directly to Legal Service Defendants and/or others due to Defendants' pattern of fraudulent conduct in connection with personal injury lawsuits, the exact amount to be determined at trial; and

     b.    Actual and consequential damages for the expenses incurred, the lost profits caused by the administration of these claims and the retention of additional staff (against calculated fixed income not designed to accommodate the dozens of admittedly fraudulent cases arising from Subin Firm alone) to perform investigative and support services for claims wherein Defendants submitted or caused to be submitted claims/demands for monetary payments in connection with personal injury lawsuits, the exact amount to be determined at trial.

## V.    CAUSES OF ACTION

### COUNT I
**RICO Violation (§ 1962[c])**
*Enterprise*

**As Against ("Count I Defendants"):**
**SUBIN ASSOCIATES, LLP**
**KOLB RADIOLOGY P.C.**
**THOMAS M. KOLB, M.D.,**
**METRO POINT MEDICAL P.C.**
**SMB MEDICAL SERVICES, P.C.**
**STEPHANIE BAYNER, M.D.**
**ADVANCED ORTHOPEDICS AND NEUROSURGERY, LLC**
**SCOTT STEVEN KATZMAN, M.D.**
**WEST ORANGE SURGICAL CENTER D/B/A MOUNTAIN SURGERY CENTER**
**ALEXANDRE B. DE MOURA, M.D., P.C. D/B/A NEW YORK SPINE INSTITUTE**
**ANGEL EDUARDO MACAGNO, M.D**
**ALEXANDRE B. DE MOURA, M.D.**
**GERLING INSTITUTE CENTER FOR MUSCULOSKELETAL & NEUROLOGICAL CARE**
**MICHAEL GERLING, M.D.**
**WASHINGTON MEDICAL, P.C.**
**SAWEY HARHASH, M.D.**
**ALL BORO MEDICAL REHABILITATION PLLC**
**FELIX KARAFIN, M.D.**
**KEVIN WEINER, M.D.**
**SANFORD R. WERT, M.D., PC**
**SANFORD R. WERT. M.D.**
**NY&NJ ORTHO SPINE, LLC**
**ROSS SHERBAN, M.D.**
**ARON ROVNER, M.D.**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS**
**KENNETH MCCULLOCH, M.D.**
**HASANUZZAMAN MEDICAL CARE P.C., and**
**MOHAMMAD HASANUZZAMAN, M.D.**

823.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

824.    Each of Subin Firm, Kolb Radiology, Metro Point, SMB Medical, Bayner, Advanced Ortho, Katzman, NYSI, Macagno, De Moura, Gerling Institute, Gerling, Washington

207

Medical, Harhash, All Boro, Karafin, Weiner, Wert, PC, Wert, NY&NJ Ortho, Sherban, Rovner, McCulloch Ortho, McCulloch, Hasanuzzaman PC, and Hasanuzzaman, is a "person" as that term is defined by statute under 18 U.S.C. § 1961, et. seq.

825.    Count I Defendants constituted an association-in-fact Enterprise as that term is defined by statute under 18 U.S.C. § 1961, *et. seq*.

826.    The Count I Defendants maintained a common purpose: to generate and monetize personal-injury and Workers' Comp claims through falsified testimony, medical necessity, and unnecessary surgeries. The relationships among Count I Defendants and others enabled the Enterprise's functions (referrals, imaging, surgeries, liens, funding, and litigation coordination); and, the Enterprise has maintained sufficient longevity to pursue its purpose, as well as continues through the present.

827.    From at least 2022 through the present, each Count I Defendant conducted and/or participated in the conduct of the affairs of the Fraud Enterprise, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

828.    This conduct included predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, Travel Act violations under 18 U.S.C. § 1952, and Hobbs Act violations under 18 U.S.C. § 1951, directly and proximately causing Plaintiff's compensable damages, as well as numerous other 18 U.S.C. §§ 1341 and 1343, and Travel Act violations under 18 U.S.C. § 1952, as set forth regarding substantially similar related predicate acts extending from at least 2022 through to the present, and likely to continue into the future. These acts included, but are not limited to, the following:

**SUBIN ASSOCIATES, LLP**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Subin Firm to N.Y. Supreme Court | February 15, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/Email 18 U.S.C. § 1343 |
| A | Subin Firm to Plaintiff's Defense Counsel | September 7, 2023 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| A | Subin Firm | February 15, 2022 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |
| F | Subin Firm to N.Y. Supreme Court (May) | December 21, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. § 1343 |
| F | Subin Firm to Plaintiff's Defense Counsel (May) | February 28, 2023 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| F | Subin Firm | December 21, 2022 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |
| E | Subin Firm to N.Y. Supreme Court | February 1, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| E | Subin Firm to Plaintiff's Defense Counsel | March 13, 2023 | Served Verified Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| E | Subin Firm | February 1, 2022 to June 28, 2024 | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham medical treatment/litigation 18 U.S.C. § 1951 |

| C | Subin Firm to N.Y. Supreme Court | March 16, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| C | Subin Firm to Plaintiff's Defense Counsel | June 28, 2022 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| C | Subin Firm to Plaintiff's Defense Counsel | January 10, 2024 | Served Supplemental Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| C | Subin Firm | March 16, 2022 to March 10, 2025 | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |
| B | Subin Firm to N.Y. Supreme Court | March 16, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| B | Subin Firm to Plaintiff's Defense Counsel | June 21, 2022 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| B | Subin Firm to Plaintiff's Defense Counsel | September 6, 2022 | Served Supplemental Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| B | Subin Firm | March 16, 2022 to March 20, 2024 | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries /litigation 18 U.S.C. § 1951 |
| D | Subin Firm to N.Y. Supreme Court | May 16, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| D | Subin Firm to Plaintiff's Defense Counsel | February 27, 2023 | Served Verified Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |

| D | Subin Firm to Plaintiff's Defense Counsel | October 24, 2023 | Served Supplemental Verified Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
|---|---|---|---|---|
| D | Subin Firm | May 16, 2022 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |
| H | Subin Firm to N.Y. Supreme Court | October 28, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| H | Subin Firm to Plaintiff's Defense Counsel | March 22, 2023 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| H | Subin Firm to Plaintiff's Defense Counsel | February 21, 2024 | Served Supplemental Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| H | Subin Firm | October 28, 2022 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |
| G | Subin Firm to N.Y. Supreme Court | July 28, 2022 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| G | Subin Firm to Plaintiff's Defense Counsel | October 26, 2022 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| G | Subin Firm to Plaintiff's Defense Counsel | May 10, 2023 | Served Supplemental Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| G | Subin Firm | July 28, 2022 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |

| I | Subin Firm to N.Y. Supreme Court | January 5, 2024 | Filed Verified Complaint in furtherance of Fraud Scheme over the wires via NYSCEF | Upload/email 18 U.S.C. §1343 |
| I | Subin Firm to Plaintiff's Defense Counsel | June 3, 2024 | Served Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| I | Subin Firm to Plaintiff's Defense Counsel | September 12, 2024 | Served Supplemental Bill of Particulars with false contents and omissions in furtherance of the Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| I | Subin Firm | January 5, 2024 to present | Attempted Extortion Conspiracy to Commit Extortion | Fear of economic loss *via* sham surgeries/litigation 18 U.S.C. § 1951 |

**KOLB RADIOLOGY P.C.**

| Claimant | Who | When | What | How |
|----------|-----|------|------|-----|
| B | Kolb Radiology (Kolb) to Katzman | June 29, 2022 | Knowingly and foreseeably caused emailing of false medical records (cervical spine MRI) to Katzman in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Kolb Radiology | June 29, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

212

| F | Kolb Radiology (Kolb) to Plaintiff's Defense Counsel and/or GNY (via MCS) | May 19, 2023 | Emailed false medical records (left shoulder MRI) to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
|---|---|---|---|---|
| F | Kolb Radiology | July 2, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | Kolb Radiology (Kolb) to Plaintiff's Defense Counsel and/or GNY (via MCS) | April 11, 2023 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Kolb Radiology | October 10, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| I | Kolb Radiology (Kolb) to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 25, 2024 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| I | Kolb Radiology | September 22, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|

**THOMAS M. KOLB, M.D.,**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| B | Kolb to Katzman | June 29, 2022 | Knowingly and foreseeably caused emailing of false medical records (cervical spine MRI) to Katzman in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Kolb | June 29, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| F | Kolb to Plaintiff's Defense Counsel and/or GNY (via MCS) | May 19, 2023 | Knowingly and foreseeably caused emailing of false medical records (left shoulder MRI) to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | Kolb | July 2, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

214

| | | | | |
|---|---|---|---|---|
| H | Kolb to Plaintiff's Defense Counsel and/or GNY (via MCS) | April 11, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Kolb | October 10, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| I | Kolb to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 25, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| I | Kolb | September 22, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**METRO POINT MEDICAL P.C.**

| Claimant | Who | When | What | How |
|----------|-----|------|------|-----|
| A | Metro Point (Bayner) to Subin Firm | January 11, 2022 | Faxed false medical records (right shoulder MRI) to Subin Firm in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to Subin Firm | January 11, 2022 | Faxed false medical records (left knee MRI) to Subin Firm in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | February 18, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | February 25, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 2, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 4, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 11, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| A | Metro Point (Bayner) to NY WCB | March 18, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
|---|---|---|---|---|
| A | Metro Point (Bayner) to NY WCB | March 30, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | April 29, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | June 10, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 2, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 22, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | December 14, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| A | Metro Point (Bayner) to NY WCB | June 16, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | June 23, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | July 14, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 6, 2023 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point | November 30, 2021 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| C | Metro Point (Bayner) to Plaintiff's Defense Counsel and/or GNY (via MCS) | July 28, 2022 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme. | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| C | Metro Point | November 12, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Metro Point (Bayner) to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 7, 2024 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme. | Upload/Email 18 U.S.C. §1343 |
| G | Metro Point | November 12, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**SMB MEDICAL SERVICES, P.C.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | SMB (Bayner) to Subin Firm | January 11, 2022 | Faxed false medical records (right shoulder MRI) to Subin Firm in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |
| A | SMB (Bayner) to Subin Firm | January 11, 2022 | Faxed false medical records (left knee MRI) to Subin Firm in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |
| A | SMB Medical (Bayner) to NY WCB | August 11, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

219

| A | SMB Medical | August 4, 2023 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|
| E | SMB Medical (Bayner) to NY WCB | On or about May 12, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | SMB Medical (Bayner) to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 23, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme. | Upload/Email 18 U.S.C. §1343 |
| E | SMB Medical | February 18, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted medical treatment in furtherance of economic fear of loss 18 U.S.C. §1951 |

**STEPHANIE BAYNER, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Metro Point (Bayner) to Subin Firm | January 11, 2022 | Knowingly and foreseeably caused faxing of false medical records (right shoulder MRI) to Subin Firm in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| A | Metro Point (Bayner) to Subin Firm | January 11, 2022 | Knowingly and foreseeably caused faxing of false medical records (left knee MRI) to Subin Firm in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | February 18, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | February 25, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 2, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 4, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 11, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | March 18, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| A | Metro Point (Bayner) to NY WCB | March 30, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | April 29, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | June 10, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 2, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 22, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | December 14, 2022 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | June 16, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| A | Metro Point (Bayner) to NY WCB | June 23, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
|---|---|---|---|---|
| A | Metro Point (Bayner) to NY WCB | July 14, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Metro Point (Bayner) to NY WCB | September 6, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Bayner | November 30, 2021 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| E | Metro Point (Bayner) to NY WCB | February 17, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Metro Point (Bayner) to NY WCB | April 26, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Metro Point (Bayner) to NY WCB | February 18, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| E | Bayner | November 30, 2021 to September 23, 2024 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted medical treatment in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|
| C | Metro Point (Bayner) to Plaintiffs Defense Counsel and/or GNY (via MCS) | July 28, 2022 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| C | Bayner | November 12, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Metro Point (Bayner) to Plaintiffs Defense Counsel and/or GNY (via MCS) | August 7, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| G | Bayner | November 12, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ADVANCED ORTHOPEDICS AND NEUROSURGERY, LLC**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Advanced Ortho (Katzman) to NY WCB | March 8, 2023 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Advanced Ortho (Katzman) to NYSCEF | April 30, 2025 | Knowingly and foreseeably caused emailing of false medical records to NYSCEF in underlying lawsuit in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| A | Advanced Ortho | December 21, 2022 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| B | Advanced Ortho (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 20, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Advanced Ortho (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 21, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in the underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

225

| | | | | |
|---|---|---|---|---|
| B | Advanced Ortho | January 25, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Advanced Ortho (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 7, 2024 | Emailed false medical records to Defense Counsel and/or GNY in the underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| G | Advanced Ortho | December 21, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**SCOTT STEVEN KATZMAN, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Advanced Ortho (Katzman) to NY WCB | March 8, 2023 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Advanced Ortho (Katzman) to NYSCEF | April 30, 2025 | Knowingly and foreseeably caused emailing of false medical records to NYSCEF in underlying lawsuit in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| A | Katzman | March 26, 2023 | Made use of (and caused Claimant A to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| A | Katzman | December 21, 2022 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| B | Advanced Ortho (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 20, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Advanced Ortho (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 21, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in the underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| B | Katzman to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 21, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in the underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Katzman | August 8, 2022 | Made use of (and caused Claimant B to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| B | Katzman | October 23, 2023 | Made use of (and caused Claimant B to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| B | Katzman | May 20, 2024 | Made use of (and caused Claimant B to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |

| | | | | |
|---|---|---|---|---|
| B | Katzman | January 25, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Katzman to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 10, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in the underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |
| G | Katzman | March 29, 2023 | Made use of (and caused Claimant G to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| G | Katzman | December 21, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**WEST ORANGE SURGICAL CENTER D/B/A MOUNTAIN SURGERY CENTER**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Mountain Surgery to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 26, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit in furtherance of Fraud Scheme | Email 18 U.S.C. §1343 |
| A | Mountain Surgery (Katzman) to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 2, 2025 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit in furtherance of Fraud Scheme | Email 18 U.S.C. §1343 |
| A | Mountain Surgery | March 29, 2023 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| B | Mountain Surgery to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 8, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Mountain Surgery to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 20, 2024 | Uploaded false medical records to defense counsel and/or GNY in underlying lawsuit in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | Who | When | What | How |
|---|---|---|---|---|
| B | Mountain Surgery | August 8, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Mountain Surgery to Defense Counsel and/or GNY (via MCS) | June 27, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| G | Mountain Surgery | March 29, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ALEXANDRE B. DE MOURA, M.D., P.C. D/B/A NEW YORK SPINE INSTITUTE**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | NYSI (Defendant Macagno) to NY WCB | October 25, 2022 | Emailed false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | NYSI | October 10, 2022 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| | | | | |
|---|---|---|---|---|
| D | NYSI (Macagno) to workers' compensation carrier ("NYSIF") | March 10, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Reconsideration) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| D | NYSI (Macagno) to NYSIF | October 19, 2022 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| D | Macagno (NYSI) to Plaintiff's Defense Counsel and/or GNY (via MCS) | February 5, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Mail 18 U.S.C. §1343 |
| D | NYSI | June 16, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| F | NYSI (Macagno) to Plaintiff's Defense Counsel (via MCS) | October 20, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |

| | | | | |
|---|---|---|---|---|
| F | NYSI | May 3, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ANGEL EDUARDO MACAGNO, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Macagno to NY WCB | October 25, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | Macagno | October 10, 2022 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| D | Macagno to Plaintiff's Defense Counsel and/or GNY (via MCS) | February 5, 2024 | Mailed false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Mail 18 U.S.C. §1341 |
| D | NYSI (Macagno) to NYSIF | March 10, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Reconsideration) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| D | Macagno to NYSIF | October 19, 2022 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
|---|---|---|---|---|
| D | Macagno | June 16, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| D | Macagno | February 2, 2023 | Made use of interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| F | Macagno to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 20, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Macagno | May 3, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

ALEXANDRE B. DE MOURA, M.D.

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | NYSI (De Moura) to NY WCB | October 25, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| A | De Moura | October 10, 2022 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| D | NYSI (De Moura) to NYSIF | October 19, 2022 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| D | De Moura (Macagno) to Plaintiff's Defense Counsel and/or GNY (via MCS) | February 5, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Mail 18 U.S.C. §1343 |
| D | NYSI (De Moura) to NYSIF | March 19, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| D | De Moura | June 16, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| F | NYSI (De Moura) to Plaintiff's Defense Counsel (via MCS) | October 20, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | De Moura | May 3, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**GERLING INSTITUTE**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | Gerling Institute (Gerling) to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 30, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |

| | | | | |
|---|---|---|---|---|
| F | Gerling Institute (Gerling) to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 15, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Gerling Institute (Gerling) to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 21, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Gerling Institute (Gerling) | April 20, 2023 | Made use of (and caused Claimant F to make use of) interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| F | Gerling Institute | October 14, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

237

MICHAEL GERLING, M.D.

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | Gerling to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 30, 2023 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Gerling to Plaintiff's Defense Counsel and/or GNY (via MCS) | August 15, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Gerling to Plaintiff's Defense Counsel and/or GNY (via MCS) | October 21, 2024 | Knowingly and foreseeably caused emailing of false medical records to defense counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1344 |
| F | Gerling | April 20, 2023 | Made use of (and caused Claimant F to make use of) interstate facilities in travelling to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |

| F | Gerling | October 14, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|

**WASHINGTON MEDICAL, P.C.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| E | Harhash to NYSIF | March 10, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Washington Medical (Harhash) to NYSIF | November 8, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Washington Medical (Harhash) to NYSIF | April 22, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Washington Medical (Harhash) to NYSIF | June 17, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| E | Washington Medical (Harhash) to NYSIF | July 13, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Washington Medical | February 9, 2022 to September 23, 2024 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted medical treatment in furtherance of economic fear of loss 18 U.S.C. §1951 |

**SAWEY HARHASH, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| E | Harhash to NYSIF | March 10, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Harhash to NYSIF | November 8, 2022 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Harhash to NYSIF | January 13, 2023 | Knowingly and foreseeably caused emailing of false medical records to NY WCB in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| E | Harhash to NYSIF | April 22, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Harhash to NYSIF | June 17, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Harhash to NYSIF | July 13, 2023 | Knowingly and foreseeably caused emailing of false medical records to NYSIF (via Health Insurance Claim Form) in furtherance of Fraud Scheme | WCB File Transfer 18 U.S.C. §1343 |
| E | Harhash | February 9, 2022 to September 23, 2024 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted medical treatment in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ALL BORO MEDICAL REHABILITATION PLLC**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | All Boro (Karafin) to Plaintiff's Defense Counsel and/or GNY via MCS | March 5, 2024 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| F | All Boro (Karafin) to Plaintiff's Defense Counsel and/or GNY via MCS | March 20, 2025 | Emailed/Uploaded of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | All Boro | June 18, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | All Boro to Plaintiff's Defense Counsel and/or GNY via MCS | September 5, 2023 | Emailed false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | All Boro | August 17, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| | | | | |
|---|---|---|---|---|
| I | All Boro to Plaintiff's Defense Counsel and/or GNY (via MCS) | July 8, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| I | All Boro | August 24, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**FELIX KARAFIN, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | Karafin to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 5, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | Defendant to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 20, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| F | Karafin | June 18, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | Karafin to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 5, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Karafin | November 22, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| I | Karafin to Plaintiff's Defense Counsel and/or GNY (via MCS) | July 8, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| I | Karafin | September 18, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**KEVIN WEINER, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | Weiner to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 5, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | Weiner to Plaintiff's Defense Counsel and/or GNY via MCS | March 20, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | Weiner | November 19, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

245

| H | Weiner to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 5, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Weiner | September 19, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

### SANFORD R. WERT M.D., PC

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| D | Wert PC (Wert) to Plaintiff's Defense Counsel and/or GNY (via MCS) | February 1, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| D | Wert PC | October 10, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| | | | | |
|---|---|---|---|---|
| H | Wert PC (Wert) to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 14, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Wert PC (Wert) to Plaintiff's Defense Counsel via MCS | April 21, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Wert PC | January 26, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Wert PC (Wert) to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 4, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| G | Wert PC | July 11, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| G | Wert PC (Wert) | July 29, 2022 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
|---|---|---|---|---|
| I | Wert PC (Wert) | November 17, 2023 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| I | Wert PC (Wert) | February 16, 2024 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |

**SANFORD R. WERT M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| D | Wert to Plaintiff's Defense Counsel and/or GNY (via MCS) | February 1, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| D | Wert | October 10, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|
| H | Wert to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 14, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Wert PC (Wert) to Plaintiff's Defense Counsel and/or GNY (via MCS) | April 21, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Wert | January 26, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| | | | | |
|---|---|---|---|---|
| G | Wert to Plaintiff's Defense Counsel and/or GNY (via MCS) | September 4, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| G | Wert | July 11, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| G | Wert | July 29, 2022 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| I | Wert to Plaintiff's Defense Counsel and/or GNY (via MCS) | July 3, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| I | Wert | October 16, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| I | Wert | November 17, 2023 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| I | Wert | February 16, 2024 | Made use of interstate facilities in travelling from New Jersey to New York intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |

**NY&NJ ORTHO SPINE, LLC**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| H | NYNJ Ortho (Sherban) to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 25, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| H | NYNJ | November 7, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| C | NYNJ Ortho (Sherban) to Plaintiff's Defense Counsel | January 10, 2024 | Knowingly and foreseeably caused mailing of false medical records to Defense Counsel in underlying lawsuit through Defense Counsels Supplemental Bill of Particulars in furtherance of Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| C | NYNJ Ortho | December 9, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ROSS SHERBAN, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| H | Sherban to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 25, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via | Fax 18 U.S.C. §1343 |

| | | | MCS) in furtherance of Fraud Scheme | |
|---|---|---|---|---|
| H | Sherban | November 7, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| C | Sherban to Plaintiff's Defense Counsel | January 10, 2024 | Knowingly and foreseeably caused mailing of false medical records to Defense Counsel in underlying lawsuit through Defense Counsels Supplemental Bill of Particulars in furtherance of Fraud Scheme | Mail 18 U.S.C. §1341 *and/or* Email 18 U.S.C. § 1343 |
| C | Sherban | December 9, 2023 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**ARON ROVNER, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| A | Rovner to NY WCB | October 30, 2023 | Knowingly and foreseeably caused faxing of false medical records to NY WCB in furtherance of Fraud Scheme | Fax 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| A | Rovner | October 9, 2023 | Made use of interstate facilities in travelling from New York to New Jersey intending to perform (and performing) a knowingly unnecessary surgery in furtherance of the Fraud Scheme | Travel Act 18 U.S.C. §1952 |
| A | Rovner | September 13, 2023 to June 23, 2025 | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | Rovner to Plaintiff's Defense Counsel via MCS | December 19, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Rovner | January 10, 2024 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**McCulloch Orthopaedic Surgical Services, P.L.L.C. d/b/a New York Spine and Joints Orthopaedic Specialists**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | McCulloch Ortho to Plaintiff's Defense Counsel and/or GNY (via MCS) | June 28, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | McCulloch Ortho | December 28, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | McCulloch Ortho to Plaintiff's Defense Counsel and/or GNY via MCS | June 1, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | McCulloch Ortho to Plaintiff's Defense Counsel and/or GNY (via MCS) | April 21, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

255

| | McCulloch Ortho | November 22, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
|---|---|---|---|---|
| H | | | | |

**KENNETH MCCULLOCH, M.D.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| F | McCulloch to Plaintiff's Defense Counsel via MCS | June 28, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| F | McCulloch | December 28, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | McCulloch to Plaintiff's Defense Counsel via MCS | June 1, 2023 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| H | McCulloch Ortho to Plaintiff's Defense Counsel and/or GNY via MCS | April 21, 2025 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY in underlying lawsuit (via MCS) in furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | McCulloch | November 22, 2022 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

**HASANUZZAMAN MEDICAL CARE P.C.**

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| B | Hasanuzzaman Medical Care P.C. to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 29, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Hasanuzzaman P.C. | December 8, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

| | | | | |
|---|---|---|---|---|
| H | Hasanuzzaman P.C. to Plaintiff's Defense Counsel and/or GNY (via MCS) | Aril 21, 2025 | Emailed false medical records (left shoulder MRI) to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| H | Hasanuzzaman P.C. | October 21, 2024 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

## MOHAMMAD HASANUZZAMAN, M.D.

| Claimant | Who | When | What | How |
|---|---|---|---|---|
| B | Hasanuzzaman to Plaintiff's Defense Counsel and/or GNY (via MCS) | March 29, 2024 | Knowingly and foreseeably caused emailing of false medical records to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |
| B | Hasanuzzaman | December 8, 2021 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |
| H | Hasanuzzaman to Plaintiff's Defense Counsel and/or GNY (via MCS) | Aril 21, 2025 | Emailed false medical records (left shoulder MRI) to Defense Counsel and/or GNY via MCS in underlying lawsuit furtherance of Fraud Scheme | Upload/Email 18 U.S.C. §1343 |

| | | | | |
|---|---|---|---|---|
| H | Hasanuzzaman | October 21, 2024 to present | Conspiracy to commit extortion | Agreed to and did provide substantial assistance in falsely justifying unwarranted surgery in furtherance of economic fear of loss 18 U.S.C. §1951 |

829.    On information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiff cannot readily ascertain without discovery.

830.    The predicate acts of mail fraud and wire fraud have proximately and directly caused Plaintiff's damages and have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent or were otherwise in furtherance of the Fraud Scheme. In addition, because mail fraud and wire fraud were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that Count I Defendants knew, intended, and/or could reasonably foresee the use of such mails and wires were a necessary step in furtherance of the larger scheme or artifice to defraud.

831.    The Travel Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to use of the interstate facilities, intent to facilitate, carry on, and/or promote specified unlawful conduct, that same was in fact carried out, and the underlying unlawful conduct as alleged plausibly permits inference of unlawful bribery *via* kickback scheme and Hobbs Act violations/extortion.

832.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's

consent, as induced by wrongful use of actual force and violence (upon Claimants) and/or fear of economic harm (upon Plaintiff).

833.    The knowingly unjustified surgeries performed by the Total Ortho Defendants, and Advanced Defendants (actual force and violence), substantially assisted by way of false facial justification knowingly prepared by Advanced Ortho Defendants, NYSI Defendants, and Gerling Defendants were weaponized by Subin Firm in causing or attempting to cause such fear of economic harm so as to induce Plaintiff to having its property wrongfully obtained by consent.

834.    The knowingly unjustified surgeries, performed at the ultimate request and direction of Subin Firm, further constituted acts of actual force or violence in attempting to induce Plaintiff's consent.  The Advanced Ortho Defendants, NYSI Defendants, Gerling Defendants, and Subin Firm agreed to, and in fact engaged, in such conduct as alleged.

835.    The transmissions pled were made to support monetary demands backed by such wrongful use of actual violence or force, and fear of economic harm, were made by wire and mail, involves several instances of violence and force in other states, and thus constituted acts of extortion or attempted extortion affecting interstate commerce.

836.    Each surgery identified in the predicate table constituted an act of actual force or violence, used to bolster the extortionate demands for payment from Plaintiff and other insurers, and to induce consent to part with money under fear of economic harm.

837.    Subin Firm's lawsuits, proxy WC Firms' filings, pre-suit demands, and lien/assignment claims (collectively, the "Sham Claims") were/are fraudulent and/or objectively baseless. Across even, and at least, the 9 exemplars herein, Subin Firm:

- knowingly pursued injury claims contradicted by contemporaneous medical records, IME findings, and their own diagnostic reviews;

- knowingly relied on templates that were cut-and-paste across patients with identical "findings" and billing codes;

- knowingly relied on inflated or fabricated treatment records; and

- utilized escalating and unjustified medical treatments and surgeries on non-English speaking, often undocumented, immigrants with limited education and understanding, not to obtain legitimate redress on any merits, but to impose escalating litigation and discovery costs and exposure risk so as to coerce payments unrelated to claim validity - *i.e.*, to use the legal and NY workers' compensation claim processes, as opposed to the valid outcome of that processes, as a weapon.

838.    As evidenced herein and elsewhere, Subin Firm wages a repeated and identifiable campaign in Courts and WC proceedings to block, burden, and penalize Plaintiff's right and ability to contest claims, flooding calendars with copy-paste actions and repeated allegation supplements so as to prevent any sustained scrutiny on any individual treatment, surgery, or provider, to multiply the expense of defense, and to continuously raise exposure risk so as to impose the false construct of settling at or near policy or risk bad faith exposure for failing to so *via* potential bad faith claims.

839.    Subin Defendants abused process through knowing and material falsehoods to Courts and administrative bodies, as well as Plaintiff and similarly situated ultimate payors *via* fabricated medical findings, false statements of treatment rendered, and intentionally utilizing a network of concealed kickbacks and self-referral arrangements. The lawsuits and claims were (a) objectively baseless and (b) subjectively intended to burden and coerce rather than to win on legitimate merits.

840.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants not yet so identified as part of the Fraud Scheme.

841.    As a result of the pattern of racketeering activity, Plaintiff has suffered damages to their business and property.

842.    As the ultimate goal of the Enterprise was to extort and/or defraud Plaintiff out of its money (e.g., payments for settlements, judgments, and costs and fees in connection with defending the claims and lawsuits), Plaintiff is a direct victim of the Fraud Scheme and the pattern of racketeering activity. Put simply, should the Fraud Scheme succeed, the success is marked by Defendants being paid by Plaintiff for the fraud they committed. Plaintiff's account would be, or has been, drawn upon for purposes of those payments, and in the interim, Plaintiff pays investigative fees, expert fees, legal fees, and litigation costs as required under its duty to defend. There is a direct relationship between Defendants' conduct and Plaintiff's damages.

**WHEREFORE**, Plaintiff demands judgment against the Count I Defendants, and each of them, jointly and severally, for

a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c)    Injunctive relief enjoining Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d)    Such other relief as the Court deems just and proper.

## COUNT II
### RICO Conspiracy (§ 1962[d])

**As Against:**
**ALL DEFENDANTS**

843.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

844.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

845.    The pattern of racketeering activity in which Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Travel Act violations (18 U.S.C. § 1952), and Hobbs Act violations (18 U.S.C. § 1951) – all of which are "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

846.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations involved the transmission and use of false and misleading documentation in furtherance of Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

847.    These predicate acts were necessary steps in and in furtherance of the Fraud Scheme. Each Defendant agreed to Fraud Scheme's objective to defraud Plaintiff and others, illegally profit from it, and use a pattern of racketeering as described above to achieve the Fraud Scheme's objective. The means by which the Fraud Scheme achieved its objective includes:

- Recruiting Claimants and staging accidents;

- Securing retainer of the attorneys who participated in the Enterprise, including Subin Firm;

- Managing Claimants through pre-determined protocol treatment *via, inter alia,* Medical Provider Defendants;

- Performing pre-determined and unnecessary surgeries by, *inter alia,* Medical Provider Defendants;

- Filing and prosecuting fraudulent lawsuits and related workers' compensation claims;

- Laundering and concealing the nature of the Fraud Scheme proceeds; and

- Concealing the nature of the Fraud Scheme to perpetuate it.

848.    Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of the Enterprise.

849.    Subin Defendants agreed to, and did, provide substantial assistance through the management of the Enterprise, supervision and management of the litigation proceedings, managing Claimants and Medical Provider Defendants, and managing Subin Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, B, C, D, E, F, G, H, and I, as well as in fact personally verifying false information.

850.    Villamar Defendants agreed to, and did, provide substantial assistance through the management of the related WC firms, supervision and management of the WC proceedings, managing Claimants and Medical Provider Defendants, and managing Villamar Firm attorneys and employees in furtherance of the scheme, including the matters of Claimants A, D, and E, as well as in fact preparing and submitting knowingly false WC submissions.

851.    Kolb Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants B and F.

852.    Rand Defendants agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants A and C.

853.    Metro Point Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimants A, C, E, and G.

854.    Advanced Ortho Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimants A, B, and G.

855.    NYSI Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical

records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimants A, C, D, and F.

856.    Gerling Institute Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant F.

857.    Washington Medical Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant E.

858.    Contemporary Diagnostic Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant D and E.

859.    Mountain Surgery agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant A, B, and G.

860.    All Boro Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant F, H, and I.

861.    Wert PC Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant D, G, H, and I.

862.    NYNJ Ortho Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant C, and H.

863.    Rovner PLLC Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant A, and H.

864.    McCulloch Ortho Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical

267

records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant F, and H.

865.    Hasanuzzaman PC Defendants agreed to, and did, provide substantial assistance both individually and through supervision and management of respective and joint employees, in performing and providing falsified records of unnecessary and unjustified surgeries and medical records intended to falsely justify such surgeries, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, including the matter of Claimant B, and H.

866.    At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I.

867.    Each Defendant had knowledge of the general contours of the Fraud Scheme and its objective – defrauding Plaintiff and those similarly situated. Each Defendant voluntarily agreed to participate in the Fraud Scheme.

868.    As a direct and proximate result of the § 1962(c) violations that Count II Defendants conspired to commit and the § 1962(d) conspiracy, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert fees, and litigation costs.

869.    Plaintiffs' injuries were the direct consequence of the conspiracy. Absent Count II Defendants' knowledge of and agreement to participate in the Fraud Scheme and the predicate acts committed in furtherance thereof, Plaintiff would not have suffered the damages described herein.

870.    As a result of the Fraud Scheme and the conspiracy to commit same, Plaintiff has suffered damage to its business and property.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

a.  An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.  Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.  Injunctive relief enjoining Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.  Such other relief as the Court deems just and proper.

**COUNT III**
**RICO Violation (§ 1962[c])**
***Subin Firm Enterprise***

**As Against:**
**HERBERT SUBIN**
**ERIC SUBIN**
**ROBERT EISEN**
**ARNOLD BAUM**
**PETER MAY**

871.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

872.    Each of H. Subin, E. Subin, Eisen, Baum, and May is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et. Seq.*  The Subin Firm is an expressly defined "enterprise" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

873.    From at least 2018 through the present, H. Subin, E. Subin, Eisen, Baum, and May have conducted and/or participated in the conduct of the affairs of Subin Firm, and continue to so conduct and participate, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The transactions and predicate acts

269

occurred over a substantial period of time through to the present and present a credible risk of continuing into the future.

874.    This conduct included predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, and Hobbs Act violations under 18 U.S.C. § 1951 that directly and proximately caused Plaintiff's damages, as well as numerous other 18 U.S.C. §§ 1341 and 1343, and Hobbs Act violations under 18 U.S.C. § 1951, as set forth regarding substantially similar related predicate acts and are likely to continue into the future. These acts included but are not limited to the acts as set forth at length in Count I.

875.    On information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of H. Subin, E. Subin, Eisen, Baum, and May that Plaintiff cannot readily ascertain without discovery.

876.    The predicate acts of mail fraud and wire fraud which have proximately and directly caused Plaintiff's damages and have been pled with particularity, detailing who sent the mail and wires, how, when, and to whom, and in what manner they were fraudulent. In addition, as such mailings were in furtherance of a larger scheme or artifice to defraud, it has been plausibly pled that H. Subin, E. Subin, Eisen, Baum, and May each knew, intended, and/or could reasonably foresee the use of such mails and wires, the same being a necessary step in furtherance of the larger scheme or artifice to defraud.

877.    The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (upon Plaintiff), as set forth at length in Count I. H.

270

Subin, E. Subin, Eisen, Baum, and May agreed, conspired to, and in fact did, attempt to impose such fear of economic harm upon Plaintiff so as to induce consent for Plaintiff's property to be obtained.

878.    These acts occurred as part of a pattern extending from at least 2018 through to the present, with a real threat of continued racketeering activity. Additional predicate acts exist and will be identified in discovery, including transmissions and filings for the numerous Claimants yet to be identified who have been drawn into the Fraud Scheme.

879.    As a result of the pattern of racketeering activity, Plaintiff has directly and proximately suffered damages to their business and property.

880.    As the ultimate goal of the Fraud Scheme is to defraud Plaintiff and others, Plaintiff is a direct victim of the Subin Firm Enterprise and its related pattern of racketeering activity.

**WHEREFORE**, Plaintiff demands judgment against H. Subin, E. Subin, Eisen, Baum, and May for:

   a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

   b)    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

   c)    Injunctive relief enjoining Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

   **d)**    Such other relief as the Court deems just and proper.

## COUNT IV
### New Jersey Insurance Fraud Prevention Act (N.J.S.A. § 17:33A-1, *et seq.*)

**As Against ("Count IV Defendants"):**
**SUBIN ASSOCIATES, LLP**
**VILLAMAR & MEWAFY, PLLC**
**KOLB RADIOLOGY P.C.**
**METRO POINT MEDICAL P.C.**
**SMB MEDICAL SERVICES, P.C.**
**STEPHANIE BAYNER, M.D.**
**METROPOLITAN MEDICAL AND SURGICAL PC**
**MARK GLADSTEIN, M.D.**
**ADVANCED ORTHOPEDICS AND NEUROSURGERY, LLC**
**SCOTT STEVEN KATZMAN, M.D.**
**ALEXANDRE B. DE MOURA, M.D., P.C. D/B/A NEW YORK SPINE INSTITUTE**
**ANGEL EDUARDO MACAGNO, M.D**
**ALEXANDRE B. DE MOURA, M.D.**
**RAND MEDICAL P.C. D/B/A RAND DIAGNOSTIC IMAGING**
**MADHU BOPPANA, M.D.**
**MICHAEL GERLING, M.D.**
**WASHINGTON MEDICAL, P.C.**
**SAWEY HARHASH, M.D.**

881.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

882.    The New Jersey Insurance Fraud Prevention Act ("NJ IFPA") allows insurance companies to bring an action relating to fraudulent claims in any court of competent jurisdiction pursuant to § 17:33A-7(a).

883.    Plaintiff is an insurance carrier authorized to business in the State of New Jersey and is an "insurance company" pursuant to § 17:33A-1.

884.    Plaintiff has mailed a copy of this Complaint to the New Jersey Commissioner of Banking and Insurance contemporaneous with the filing of this Complaint, and shall report to the commissioner, on a form prescribed by the commissioner, the amount ultimately recovered and such other information as is required by the commissioner.

a. **Claimant A**

885.    In travelling (and causing Claimant A to travel) to New Jersey on October 9, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Defendant Rovner violated the NJ IFPA, § 17:33A-4(a)(2).

886.    In creating additional facility records dated October 30, 2023 related to the above surgery, which Defendant Rovner knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Defendant Rovner committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

887.    In travelling (and causing Claimant A to travel) from New York to New Jersey on March 26, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman violated the NJ IFPA, § 17:33A-4(a)(2).

888.    In creating facility records dated March 6, 2023 requesting approval for the above-referenced surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information and which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2), through the submission of such documents to the NY WCB.

889.    In creating additional facility records dates April 4, 2023 related to the above surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

890.    In creating additional facility records dated May 31, 2023 related to the above surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

891.    In presenting or causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on or about June 2, 2025, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through submission of such documents to Plaintiff's defense counsel in the underlying lawsuit via its medical records agent, MCS.

892.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Advanced Ortho Defendants' violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

893.    As the conduct described above constituted a "pattern" as defined in § 17:33A-3, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

894.    It is further alleged that each of Subin Firm, Villamar Firm, Metro Point Defendants, Rand Defendants, and NYSI Defendants further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

895.    It is further alleged that each of Subin Firm, Villamar Firm, Metro Point Defendants, Rand Defendants, and NYSI Defendants further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

896.    As a result, Count IV Defendants are jointly and severally liable to Plaintiff for their damages herein.

**b.  Claimant B**

897.    In travelling (and causing Claimant B to travel) from New York to New Jersey on August 8, 2022, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman violated the NJ IFPA, § 17:33A-4(a)(2).

898.    In creating additional facility records dated August 30, 2022 related to the above surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

899.    In creating additional facility records dated September 13, 2022 related to the above surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

900.    In presenting (Advanced Ortho) and causing to be presented (Katzman) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on October 17, 2024, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the emailing of such records from Advanced Ortho Defendants to Plaintiff's medical records agent in the underlying lawsuit, MCS, in support of the underlying claim for payment.

901.    In travelling (and causing Claimant B to travel) from New York to New Jersey on October 23, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman violated the NJ IFPA, § 17:33A-4(a)(2).

902.    In creating additional facility records dated November 11, 2023 related to the above surgery, which Advanced Ortho Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, Advanced Ortho Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

903.    In presenting (Advanced Ortho) and causing to be presented (Katzman) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on October 17, 2024, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the emailing of such records from Advanced Ortho Defendants to Plaintiff's medical records agent in the underlying lawsuit, MCS, in support of the underlying claim for payment.

904.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Advanced Ortho Defendants' violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

905.    In travelling (and causing Claimant B to travel) from New York to New Jersey on May 20, 2024, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman violated the NJ IFPA, § 17:33A-4(a)(2).

906.    In presenting (Advanced Ortho) and causing to be presented (Katzman) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on October 17, 2024, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the emailing of such records from Advanced Ortho Defendants to Plaintiff's medical records agent in the underlying lawsuit, MCS, in support of the underlying claim for payment.

907.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Advanced Ortho Defendants' violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

908.    As the conduct described above constituted a "pattern" as defined in § 17:33A-3, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

909.    It is further alleged that each of Subin Firm, Villamar Firm, and Kolb Defendants further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

910.    It is further alleged that each of Subin Firm, Villamar Firm, and Kolb Defendants further violated the NJ IFPA in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

911.    As a result, Count IV Defendants are jointly and severally liable to Plaintiff for their damages herein.

c.    **Claimant D**

912.    In travelling (and causing Claimant D to travel) from New York to New Jersey on February 2, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance

278

company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Macagno violated the NJ IFPA, § 17:33A-4(a)(2).

913.    In creating additional facility records dated February 2, 2023 related to the above surgery, which NYSI Defendants knew to contain materially false and/or misleading information which were intended to be presented to an insurance company in connection with, or in support of a claim for payment or other benefit pursuant to an insurance policy, NYSI Defendants committed a separate and distinct violation of the NJ IFPA. § 17:33A-4(a)(2).

914.    In presenting (NYSI) and causing to be presented (Macagno) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on July 13, 2023, NYSI Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the submission of such records from NYSI to NYSIF in support of the underlying claim for payment.

915.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for NYSI Defendants' violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

916.    As the conduct described above constituted a "pattern" as defined in § 17:33A-3, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

917.    It is further alleged that each of Subin Firm violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral

agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

918.    As a result, Count IV Defendants are jointly and severally liable to Plaintiff for their damages herein.

### d.    Claimant F

919.    In travelling (and causing Claimant F to travel) to New Jersey on April 20, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Gerling violated the NJ IFPA, § 17:33A-4(a)(2).

920.    In presenting (Gerling Institute) and causing to be presented (Gerling) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on August 15, 2024, Gerling Institute Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the emailing of such records from Advanced Ortho Defendants to Plaintiff's medical records agent in the underlying lawsuit, MCS, in support of the underlying claim for payment.

921.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Gerling Institute Defendants' violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

922.    As the conduct described above constituted a "pattern" as defined in § 17:33A-3, Plaintiff is entitled to statutory trebling of damages pursuant to § 17:33A-7(b).

923.    It is further alleged that each of Subin Firm, Kolb Defendants, and NYSI Defendants further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

924.    It is further alleged that each of Subin Firm, Kolb Defendants, and NYSI Defendants further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

925.    As a result, Count IV Defendants are jointly and severally liable to Plaintiff for their damages herein.

### e.  Claimant G

926.    In travelling (and causing Claimant G to travel) from New York to New Jersey on March 29, 2023, availing themselves of New Jersey's laws, performing surgery, and creating records known to be false, which were knowingly intended to be presented to an insurance company in connection with, or in support of, a claim for payment or other benefit pursuant to an insurance policy, Katzman violated the NJ IFPA, § 17:33A-4(a)(2).

927.    In presenting (Advanced Ortho) and causing to be presented (Katzman) such records described above, knowing that the records contained materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on September 19, 2024, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the emailing of such

records from Advanced Ortho Defendants to Plaintiff's medical records agent in the underlying lawsuit, MCS, in support of the underlying claim for payment.

928.    In causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on June 27, 2024, Defendants Mountain Surgery and Katzman further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such records from Advanced Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

929.    In causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on August 7, 2024, Advanced Ortho Defendants further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such records from Advanced Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

930.    In causing to be presented such records described above, knowing that the records contains materially false and/or misleading information, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, on August 21, 2024, Defendants Advanced Ortho and Katzman further committed a separate and distinct violation of the NJ IFPA § 17:33A-4(a)(1), through the mailing of such records from Advanced Ortho to Plaintiff's medical records agent in support of the underlying claim for payment.

931.    As a result of the above violations described in, Plaintiff, an insurance company, has been damaged, including but not limited to incurring reasonable investigation expenses, costs of suit and attorneys' fees which Plaintiff would not have incurred but for Advanced Ortho

Defendants and Mountain Surgery's violations, and Plaintiff may recover such damages pursuant to § 17:33A-7(a).

932.    It is further alleged that each of Subin Firm, Advanced Ortho Defendants, and Mountain Surgery further violated the NJ IFPA by knowingly assisting in, and conspiring to, commit the violations described in this Count through express agreement, logistical assistance as to the surgery itself including transportation, mutual referral agreements, and providing the false facial justification for such surgery, and in pursuit of the underlying claim falsely supported by the subject surgery, all in violation of § 17:33A-4(b).

933.    It is further alleged that each of Subin Firm, Advanced Ortho Defendants, and Mountain Surgery further violated the NJ IFPA, in knowingly benefitting, directly or indirectly from the proceeds derived from the above violations, due to such assistance and conspiracy, all in violation of § 17:33A-4(c).

934.    As a result, Count IV Defendants are jointly and severally liable to Plaintiff for their damages herein.

**WHEREFORE**, Plaintiff demands judgment against the Count IV Defendants and each of them, jointly and severally, for:

a)    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to §§ 17:33A-7(a) and (b), as against Advanced Ortho Defendants, Subin Firm, Villamar Firm, Metro Point Defendants, Rand Defendants, and NYSI Defendants for the acts and violations set forth involving the matter of Claimant A;

b)    An award of Plaintiff's actual and consequential damages to be established at trial pursuant to § 17:33A-7(a) as against Advanced Ortho Defendants,

283

Subin Firm, and Kolb Defendants for the acts and violations set forth involving the matter of Claimant B;

c)  An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to §§ 17:33A-7(a) and (b), as against Macagno, NYSI, and Subin Firm for the acts and violations set forth involving the matter of Claimant D;

d)  An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to §§ 17:33A-7(a) and (b), as against Gerling Institute Defendants, Subin Firm, Kolb Defendants, and NYSI Defendants for the acts and violations set forth involving the matter of Claimant F;

c)  An award of Plaintiff's actual and consequential damages to be established at trial pursuant to § 17:33A-7(a) as against Advanced Ortho Defendants, and Subin Firm, for the acts and violations set forth involving the matter of Claimant G;

e)  Plaintiff's reasonable attorneys' fees, investigative fees, expenses, costs, and interest; and,

f)  Such other relief as the Court deems just and proper.

## COUNT V
### General Business Law § 349

### As Against ("Count V Defendants"):
### LEGAL SERVICE DEFENDANTS
### MEDICAL PROVIDER DEFENDANTS

935.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

284

936.    New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

937.    It is well-established that virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349. It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

938.    As set throughout this Complaint, *supra*, each of the Count V Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

939.    GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, and the Court may award reasonable attorney's fees to a prevailing plaintiff.

940.    The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused by the instant deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

941.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards - and

nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (i.e., everyone).

942.    This phenomenon and its effects have recently begun to attract media attention. Legal Newsline, September 10, 2025: ‘Pincushion’: When immigrants sliced, U.S. lawyers and doctors cash in (specifically discussing the Puac matter referenced *supra*, at ¶ 255, involving amongst others, Defendants Subin Firm and Kolb); ABC News, October 4, 2024: 7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings (“We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board,” Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. “We need to find a way to get it to stop.”); ABC News, March 17, 2024: Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims ("’These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,’ said Assemblyman David Weprin.”).

943.    The deceptive trade practices of the Count V Defendants – the Fraud Scheme – occurred and is continuing to occur in the State of New York, Count V Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

944.    Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count V Defendants are liable to Plaintiff for compensatory damages and the attorneys’ fees incurred in bringing and prosecuting this Action.

**WHEREFORE**, Plaintiff demands judgment against Count V Defendants for:

a.    An award of Plaintiff’s actual damages to be established at trial;

      b.     Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

      c.     Such other relief as the Court deems just and proper.

## COUNT VI
### Judiciary Law § 487

**As Against ("Count VI Defendants"):**
**SUBIN DEFENDANTS**

945.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

946.    New York State Judiciary Law § 487 provides that: "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or, 2. Willfully delays his client's suit with a view to his own gain … and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

947.    H. Subin is a licensed attorney, and thereby an officer of the Court.

948.    E. Subin is a licensed attorney, and thereby an officer of the Court.

949.    Eisen is a licensed attorney, and thereby an officer of the Court.

950.    Baum is a licensed attorney, and thereby an officer of the Court.

951.    May is a licensed attorney, and thereby an officer of the Court.

952.    New York Courts expressly recognizes vicarious liability on § 487 claims, rendering Subin Associates, LLP liable for acts committed by its employees and agents in the course of its employment.

953.    Recovery under Jud. Law § 487 is not contingent upon the attempted deceit being successful.

954.   Litigation costs, including attorney's fees, and disbursements, incurred as a result of such conduct are recoverable under Jud. Law § 487 and subject to trebling.

955.   When a party commences or continues an action grounded in a material misrepresentation of fact, the opposing party is obligated to defend or default and necessarily incurs legal expenses. Because the lawsuit could not have gone forward in the absence of the material misrepresentations, that party's legal expenses in defending the lawsuit may be treated as the proximate result of the misrepresentation.

956.   Subin Defendants' alleged misrepresentations, as set forth herein and summarized under Counts I and III, were made in the course of litigation in Courts within the State of New York Unified Court System.

957.   While the underlying matters discussed herein were pending before the Courts, Subin Defendants engaged in pervasive deceit and colluded with Runner/Support Defendants, other Legal Service Defendants, Medical Provider Defendants, and others, with the intent to deceive the Courts, the named adversarial parties, and Plaintiff.

958.   This is not merely business as usual. Subin Defendants, as officers of the Court, in knowingly and intentionally attempting to deceive the Courts and Plaintiff, premised the damages in the underlying matters discussed herein on knowingly false testimony, and have argued directly to the Courts that they should rely on such evidence, and, continued the underlying matters, despite actual knowledge of those falsities, to Plaintiff 's detriment.

959.   Subin Defendants further willfully delayed these lawsuits for their own gain by intentionally prolonging litigation to, among other things, render unwarranted medical services, accrue interest on litigation loans provided to Claimants by Funding Defendants, and buttress Funding Defendants' inventory-based credit lines.

960.    Plaintiff was harmed directly as a result of the precise conduct held actionable by the New York Court of Appeals, and suffered damages in the precise manner deemed compensable by the New York Court of Appeals and is the party injured and, thus, is entitled to recover treble damages thereby.

**WHEREFORE**, Plaintiff demands judgment against Subin Defendants for:

    a.  An award of damages, including reasonable attorneys' fees, costs, and disbursements and all other losses incurred, as actual damages to be established at trial;

    b.  An award of treble damages as to Plaintiff's actual damages to be established at trial; and,

    c.  Such other relief as the Court deems just and proper.

<u>**COUNT VII**</u>
**Common Law Fraud**

**As Against ("Count VII Defendants"):**
**LEGAL SERVICE DEFENDANTS**
**MEDICAL PROVIDER DEFENDANTS**

961.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

962.    As set forth in Count I, which are incorporated by reference as if fully set forth herein, the Count VII Defendants made misrepresentations of facts, and deliberately concealed and omitted materials facts that they had a duty to disclose, in connection with their lawsuits and/or claims for payment under New York law.

963.    These misrepresentations of fact by the Count VII Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents,

the existence of injuries, and the necessity of treatment. A list of such misrepresentations, who they were made by, and when, are detailed in the tables under Count I.

964.    The Count VII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. Count VII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. The falsity of each such representation is set forth under Count I and the corresponding Claimant sections of this Complaint, *supra*.

965.    The Count VII Defendants made these misrepresentations with the intent they reach Plaintiff and be relied upon thereto, and in furtherance of the Fraud Scheme to defraud Plaintiff by submitting claims for payment of Workers' Comp and general liability insurance proceeds, knowingly falsified treatment records, inflated liens, and other submissions presented to Plaintiff through the course of the Fraud Scheme.  Subin Defendants presented such misrepresentations directly to Plaintiff and/or its attorneys. Medical Provider Defendants presented such misrepresentations in some instances directly to Plaintiff or *via* conduits (e.g., New York State Courts, NY WCB, Legal Service Defendants, Plaintiff's defense counsel and other parties to the underlying lawsuits and workers' compensation claims) with Plaintiff as the intended recipient.

966.    The Count VII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

967.    Plaintiff reasonably and justifiably relied, to its detriment, on the Count VII Defendants' representations concerning their eligibility to receive payments of Workers' Comp and general liability insurance proceeds, the validity of such claims and treatment, and without

knowledge of the Count VII Defendants' scheme and artifice to defraud them; and, even in the absence of such belief, Plaintiff's hands were tied under New York law and the duty to defend to provide a defense to its insured. Count VII Defendants' conduct thus induced action by Plaintiff as required by law, regardless of belief or knowledge of veracity.

968.    The Count VII Defendants knew, or should have known, that Plaintiff would rely on such representations, and planned to exploit such reliance.

969.    But for the Count VII Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have incurred damages.

970.    As a matter of New York law, which requires Plaintiff to fulfill its duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected fraud, such reliance was thrust upon Plaintiff. Plaintiff was forced to take action and incur expenses it otherwise would not have taken or incurred, so influenced as a direct result of the false representations.

971.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, forced reliance upon Plaintiff to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

972.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the

scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

973.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count VII Defendants were engaged in misrepresentations, omissions, and rampant fraudulent conduct; this is particularly true where Count VI Defendants are considered officers of the Court and the Medical Provider Defendants have taken oaths to do no harm.

974.    As a direct and proximate cause of the Count VII Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count VII Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff to the Count VII Defendants or caused by the Count VI Defendants.

975.    Because the Count VII Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Count VII Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial;

b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Count VII Defendants' illegal conduct;

c.    Punitive damages to be established at trial; and,

d.    Such other relief as the Court deems just and proper.

## COUNT VIII
### Aiding and Abetting Fraud

### As Against:
### ALL DEFENDANTS

976.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

977.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count VIII.

978.    As set forth in detail, *supra*, and in the charts set forth under Counts I, each Defendant engaged in overt acts in furtherance of the fraud, or otherwise provided substantial assistance to advance such fraud's commission.

979.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

980.    As a direct and proximate cause of Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

981.    Because Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial;

b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

c.    Punitive damages to be established at trial; and,

d.    Such other relief as the Court deems just and proper.

<u>COUNT IX</u>
**Fraudulent Transfer (New York Debtor and Creditor Law § 273)**

**As Against ("Count IX Defendants"):**
**SUBIN ASSOCIATES, LLP**
**SUBIN & ASSOCIATES LLC**
**SUBIN, LLP**
**ERIC SUBIN, PLLC**
**CERCHIONE HUROWITZ LAW GROUP LLP**
**HERBERT S. SUBIN**
**ERIC D. SUBIN**
**ROBERT EISEN**
**ARNOLD BAUM**
**PETER MAY**

982.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

983.    Under New York law, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving equivalent value in exchange for the transfer or obligation…." New York Debtor and Creditor Law ("DCL") § 273.

984.    At all relevant times, Plaintiff was a future creditor of Subin Defendants.

985.    The transfers at issue include: (i) the formation of Subin, LLP and Eric Subin, PLLC on July 10, 2024; (ii) the formation of Cerchione LLP on May 28, 2025; (iii) the transfer of certain Claimants' personal injury lawsuits to Subin, LLP in or around February 2025; (iv) the transfer of certain Claimants' personal injury lawsuits to Cerchione LLP in or around January 2026; (v) the financing agreement entered into by and between debtors Subin, LLP and Eric Subin, PLLC and creditor Esquire Bank, N.A. ("Esquire Bank"), whereby Subin, LLP and Eric Subin, PLLC transferred all of their present and future assets, as evidenced by a New York UCC financing

statement, filed December 2, 2024; and (vi) the financing agreement entered into by and between debtor Cerchione LLP and creditor Esquire Bank, whereby Cerchione LLP transferred all of its present and future assets, as evidenced by a New York UCC financing statement, filed December 26, 2025 (hereinafter, the "Subject Transfers").

986.    Prior to, at the time of, and following the Subject Transfers, Plaintiff was a future creditor of Subin Firm by virtue of the instance claims, set forth herein.

987.    The Subject Transfers were made with actual intent to hinder, delay or defraud Subin Firm's present and future creditors, including Plaintiff, and/or without receiving a reasonably equivalent value in exchange for the transfer or obligation under DCL § 273, which is evident from the presence of multiple badges of fraud, including:

(i)     There was no business purpose for the Subject Transfers, other than to strip assets of Subin Firm so that Subin Firm could avoid paying any debts that it may owe in connection with the instant lawsuit or any other pending lawsuits and claims against Subin Firm, including pending RICO actions in the U.S. District Court for the Eastern District of New York and counterclaims filed against Subin Firm in Supreme Courts in the State of New York (the "Pending Claims");

(ii)    At the time of the Subject Transfers, Subin Defendants knew of the Pending Claims and, on information and belief, had been threatened with future lawsuits, claims and/or counterclaims; and knew (or reasonably should have known) that Subin Firm would not be able to meet its obligations to pay its obligations as they became due, including any and all judgments rendered against it;

(iii)   The Subject Transfers occurred shortly before and after Subin Firm incurred substantial debts, including but not limited to the Pending Claims;

(iv)    Subin Firm was insolvent and left with unreasonably small capital at the time of Subject Transfers or, as a result thereof, became insolvent shortly thereafter;

(v)    The Subject Transfers transferred substantially all of the assets of Subin Firm, including but not limited to dozens (if not hundreds) of personal injury lawsuits;

(vi)    The Subject Transfers involved transfers to insiders, including E. Subin, as well as several now-former members of Subin Firm, as defined by DCL § 270(h)(2)(iii) and relevant case law;

(vii)    Subin Defendants retained possession and control of the assets transferred after the Subject Transfers, including the personal injury lawsuits;

(viii)    Subin Defendants had clear motives to transfer assets from Subin Firm to other entities to the benefit of themselves and the detriment of present and future creditors, including Plaintiff; and

(ix)    Any consideration that Subin, LLP, Eric Subin, PLLC and Cerchione LLP received for the Subject Transfers was not reasonably equivalent to the value of the assets transferred.

988.    By virtue of the foregoing, the Subject Transfers were in violation of and voidable fraudulent transfers under the New York Uniform Voidable Transactions Act (DCL §§ 270-281 (the "NYUVTA")), and in particular, DCL § 273.

**WHEREFORE**, Plaintiff demands judgment against Count IX, for:

a.    The avoidance and recovery of all transfers (and all proceeds and products thereof), as fraudulent transfers under DCL § 273, and to the extent necessary to satisfy the Plaintiff's claims and for other relief permitted under the NYUVTA; and

b.    Such other relief as the Court deems just and proper.

## VI. JURY TRIAL DEMAND

989. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims.

Dated: January 27, 2026

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**
By: _/s/_ Kristy R. Eagan
KRISTY R. EAGAN
WILLIAM J. CLAY
MICHAEL A. GRAVES
DANIEL A. JOHNSTON
1985 Forest Lane
Garland, Texas 75042
Telephone: 214-736-9433
Facsimile: 214-736-9994
Service Email: service@thewillislawgroup.com

***ATTORNEYS FOR PLAINTIFF GREATER NEW YORK MUTUAL INSURANCE COMPANY***